# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| FULTON COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil No. 08-cv-00458-LA |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF LAW IN OPPOSITION** |
| vs. | ) | **TO MOTIONS OF MGIC INVESTMENT** |
| | ) | **CORPORATION, CURT S. CULVER,** |
| MGIC INVESTMENT | ) | **LARRY PIERZCHALSKI, J. MICHAEL** |
| CORPORATION, CURT S. CULVER, | ) | **LAUER, BRUCE WILLIAMS AND JOHN** |
| LARRY PIERZCHALSKI, J. | ) | **DRAGHI TO DISMISS CONSOLIDATED** |
| MICHAEL LAUER, BRUCE | ) | **CLASS ACTION COMPLAINT** |
| WILLIAMS AND JOHN DRAGHI, | ) | |
| | ) | |
| Defendants. | ) | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................. 6

    A.    MGIC and the Individual Defendants.................................................... 6

        1.    MGIC and the Private Mortgage Insurance Business................................. 6

        2.    The Individual Defendants........................................................ 8

        3.    C-BASS................................................................................ 8

    B.    MGIC Secretly Jettisons Its Underwriting Standards
        to Insure High Risk Mortgage Loans ................................................... 9

        1.    An Era of Loose Money Incentivized Risk................................ 9

        2.    MGIC Succumbed to Pressure from Mortgage Lenders............. 10

    C.    MGIC Defendants Realized that Deteriorating Underwriting
        Subjected MGIC to Higher Future Insured Loan Losses,
        but Chose to Mislead the Market in the Hopes of Outrunning
        Their Problems.................................................................... 13

        1.    The Red Flags of Growing Loan Losses................................. 13

        2.    MGIC Defendants Actively Misled Analysts and the Market
            About the Company's Flawed Underwriting Practices and Increasing
            Insured Loan Losses .................................................... 15

    D.    MGIC Raced to Merge with Radian ................................................ 17

    E.    Contrary to Defendants' False Assurances, C-BASS Shared
        the Same Problems and Fate as Others in the Subprime Business ..................... 17

    F.    A Wave of Margin Calls Threatened C-BASS's Viability................... 19

    G.    During the Second Quarter 2007 Earnings Call, Defendants
        Actively Mislead Analysts About C-BASS....................................... 20

    H.    The Truth Emerges ....................................................................... 21

ARGUMENT................................................................................................... 22

A.      Standards on a Motion to Dismiss a 10(b) Claim ................................. 22

B.      Defendants' Misrepresentations and Omissions Are Actionable
Under Section 10(b) of the Exchange Act and Rule 10b-5 ................................. 23

         1.      The CCAC Adequately Pleads Falsity ....................................... 23

                 a.      Defendants Made False Representations that
MGIC's Purportedly Superior Underwriting Quality
Had Insulated the Company from the Subprime
Mortgage Crisis ............................................................. 24

                 b.      Defendants Mislead the Market About the Rate of
Defaults and Impending Losses on Recent Vintage
Year Business ................................................................. 26

                 c.      Defendants Falsely Reassured the Market About
C-BASS and Hid Its Crippling Margin Calls ............... 29

         2.      Federal Courts Have Repeatedly Found that Statements
Regarding Underwriting Quality Are Actionable Under
Federal Securities Law ............................................................. 31

         3.      Defendants' Arguments Are Easily Dismissed ........................ 32

                 a.      None of Defendants' Purported "Disclosures" Render
Their Statements Non-Misleading ................................ 32

                 b.      The Defendants Had a Duty to Disclose ...................... 34

                 c.      The MGIC Defendants Endorsed Analyst Statements .................. 35

                 d.      The MGIC Defendants Are Liable for the Statements
of Williams and Draghi at MGIC Earnings Calls ......... 36

                 e.      Cautionary Language Does Not Render the Alleged
Misrepresentations and Omissions Immaterial or Protect
Defendants from Liability ............................................. 38

                 f.      Defendants' Statements Are Not "Corporate Puffery" ................. 40

                 g.      Defendants' False Statements and Omissions Are Material ......... 41

C.      The CCAC Adequately Pleads Scienter ............................................. 42

1.    Defendants Culver, Lauer and Pierzchalski Either
Knew or Were Reckless in Not Knowing that Their
Statements About MGIC's Underwriting Practices and
Delinquencies Were False........................................................................ 43

    a.    The Confidential Witnesses ........................................... 44

    b.    Defendants' Own Statements........................................ 47

    c.    Defendants Had Access to Contrary Information....................... 48

    d.    The Severity of Problems............................................. 50

    e.    Defendants' Misrepresentations Went to MGIC's
Core Operations ............................................................ 50

2.    C-BASS Defendants and the MGIC Defendants Knew or
Were Reckless in Not Knowing that Their Statements
About C-BASS Were Misleading ............................................................ 51

    a.    The C-BASS Defendants .............................................. 52

    b.    The MGIC Defendants ................................................. 53

3.    Defendants' Alleged Motives Further Support a Strong
Inference of Scienter as to Both Sets of Misstatements........................... 55

4.    There Is No Merit to Defendants' Standing Argument ............................ 57

# TABLE OF AUTHORITIES

Page(s)

CASES

*Ackerman v. Schwartz,*
947 F.2d 841 (7th Cir. 1991) ........................................................... 34

*Asher v. Baxter Int'l Inc.,*
377 F.3d 727 (7th Cir. 2004) ........................................................... 33

*Atlas v. Accredited Home Lenders Holding Co.,*
556 F. Supp. 2d 1142 (S.D. Cal. 2008) ............................................ 31

*Barrie v. Intervoice-Brite, Inc.,*
409 F.3d 653 (5th Cir. 2005) ....................................................... 37, 54

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ......................................................................... 41

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ......................................................................... 23

*Blatt v. Corn Products Int'l, Inc.,*
No. 05-3033, 2006 WL 1697013 (N.D. Ill. June 14, 2006) ............... 38

*Brody v. Transitional Hospitals Corp.,*
280 F.3d 997 (9th Cir. 2002) ..................................................... 31, 33

*Danis v. USN Communs., Inc.,*
73 F. Supp. 2d 923 (N.D. Ill. 1999) ................................................. 51

*Doherty v. City of Chicago,*
75 F.3d 318 (7th Cir. 1996) ............................................................. 23

*Elkind v. Liggett & Myers, Inc.,*
635 F.2d 156 (2d Cir. 1980) ............................................................ 36

*Ganino v. Citizens Utilities Co.,*
228 F.3d 154 (2d Cir. 2000) ............................................................ 34

*Greebel v. FTP Software, Inc.,*
194 F.3d 185 (1st Cir. 1999) ....................................................... 52, 54

*Helwig v. Vencor, Inc.,*
251 F.3d 540 (6th Cir. 2001) .............................................. 48, 49, 52, 54

*In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004)....................................................................45

*In re Cirrus Logic Sec. Litig.*,
   946 F. Supp. 1446 (N.D. Cal. 1996) ...............................................................36

*In re Countrywide Fin. Corp Deriv. Litig.*,
   542 F. Supp. 2d 1160 (C.D. Cal.) ...................................................................31

*In re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*,
   7 F.3d 357 (3d Cir. 1993) ...............................................................................40

*In re Downey Sec. Litig.*,
   No. 08-3261, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009)..........................46

*In re MobileMedia Sec. Litig.*,
   28 F. Supp. 2d. 901 (D.N.J. 1998) ..................................................................40

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ....................................................31, 47

*In re Next Level Systems, Inc.*,
   No. 97-7362, 1999 WL 387446 (N.D. Ill. Mar. 31, 1999) ............................41

*In re Northpoint Communications Group, Inc., Sec. Litig.*,
   184 F. Supp. 2d 991 (N.D. Cal. 2001) ............................................................45

*In re PMI Group, Inc. Sec. Litig.*,
   No. 08-1405, 2009 WL 1916934 (N.D. Cal. July 1, 2009) ......................32, 33

*In re Radian Sec. Litig.*,
   612 F. Supp. 2d 594 (E.D. Pa. 2009) ..............................................................56

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)..........................................................................24, 28

*In re Sears, Roebuck & Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003) ..............................................................51

*In re Shopko Sec. Litig.*,
   No. 01-1034, 2002 WL 32003318 (E.D Wis. Nov. 5, 2002)................... *passim*

*In re Silicon Graphics, Inc. Sec. Litig.*,
   970 F. Supp. 746 (N.D. Cal. 1997) ............................................................38, 54

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
   124 F. Supp. 2d 527 (S.D. Ohio 2000) .......................................................37, 54

v

*In re Telxon Corp. Sec. Litig.*,
    133 F. Supp. 2d 1010 (N.D. Ohio 2000)...................................................48

*In re Vicuron Pharm., Inc. Sec. Litig.*,
    No. 04-2627, 2005 WL 2989674 (E.D. Penn. July 1, 2005) ...................................48

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
    No. 02-5893, 2006 WL 3332917 (N.D. Ill. Nov. 13, 2006) ...................................34

*Lewis v. Straka*,
    535 F. Supp. 2d 926 (E.D. Wis. 2008) (Adelman, J.)................................... *passim*

*Lindelow v. Hill*,
    No. 00-3727, 2001 WL 830956 (N.D. Ill. July 20, 2001) .........................33, 40, 41

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ("*Tellabs I*") ................................................... *passim*

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*")................................................... *passim*

*Marks v. CDW Computer Centers, Inc.*,
    122 F.3d 363 (7th Cir. 1997) ............................................................................41

*Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*,
    388 F. Supp. 2d 871 (N.D. Ill. 2004) ............................................................31, 32

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ............................................................................37

*Rehm v. Eagle Finance Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) ...................................................................50

*Selbst v. McDonald's Corp.*,
    No. 04-3635, 2005 WL 2319936 (N.D. Ill. Sept. 21, 2005).................................51

*Sequel Capital, LLC v. Rothman*,
    No. 03 C 0678, 2003 WL 22757758 (N.D. Ill. Nov. 20, 2003).........................32, 33

*Southland Sec. Corp. v. INspire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) .......................................................................35, 36, 55

*Stavros v. Exelon Corp.*,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ...............................................................45

*Stransky v. Cummins Engine Co., Inc.*,
    51 F.3d 1329 (7th Cir. 1995) ............................................................................23

*Sundstrand Corp. v. Sun Chem. Corp.*,
    553 F.2d 1033 (7th Cir. 1977) ...................................................................42

*Takara Trust v. Molex Inc.*,
    429 F. Supp. 2d 960 (N.D. Ill. 2006) .................................................39, 40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................... *passim*

*Triad Assocs., Inc. v. Chicago Housing Auth.*,
    892 F.2d 583 (7th Cir. 1989) ...................................................................23

*Tricontinental Indus., Ltd. v. Anixter*,
    184 F. Supp. 2d 786 (N.D. Ill. 2002) .........................................................34

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976).................................................................................41

*U.S. v. Morris*,
    80 F.3d 1151 (7th Cir. 1996) .............................................................38, 40

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)........................................................................33, 40

*W. Pennsylvania Elec. Employees Pension Trust v. Plexus Corp.*,
    No. 07-582, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009) ...........................34

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .............................................................36, 37

*White v. Heartland High-Yield Mun. Bond Fund*,
    237 F. Supp. 2d 982 (E.D. Wis. 2002).......................................................40

*Wielgos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) ...................................................................34

*Zurich Capital Markets Inc. v. Coglianese*,
    No. 03-7960, 2005 WL 1950653 (N.D. Ill. Aug. 12, 2005) .......................34

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78u-4(b).................................................................................................37

Federal Rules of Civil Procedure
    Rule 9(b) .................................................................................................23
    Rule 10b-5.........................................................................................22, 23
    Rule 12(b)(6)...........................................................................................23

Case 2:08-cv-00458-LA   Filed 10/06/09   Page 8 of 68   Document 65

17 Code of Federal Regulations
  §240.10b-5(b)..................................................................................................22

**OTHER AUTHORITIES**

W. Page Keaton et al., *Prosser and Keaton on the Law of Torts* ..................................................48

Lead Plaintiff Fulton County Employees' Retirement System ("Plaintiff") respectfully submits this Memorandum of Law in opposition to the motion filed by MGIC Investment Corporation ("MGIC" or the "Company"), Curt S. Culver, Larry Pierzchalski and J. Michael Lauer (the "MGIC Defendants") ("MGIC Mtd. Brief") to dismiss the Consolidated Class Action Complaint dated June 22, 2009 (the "CCAC"). By this Memorandum of Law, Plaintiff also opposes the motion filed by Bruce Williams and John Draghi (the "C-BASS Defendants") to dismiss the CCAC ("C-BASS Mtd. Brief").

## INTRODUCTION

This action arises out of two interrelated sets of false and misleading statements. The first set of false and misleading statements and omissions concerns the deterioration of MGIC's underwriting standards and practices in 2005 and 2006 and the increased loan delinquencies and losses resulting from this deterioration. The second set of false and misleading statements concerns a series of margin calls in July 2007 that threatened the viability of Credit-Based Asset Servicing and Securitization LLC ("C-BASS"), a company partially owned by MGIC.

Amidst the tumult of the housing boom that gripped the country in the middle part of the decade, MGIC's previously professional insurance underwriting standards were jettisoned in favor of growing its mortgage insurance business, particularly with its favored mortgage lenders, many of whom have since become defunct. Mortgage lenders, chasing after what appeared to be easy profits, while shifting much of the financial risk to others, created ever more exotic types of housing loans. These lenders extended mortgage loans to borrowers who had neither the cash to make meaningful down payments nor the income to satisfy the interest and principal amortization requirements of a traditional fixed mortgage loan's monthly payments. MGIC began insuring mortgage loans that were broadly made on a bet that housing prices would

1

continue to escalate and thereby provide the equity to permit the loans to be refinanced and serviced by the borrowers, or in the event they defaulted, to provide enough collateral to pay off the loan upon foreclosure. Often these loans were made with little or no income documentation – even to wage-earners who could easily produce a W-2 to prove up their income (and thereby obtain a lower interest rate) – a type of loan that many in the industry referred to as "stated income" or "liar's loans." MGIC's CEO, Curt Culver, in a paper he authored in 2004, purported to "sound the alarm" about the risks being taken by MGIC's peers in insuring these obviously fraudulent loans, explaining that, when housing prices reversed, he expected to see "five times loss rates" on this group of loans. Culver also asserted that MGIC was passing up these risky business opportunities through its strengthened underwriting standards – which standards were then promptly and secretly jettisoned.

As part of the mortgage-making process, mortgage lenders needed to work with mortgage insurers such as MGIC so that the mortgage lender could obtain the funding to make new mortgage loans. Once insured, the mortgage lenders could then sell their loans to government purchasers, or "GSEs," such as Fannie Mae or Freddie Mac, returning capital to the mortgage lenders so that the cycle could continue. In order to increase market share, MGIC increasingly acquiesced to the demands from mortgage lenders that it take imprudent risks and publicly masked its escalating loan delinquencies and loss rates by lumping the riskier products together with older loans insured under a more conservative underwriting regime.[1] In so doing, Defendants succeeded – for a time – in convincing analysts and investors that MGIC had

---

[1] For example, under MGIC's earlier underwriting standards, insured "Alt-A" or undocumented loans were limited to non-wage earners who legitimately could not easily document their true periodic income. When, during the class period, MGIC reported its "Alt-A" loan delinquency rates, it aggregated the modest default experience from its loans made using its prior professional standards with those made in recent years, so that the combined loss rates smoothed out the trends and hid the increased risk and resulting losses from the current reckless underwriting practices.

escaped the ravages of the subprime crisis that was leveling so many of its peers and their lenders.

Toward the end of 2006, as housing prices stalled and then reversed in key geographic areas where the most aggressive mortgage loan products had been marketed and insured, MGIC and particularly the Individual Defendants, fully appreciated the consequences of the gamble they had taken. In early 2007, in response to pointed analyst questions at earnings conference calls and at one-on-one meetings with selected analysts, the Individual Defendants aggressively contrasted MGIC's own purportedly modest delinquency and loss experience with that of the market generally. Defendants reassured the analysts that MGIC had compiled and tracked the rates of loan defaults by the underwriting or "vintage" year, type of loan and geographical area, which showed that MGIC's superior underwriting practices had largely insulated it from the subprime crisis that was felling its less-cautious peers.[2] However, several knowledgeable confidential witnesses reported that management had, in fact, repudiated MGIC's earlier underwriting standards and radically changed its practices. Indeed, one witness explained that during 2006, she had personally shared her concerns about the deterioration in the Company's underwriting with Culver and MGIC's President and COO, Pat Sink, and that, in early 2007, when she was demoted for refusing to insure deficient loans, she e-mailed them again protesting MGIC's underwriting practices – and was forced out of the Company as a result. Coincidentally,

_____

[2]    As the CCAC explains, delinquency rates were calculated using notices from mortgage lenders that borrowers were more than 45 days late in their monthly payments, and early payment defaults ("EPD's") were "red flags" that a recently underwritten mortgage loan was infected with fraud. *Id.* at ¶¶34, 72-76. Actual insurance losses and loss rates materialized about a year later, when borrower defaults progressed to loan foreclosures, and the sales proceeds of the foreclosed collateral turned out to be inadequate to cover the unpaid loan balances. Thus, "delinquencies" pre-dated "losses" and provided the information to management, and when reported, to the public, about each underwritten year's (or "vintage" year's) loss prospects for years to come.

3

this incident occurred just as Culver was publicly hawking MGIC's superior underwriting practices.

As the Individual Defendants were meeting and reassuring the Company's analysts about its superior underwriting and lower risk, MGIC raced to complete a merger with its competitor the Radian Group Inc. ("Radian"), which was also the co-owner of C-BASS, a major purchaser and packager of subprime loans. To complete the merger, MGIC had to sell part of its stake in C-BASS so that the post-merger company would own less than 50% of C-BASS. It was untenable for the combined company to be C-BASS's majority shareholder because that would require the Company to carry C-BASS's enormous liabilities on its books, imperiling its credit rating, and in turn, causing the government and other mortgage loan purchasers to reject MGIC as an insurer. The partial sale of C-BASS would also provide MGIC with the capital cushion to consummate a $1.75 billion stock buy-back which, in turn, was expected to boost the Company's stock price. All this, however, required MGIC and C-BASS to preserve the illusion of profitability for a few months until each piece of the deal could be consummated.

MGIC produced C-BASS officers (Williams and Draghi) at MGIC's own earnings conference call for second quarter 2007, conducted on July 19, 2007, to discuss C-BASS's performance and prospects, and each C-BASS officer vigorously downplayed C-BASS's problems, contrasting C-BASS's superior underwriting practices, reported loan valuations and liquidity to those of its decimated peers in the subprime market. Starting on July 1, 2007, however, a cresting wave of margin calls hit C-BASS, triggered by the falling value of the subprime loans that served as collateral for C-BASS's financing from its banks. For the first eighteen days of July 2007, these margin calls totaled $145 million and threatened C-BASS's very existence – as well as MGIC's half a billion dollar investment in C-BASS. Moreover, the

margin calls, once revealed, confirmed the market's worst fears regarding C-BASS – *i.e.*, that, contrary to Defendants' portrayal, C-BASS had not succeeded in "walking through the raindrops" of the swirling subprime storm. The $145 million in margin calls, as well as the additional $140 million in margin calls occurring between July 19th and 26th, and yet another $330 million in margin calls a few days later, also demonstrated that C-BASS's recently reported values of its subprime assets had been grossly overstated, so as to render MGIC's investment in C-BASS practically worthless. On August 1, 2007, MGIC filed a report with the SEC revealing that, on July 26th it had determined that its half a billion dollar investment in C-BASS was "impaired," and a week later MGIC announced that its merger with Radian was likely to be cancelled. The July 19th to early August disclosures about C-BASS caused an enormous increase in the volume of MGIC stock sales and wild swings in its stock price, resulting in investor damages of more than $150 million from this short-term fraud alone.

The C-BASS fraud and its resulting shareholder losses, however, were only the tip of the iceberg. In October 2007, in presenting its third quarter 2007 financial results, MGIC changed the method in which it publicly reported its insured mortgage loan delinquencies, so that the massive defaults in its recently insured books of business, versus earlier insured loan years' experience, began to be revealed to the market – *i.e.*, MGIC began to report its delinquency rates and loan losses by "vintage" year – and the delinquency experience, particularly for the 2005 and 2006 "bulk" business, was starkly different from what Defendants had led the market to believe. Finally, on February 13, 2008, the MGIC Defendants revealed the full devastating consequences of their reckless underwriting; the Company's delinquencies and expected loan losses for 2005 and 2006, particularly for its insured Wall Street securitizations, were so severe that the Company was recording a $1.2 billion "premium deficiency" loss for this business. All told,

Defendants' wrongdoing caused MGIC's stock to rise to a high of $60.05, and then plummet to $12.61 a share when the truth was finally revealed.

For these reasons, Plaintiff has met the pleading requirements under the Federal Rules and the Private Securities Litigation Reform Act ("PSLRA") and the CCAC should be sustained and Defendants' motions to dismiss should be denied.

## STATEMENT OF FACTS

### A.  MGIC and the Individual Defendants

#### 1.  MGIC and the Private Mortgage Insurance Business

MGIC, through its insurance subsidiaries, is the largest provider of private mortgage insurance to the home mortgage lending industry in the United States, holding 25% of the domestic market during the relevant period.  ¶¶2, 29.[3]

Private mortgage insurance ("PMI") insures the owner of a residential first mortgage against default by the mortgage borrower.  ¶29.  MGIC provides insurance for individual mortgage loans, its "flow" business, and for packages of loans, its "bulk" business. ¶31.  During the class period, approximately 75% of MGIC's "bulk" business consisted of credit-enhancing securitizations of home equity loans conducted by Wall Street firms ("Wall St. bulk" insurance). *Id.*  The Individual Defendants represented (falsely) that public filings for the securitizations themselves reporting high loan losses did not reflect MGIC's own insurance losses on these products, because MGIC purportedly limited its risk by applying its underwriting standards to insure only certain of the better mortgage loans comprising the securitization.  *Id.*  In fact, however, a stunning 58% of the 2006 Wall Street-securitized loans wound up in default, and more than 20% of the defaulted securitized loans have been returned as fraudulent.  ¶6.

---

[3]  All ¶ and ¶¶ references are to the Consolidated Class Action Complaint.

One of PMI's major roles is to facilitate the sale of mortgages to entities such as Fannie Mae ("Fannie") and Freddie Mac ("Freddie"). ¶¶26-27. The vast majority of mortgage lenders do not retain the mortgage loans they underwrite. ¶26. Instead, most mortgage lenders will sell the mortgage to a third party and relend the proceeds to a subsequent mortgagor. *Id.* This cycling of the loan proceeds allows the lender to collect fees for each new loan while shifting the credit risk of the issued mortgage to other unrelated parties. *Id.*

The maintenance of this cycle requires a liquid secondary market for the mortgage lender to sell into. *Id.* Historically, Fannie and Freddie have been the dominant and very liquid secondary markets to purchase loans from lenders. ¶27. But to protect the financial solvency of Fannie and Freddie, the federal government limited the amount of risk that Fannie and Freddie can assume on any single loan by requiring that any loan purchased must have no more than an 80% loan to value ("LTV") ratio. ¶28. Accordingly, this constraint on Fannie and Freddie is also a constraint on lenders that underwrite loans with LTV ratios exceeding 80%. *Id.* In the absence of alternatives, these lenders would be forced to hold these higher LTV ratio loans, reducing their ability to make additional loans. *Id.*

PMI is one of the solutions that help lenders circumvent the federal government's limitations on Fannie and Freddie. Through insuring the excess loan value, PMI limits the risk of default on a mortgage loan that is purchased to 80% or less of the loan's value, allowing Fannie and Freddie to purchase the loan. ¶29. In exchange for assuming the excess default risk, PMI companies are paid a premium that is paid by the borrower. *Id.* The premium charged varies with the risk profile of the mortgage loan. *Id.*[4]

---

[4]     Defendants have argued that there was nothing wrong with MGIC's business decision to insure riskier loans for higher insurance premiums. There is, however, no way to measure a needed premium increase for a liar's loan – other than to assume that the borrower will not be the source of repayment of the loan. More importantly, however, while MGIC reported its increased

7

### 2. The Individual Defendants

Defendant Curt S. Culver ("Culver") is, and at all relevant times was, Chairman and Chief Executive Officer of MGIC. ¶14. Defendant Larry Pierzchalski ("Pierzchalski") is, and at all relevant times was, Executive Vice President of Risk Management at MGIC whose responsibilities included, *inter alia,* pricing structured transactions and managing the quality of insurance writings. ¶15. Defendant J. Michael Lauer ("Lauer") is, and at all relevant times was, Executive Vice President and Chief Financial Officer of MGIC whose responsibilities included, *inter alia,* the finance, corporate reinsurance, administration and investor relations functions of MGIC. ¶16. Lauer also sat on the Board of C-BASS. *Id.* Defendant Bruce Williams ("Williams") was, at all relevant times, co-founder, partial owner and CEO of C-BASS. ¶17. Defendant John Draghi ("Draghi") was, at all relevant times, the Chief Operating Officer ("COO") of C-BASS. ¶18.

### 3. C-BASS

Throughout the Class Period, C-BASS was a mortgage investment and servicing company that specialized in purchasing and securitizing subprime single-family residential mortgages. ¶2. MGIC owned 46% of C-BASS. *Id.* C-BASS's other owners were Radian, a major mortgage insurer which owned 46% of C-BASS, and C-BASS management. *Id.*

C-BASS was a material aspect of MGIC's overall business. At the beginning of the class period, MGIC's investment in C-BASS was reported as a $450 million asset, and, in 2006, C-BASS's income was responsible for 24% of MGIC's reported profits. ¶88.

---

premiums as revenue, it set its loss reserves (and expense) based upon past loss experience that was wholly unrepresentative of the new risks it was assuming – and then misled investors and analysts into believing that the Company's traditionally high standards would protect it from the ravages of the subprime market.

Because of C-BASS's importance to MGIC, MGIC's senior executives, including MGIC's COO and CFO, closely monitored C-BASS's business. As alleged by Confidential Witness #6 ("CW6"), who worked as vice president at C-BASS from the late 1990s through late 2007, and who reported directly to C-BASS's CFO, Robert Weinstein, Pat Sink, MGIC's President and Chief Operating Officer, Bernie Verhoven, a vice president at MGIC, and Jeff Lane, MGIC's general counsel[5], received information about C-BASS in connection with MGIC's quarterly reports and forecasts. ¶¶144-147. In addition to quarterly reports, executives at MGIC and C-BASS received monthly earnings reports for C-BASS and held bi-monthly calls. ¶¶147-148. CW6 further alleged that he worked with Weinstein to prepare reports on C-BASS's financial status for MGIC and C-BASS Board meetings and for MGIC analyst calls. ¶148. The financial information prepared by CW6 was presented at C-BASS Board meetings, which were attended by, *inter alia*, Defendants Lauer, MGIC's CFO, Williams, C-BASS's CEO, and Draghi, C-BASS's COO. *Id*. In addition, Lauer was a member of C-BASS's Board (¶16), which put him in a position to directly review the status of C-BASS's business.

**B.      MGIC Secretly Jettisons Its Underwriting Standards to Insure High Risk Mortgage Loans**

**1.      An Era of Loose Money Incentivized Risk**

The middle period of this decade was an era of rapidly rising housing prices and loose credit. ¶¶46-47. Where historically banks had made mortgage loans with down payments based on currently existing LTVs, and the demonstrated ability of borrowers to make their monthly mortgage payments, increasingly lenders gambled on expected future home price appreciation to pay off the loans. While fully-documented traditional 20% down payment fixed rate mortgages

---

[5]      *See* MGIC 2007 SEC Form 10-K, dated February 29, 2008, at 42-43, available at http://www.sec.gov/edgar.shtml.

remained available, mortgage lenders devised alternatives for people who could not afford traditional loans or who could not demonstrate a reliable source of income. *Id.*

These new mortgage loan products increased the risk of default for non-payment. *Id.* In addition, so-called "Alt-A" or undocumented loans, particularly when issued to employed borrowers who ought to have been able to document their income if their loan applications were truthful, increased the risk that a loan would not be repaid because of fraud. ¶33. As Culver warned in a March 1, 2004 article he authored, "one product type may be pushing the bounds of what's good for the mortgage markets, its risk-sharers and even consumers: stated-income loans." ¶72. While eschewing this business under MGIC's purportedly stricter underwriting standards,[6] Culver explained that since reduced-doc loans were so vulnerable to fraud, "the risk of [stated-income] lending has grown exponentially" and he expected that stated-income loans would produce "a claims rate that is five times greater than the claims rate for full documentation loans." *Id.* Presciently, Culver forecasted that these higher loan losses would appear when housing prices faltered. *Id.*

### 2. MGIC Succumbed to Pressure from Mortgage Lenders

Despite Culver's admitted awareness that debasing MGIC's underwriting standards would expose MGIC to an imprudent amount of risk, he and the other Defendants ultimately were unwilling to forego the short-term profits in the field of high-risk mortgage loans, even if it meant abandoning MGIC's historic focus on risk management and high-quality underwriting. Numerous confidential witnesses who worked at MGIC during the relevant period described how Defendants' determination to ingratiate MGIC with high-volume mortgage lenders led to a

---

[6]     As the CCAC alleges, several confidential witnesses have reported that, in fact, MGIC often knowingly insured these highly suspect loans. In November 2007, Culver himself tacitly admitted he had permitted this denigration of MGIC's standards, but was reversing this policy because insuring undocumented loans of wage-earners was just "silly." ¶268.

wholesale capitulation and the abandonment of its prior risk assessment and professional underwriting requirements.

For instance, Confidential Witness #3 ("CW3"), who worked at MGIC from 1998 until April 2007 as a senior account manager in the Company's Central Region, observed the breakdown in MGIC's underwriting standards for loans insured individually and in bulk. ¶¶122, 124. CW3, whose job responsibilities included developing new business from mortgage lenders and credit unions for MGIC's flow and bulk business, further described how she had determined that certain subprime lenders were too risky to work with but that her superior, Robin Mallory, sought to override CW3's risk assessment in order to expand MGIC's subprime business. ¶¶125, 127. Because of her lengthy tenure and the fact that she was an especially high producer of business, CW3 had a rapport with Culver and Sink, MGIC's Chief Operating Officer, and twice warned them about the dangerous breakdown in MGIC's underwriting process. ¶¶123, 126. In 2006, CW3 expressed her concerns about MGIC's business practices to Culver and Sink and in March or April 2007, CW3 sent Culver and Sink an e-mail reiterating her concerns about the "big risks" and bad loans at MGIC. ¶¶129, 131.

In addition, as alleged by Confidential Witness #1 ("CW1"), a MGIC Field Operations specialist based at MGIC headquarters from 2001 to 2008, MGIC "acquiesced" and "capitulated" to the pressure to insure "bad loans," noting that "all kinds of high risk loans were insured." ¶110. CW1's job entailed working with MGIC's underwriters throughout the United States to assist them in completing the underwriting process. ¶107. In his time at MGIC, CW1 observed that MGIC would sometimes approve risky loans at the behest of powerful loan originators such as Countrywide because "there was a promise somewhere down the line for future business." ¶111.

Similarly, Confidential Witness #2 ("CW2"), who worked in quality control at MGIC from 2001 to 2004 and who reviewed the contract underwriting process from 2004 through 2008, explained that MGIC's underwriting process was completely compromised by its relationship with lenders. ¶120. As CW2 explained, MGIC's underwriting process was "all about politics," meaning that whether or not a loan was approved for insurance had less to do with its risk and more to do with how approving the loan might win favor from mortgage lenders such as Countrywide. *Id.* During her time reviewing the contract underwriting process, CW2 assisted underwriters with loans that were coded "red," "yellow" or "green." ¶115. The most risky loans were coded red and had problems from the "rooter to the tooter." ¶116. When reviewing these loans, CW2 saw low FICO scores (in many cases in the 500s), high LTV ratios, low salaries and no documentation to back up stated income/assets. *Id.* Demonstrating the prevalence of risky loans, CW2 explained that "by far the highest percentage of loans I, and my department, reviewed were red." ¶115.

Confidential Witness #4 ("CW4"), who worked for MGIC as a contract underwriter from June 2007 to September 2008 and was posted at MGIC's largest lender, Flagstar, described how MGIC subordinated its underwriting practices to important mortgage lenders. ¶133. As CW4 observed, MGIC made "lots of accommodations" for Flagstar because Flagstar was such a large lender and good customer. ¶137. For example, CW4 reported that when Flagstar originated loans that were particularly bad, MGIC's policy was to insure the loan with supposedly "stringent conditions," rather than deny coverage to the loan. ¶¶137-138. CW4 also explained that she was often criticized by management for having a higher number of denials. *Id.* Similarly, CW4 described how Flagstar took control of MGIC's underwriting process and forced MGIC to make "exceptions" to its underwriting process by, for example, insuring loans in

housing markets that MGIC had classified as "declining." ¶139. Though such a loan would not have been acceptable under MGIC's then-existing underwriting guidelines, MGIC would give in to Flagstar because it was good for business. *Id.*

As Culver and MGIC's other top executives knew by 2006, MGIC's abandonment of its underwriting guidelines to follow the dictates of lenders running amok with exotic mortgages had exposed MGIC to huge amounts of undisclosed risk. Nonetheless, they continued to set loan loss reserves (and report loan loss expense) based upon the Company's experience with insurance written under an entirely different underwriting regime. MGIC's books contained many high-risk Alt-A loans that had been originated without proper documentation and many subprime loans extended to individuals whose low FICO scores suggested a likelihood of non-payment. ¶¶108, 109, 115-119, 121, 126, 135, 137, 139. Even worse, since MGIC did not insure these risky and/or fraudulent loans pursuant to an objective risk analysis (¶¶110-111, 120, 127, 137-139), MGIC had been stuck with the most dangerous types of mortgages that lenders could generate without adequate compensation. While Culver crowed about the purportedly improving "business fundamentals" and rising "persistency" of its business – *i.e.*, that the borrowers were not paying down their loans to 80% LTV and canceling their mortgage insurance so that insurance premiums continued to be paid – in fact, these changes merely locked in and assured escalating loan insurance **losses** which had yet to be reserved for, or expensed on, MGIC's books.

**C.** **MGIC Defendants Realized that Deteriorating Underwriting Subjected MGIC to Higher Future Insured Loan Losses, but Chose to Mislead the Market in the Hopes of Outrunning Their Problems**

**1.** **The Red Flags of Growing Loan Losses**

As described in MGIC's Form 10-Ks, borrower defaults occurred and were reported to MGIC by its insured lenders, when borrowers were 45 days late in a mortgage payment. MGIC

compiled noticed "defaults," calculated them as "delinquency rates" and generated statistics and trends for different segments of its business, to develop the data to calculate loss reserves and expenses reported on its financial statements. Actual insured loan losses came later – when the mortgage loans were foreclosed, the inadequate collateral sold and MGIC was called upon to satisfy the unpaid balances of the loans.

The Individual Defendants fully appreciated the relationship between early payment defaults ("EPD's") on insured fraudulent loans and higher loan losses. At the April 2007 earnings conference, Pierzchalski lectured analysts about these relationships and assured them he was monitoring the EPD's as a result. ¶65. Culver, in 2004, warned the industry that when housing prices fell, losses attributable to the insurance of "stated income" loans would increase five-fold. ¶¶70-71. By 2006, the housing boom was swiftly coming to an end, which meant lenders and their insurers could no longer look to the more valuable collateral to save them from losses on imprudently granted loans. ¶¶47-48. Nonetheless, Defendants continued to use outdated loss experience to set inadequate reserves, and hid the changed delinquency trends from investors by lumping the experience in the new, poorly underwritten loans with those written in prior years. And Culver and Pierzchalski repeatedly misled analysts, contending that the reported experience of others in the industry was not indicative of MGIC's loss performance – because of MGIC's higher standards.

In 2007, the higher EPD's reported by lenders on mortgages insured in 2005 and 2006 were "red flags" that the new vintage years' loans were performing markedly worse than mortgages insured in other years – and thus required higher loss reserves. For example, by October 2007, when MGIC first separately reported deficiency rates by vintage year, its reporting showed MGIC's 2006 bulk insured mortgages were in critical condition. ¶83. In less

than a year, 17% of MGIC's 2006 bulk insured mortgages had gone into default. *Id.* Similarly, 22.6% of MGIC's 2005 bulk insured mortgages had gone into default. *Id.* These default rates significantly outpaced the default rates for earlier vintage year books of business. ¶¶85-86. Ultimately, a stunning 58% of 2006 Wall Street securitized loans would go into default. ¶86.

In late 2006, the Individual Defendants admitted they were tracking MGIC's delinquencies, trends and losses by vintage year but rebuffed analysts' specific requests for this information. ¶184. Multiple company reporting functions provided this information to Culver, Lauer and Pierzchalski during the class period. For example, MGIC tracked the incidence of borrower default by individual vintage year, *i.e.* by the year that the new insurance had been originated, in connection with the setting of loss reserves. ¶8. Furthermore, on a quarterly basis, MGIC calculated expected default rates based on trends, per vintage year of insurance, for the purposes of calculating deferred acquisition costs and premium deficiencies.[7] ¶40.[8]

### 2. MGIC Defendants Actively Misled Analysts and the Market About the Company's Flawed Underwriting Practices and Increasing Insured Loan Losses

Throughout the Class Period, the MGIC Defendants hid the fact that MGIC had abdicated its underwriting standards and exposed itself to massive risk. For example, in March 2007, Culver met with analysts at KBW and stressed that MGIC had protected itself with "focused underwriting and risk layering in its bulk transaction" and reassured that he "remains comfortable with MGIC's credit exposures." ¶210. Similarly, on March 9, 2007, Culver, Lauer

---

[7] Surging early payment defaults in the 2006 book of business, which is a hallmark of mortgage fraud, was yet another red flag indicating that MGIC's poor underwriting practices had allowed MGIC to insure numerous high risk loans. ¶¶ 72-76. The fact that, ultimately, more than half of the loans underwritten in 2006 went into default further corroborates the statements of confidential witnesses that the 2006 loans were made and insured under an entirely different framework than those of earlier years.

[8] A premium deficiency occurs when there is reason to believe that a company's future losses from a book of insurance will exceed its future premiums for that book. *Id.*

and Pierzchalski met with Citigroup analysts and made representations suggesting that MGIC had "avoided much of the poorly written subprime and Alt-A mortgage credit of the past three years" and that MGIC had only worked with Alt-A issuers "where it was able to get the right risk profile and pricing." ¶212. Culver, Lauer and Pierzchalski further "indicated its credit outlook was unchanged over the past two months." *Id.* In the same meeting, Culver, Lauer and Pierzchalski represented that MGIC "ha[d] not written insurance on most of the loans that were apparently subject to lax underwriting standards during the second half of 2005 and the first half of 2006" and that MGIC's exposure to subprime and Alt-A mortgages was "well controlled and manageable." *Id.* The MGIC Defendants continued to make statements representing that MGIC had upheld its underwriting standards throughout the class period. ¶¶187, 196, 221, 223.

Throughout the Class Period, Defendants also repeatedly made statements hiding the stunningly high delinquency rates in recent vintages of insured mortgages. For example, MGIC's October 12, 2006 press release purported to show developments in delinquency rates on a quarter-by-quarter basis. ¶¶178-179. Because the delinquency rates were presented on an aggregate basis for all vintage years, the much higher delinquency rates in the 2005 and 2006 vintage books were masked. ¶191. At other points, Defendants specifically denied that MGIC's 2005 and 2006 vintages were materially worse than prior years. For example, on an October 12, 2006 conference call, Pierzchalski assured that "[b]ook to book to book, I think delinquencies and claim paths are pretty much in line with one another." ¶¶185, 187. On January 11, 2007, Pierzchalski again represented that there was "no significant change" on the subprime side. ¶196. As all hell was breaking out and large subprime lenders were closing their doors, the Defendants continued to insist that MGIC had weathered the crisis through its superior

16

underwriting practices and that there was no need for it to change its 2007 earnings guidance or post additional loss reserves.  ¶6.

**D.**     **MGIC Raced to Merge with Radian**

On February 6, 2007, MGIC announced its plan to merge with Radian through a stock-for-stock exchange.  ¶90.  Because of the regulatory approvals that would be required, the merger was expected to close in the fourth quarter 2007.  *Id.*  The merger plan assumed that MGIC and Radian would reduce their joint interest in C-BASS and provided that the merged company would own less than a 50% interest in C-BASS.  *Id.*  The reason for this was that it was untenable for the merged company to put C-BASS's risky investments on its balance sheet because this would greatly increase the chance of a credit rating downgrade.  *Id.*  In addition, the partial sale of C-BASS would provide MGIC with additional cash to fund a planned $1.75 billion stock buy-back.  Under the merger plan, Culver would step up to the role of Chairman of the Board and CEO of a new, much larger company.  ¶299.  Lauer and Pierzchalski too would enjoy a promotion to positions of Chief Financial Officer and Head of Risk Management, respectively, for a new, larger company.  ¶301.

**E.**     **Contrary to Defendants' False Assurances, C-BASS Shared the Same Problems and Fate as Others in the Subprime Business**

By early 2007, C-BASS was experiencing significant problems as unfolding economic events undercut the value of the subprime loans it had purchased and sought to repackage.  C-BASS's own lenders issued escalating and crippling margin calls based on the inadequacy of the subprime collateral C-BASS held on its books.   C-BASS, as a mortgage investment and servicing company that specialized in subprime single-family residential mortgages, was especially hard hit by the subprime crisis.  Despite Defendants' repeated assertions that C-BASS's superior underwriting and controls set it apart – and this concealment of its margin calls

17

– by the end of July, C-BASS's problems were laid bare and MGIC declared its $500 million investment in C-BASS to be "impaired."

When C-BASS securitized a package of mortgages, it generally took a first-loss position in the transaction, meaning that if mortgages in the security began to default, C-BASS's portion of the security would absorb those losses while other investors' portions would be shielded from the loss. *Id.* Accordingly, C-BASS had many high-risk, low-quality assets on its balance sheet, including its first-loss positions in subprime, mortgage backed securities. ¶¶142-144, 157, 161-163. As MGIC's 2006 Form 10-K reports, C-BASS purportedly marked its loans to market, but because of the illiquid nature of its subprime assets, Defendants were free to exercise their "judgment" in refusing to write-down the value of the subprime loans on C-BASS's books. C-BASS's lenders, however, had no similar hesitancy in recognizing the reality of the plummeting value of their collateral, hence the margin calls. *Id.*

C-BASS's business model was not well-suited for the challenging economic dynamics that unfolded in the first months of 2007. As Williams, C-BASS's CEO, conceded on MGIC's April 11, 2007 earnings call, "the subprime market" had "experienced a substantial repricing and increase in credit risk premium" that was "primarily due to the well-publicized issues with subprime loans, especially the 2006 vintage." ¶226. Williams explained that one consequence of this "repricing" was "increased margin calls from all lenders," which often happens when lenders seek repayment of a loan collateralized by an asset that has fallen too far in value to adequately support the loan. *Id.* During the first quarter of 2007, Williams disclosed that C-BASS had absorbed margin calls of approximately $200 million and had marked down its subprime loans by *$75 million*. *Id.*

Analysts following MGIC's stock openly expressed concern about the impact of recent events on C-BASS. At the April 11, 2007 earnings conference call, one analyst pressed Williams as to why C-BASS had only minimally marked down its low-grade loan portfolio, commenting that C-BASS's $75 million markdown of its $2.3 billion loan portfolio "just doesn't seem to make any sense given what the market has done." ¶227. Another analyst was prompted to ask Defendants to "help us understand how you guys are walking through the raindrops, as it were." ¶94. Throughout the call, Williams insisted that C-BASS had largely escaped the crisis as a result of its "franchise value," superior credit practices and geographic selectivity in purchasing mortgages. *Id.*

**F.     A Wave of Margin Calls Threatened C-BASS's Viability**

By July 2007, events had begun to overtake the Defendants. Even as MGIC and Radian struggled to find a buyer for 50% of C-BASS and to complete their merger and stock buy-out, an escalating wave of margin calls threatened C-BASS's very existence, as well as the viability of the merger itself. As revealed in MGIC's August 1, 2007 SEC Form 8-K, in second quarter 2007, *i.e.*, between April 2007 and June 30, 2007, C-BASS paid $90 million in margin calls. In the 18 days immediately preceding the July 19th second quarter 2007 earnings call, from July 1, 2007 through July 18, 2007, C-BASS paid another $145 million in margin calls. For investors critically concerned about C-BASS's ability to survive the current subprime crisis, these margin calls were obviously critical information, and their concealment during the July 19th call became all the more fraudulent as Defendants sought to reassure analysts about the sufficiency of the Company's liquidity and correctness of C-BASS's subprime loan valuations. For example:

> - Culver promoted the purportedly viable prospects for C-BASS's impending sale to unidentified investors, by stating, "Regarding C-BASS, even though there is much noise in their space we're ***pleased with the number of investors who are participating in the process which demonstrates the strength of the C-BASS franchise and its long-term opportunities***." ¶240.

19

- Williams further touted the integrity of C-BASS's subprime asset valuations by stating "Our bond valuation method has not changed. ***Our book value approximates market value,*** assuming orderly transactions that are not distressed sales or liquidations." ¶244.

- Draghi suggested C-BASS was unlike its peers and continued to be profitable despite the subprime crisis, by stating: "***Demonstrating the strength of our franchise, we were able to continue to access the market***" and by stating "for the full year, we expect pretax earnings to be between $125 and $175 million." *Id.*

- Similarly, in a press release issued the same day, MGIC stated "***C-BASS maintains substantial liquidity to cover margin calls in the event of substantial declines in the value of its mortgages and securities***." ¶236.

## G.     During the Second Quarter 2007 Earnings Call, Defendants Actively Mislead Analysts About C-BASS

Defendants made their false statements on a July 19, 2007 conference call held to report its second quarter 2007 earnings. Culver, Pierzchalski, Lauer, Williams and Draghi all attended this call. ¶238. As they did in advance of every conference call, Culver, Pierzchalski, Lauer, Williams and Draghi familiarized themselves with developments at C-BASS by reviewing reports and updates on the subject prepared by C-BASS's executives. ¶¶144-147. In addition, C-BASS's desperate need for cash to cover its escalating margin calls had, by July 19, 2007, prompted it to seek additional financing from MGIC. ¶252. MGIC had acquiesced to this request and had arranged to make an additional $50 million in credit available to C-BASS to shore up its liquidity and permit C-BASS to consummate a long-planned acquisition of Fieldstone Investment Corporation. It would thus be more than plausible to infer that Culver, Pierzchalski and Lauer, as well as Williams and Draghi, were fully aware of the hidden recent margin calls.

Nonetheless, Culver, Williams and Draghi chose to actively promote C-BASS's prospects, including for its sale to private investors, without disclosing the tsunami of margin

calls that had already occurred and their obvious implications for the reliability of C-BASS's reported subprime loan values, profitability and survivability.

## H. The Truth Emerges

From July 19 through July 26, 2007, the drumbeat of crushing margin calls continued as C-BASS was called upon to pay an additional $140 million in margin calls. ¶255. This prompted MGIC to determine on July 26, 2007 that its $500 million investment in C-BASS was "impaired" as a result of "accelerating amounts" of margin calls. ¶101. In the days following July 26, 2007, C-BASS received yet another $330 million in margin calls, implying that its reported valuations of its subprime loans it had used as collateral were complete nonsense.

Finally, on July 30, 2007, MGIC admitted the truth about C-BASS's subprime losses and the resulting liquidity crisis. In a press release, MGIC admitted that "the value of its investment in Credit-Based Asset Servicing and Securitization LLC ('C-BASS') has been materially impaired." ¶252. The press release further stated that MGIC's investment in C-BASS was approximately $516 million and that the "upper boundary" of the impairment "could be MGIC's entire investment." *Id.* In its August 1, 2007 SEC Form 8-K, MGIC admitted that the "accelerating amount of margin calls to which C-BASS was subject" was the reason for the impairment. ¶255.

When it was revealed that Defendants' July 19, 2007 statements had been misleading and that, in fact, C-BASS was overwhelmed by margin calls, and that its subprime assets used for collateral were largely worthless – so that MGIC would need to recognize a $500 million loss for its investment in C-BASS – MGIC's share price plummeted 14.9% from $45.44 to $38.66. ¶274. On August 7, 2007, MGIC issued a press release confirming that C-BASS's collapse had undermined the merger with Radian. ¶258. Defendants concluded that MGIC was not obligated to complete its pending merger "in light of the C-BASS impairment." *Id.* During the same

period, the market digested the revelation of MGIC's and C-BASS's bleaker prospects, leading to analyst and debt rating downgrades for both companies. ¶¶275-276. By August 13, 2007, MGIC's share price had fallen to $34.98. ¶276.

MGIC struggled on for several more months before it fully revealed the true risks, defaults and losses attributable to its insuring of recklessly underwritten loans. As one analyst report noted on November 2, 2007, "[o]ne of the chief investor complaints has been the lack of disclosure regarding the company's frequency and loss assumptions by vintage and product." ¶267. Finally, on February 13, 2008, MGIC announced its final financial results for 2007. ¶271. In its press release, MGIC revealed that it had insured enormous amounts of Wall Street bulk transactions, which represented approximately 41%, 66% and 89% of bulk transactions during 2007, 2006 and 2005 respectively, and that the insurance of this book of business had been so seriously flawed as to require the immediate recognition of a $1.2 billion loss for its expected premium deficiency. *Id.* This revelation shocked the market, and MGIC's share price immediately plummeted 11.1% in response. ¶¶286-288.

## ARGUMENT

### A. Standards on a Motion to Dismiss a 10(b) Claim

Rule 10b-5 forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs II*") (quoting 17 C.F.R. §240.10b-5(b)). To state a Rule 10b-5 claim, a plaintiff must allege that the "defendant: 1) made a misstatement or omission, 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which the plaintiff relied, and 6) that reliance proximately

caused the plaintiff's injury." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

"The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Triad Assocs., Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). In ruling on a motion to dismiss, a court must view the facts alleged in the complaint in the light most favorable to the plaintiff, construe the allegations liberally, and draw any reasonable inferences from the facts in plaintiff's favor. *See, e.g., Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"). As the United States Supreme Court cautioned, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).

**B.      Defendants' Misrepresentations and Omissions Are Actionable Under Section 10(b) of the Exchange Act and Rule 10b-5**

**1.      The CCAC Adequately Pleads Falsity**

Under the Private Litigation Securities Reform Act ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff in a securities fraud action must allege with particularity "each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *vacated and remanded on other grounds*, 551 U.S. 308 (2007). "The relevant question is 'whether the facts

alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Id.*[9]  However, even in light of these heightened pleading standards, a plaintiff is still not required to plead "detailed evidentiary matter."  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

> **a.  Defendants Made False Representations that MGIC's Purportedly Superior Underwriting Quality Had Insulated the Company from the Subprime Mortgage Crisis**

The CCAC adequately alleges that the MGIC Defendants made statements touting MGIC's purportedly superior underwriting practices that were false and misleading in light of MGIC's subordination of its underwriting standards to the demands of mortgage lenders.  The CCAC identifies with specificity numerous false and misleading statements, for example:

> - During a February 6, 2007 conference call, in discussing MGIC's planned merger with Radian,  Culver stated that with respect to "the loss side" of the business, "both [MGIC and Radian's] portfolios are well-managed" and "well controlled."  ¶207.

> - In early March 2007, Culver met with analysts at Keefe, Bruyette & Woods, Inc. ("KBW") and, as indicated by the subsequent KBW analyst report, "stressed" that MGIC had protected itself with "focused underwriting and risk layering in its bulk transactions."  ¶210.  The KBW report continued that it was "[t]his underwriting and other qualitative considerations" that "reinforce[d] [KBW's] belief and management's that the [mortgage insurance] exposure is not a proxy of the broader mortgage credit market" and noted that "Mr. Culver's tone regarding MGIC . . .  was the most bullish [KBW had] heard in several years."  ¶62, 210.

> - On March 9, 2007, Culver, Lauer and Pierzchalski met with Citigroup analysts and, as indicated by the subsequent report, touted the quality of MGIC's underwriting practices: "In our meetings, management exuded confidence in [MGIC's] positioning vis-à-vis the recent credit issues that have arisen in subprime mortgages.  In particular, [MGIC] has not written insurance on most of the loans that were apparently subject to lax underwriting standards during the second half of 2005 and the first half of 2006.  In fact, the CEO stated that a lot of the 'goofy' stuff was done in order to avoid mortgage insurance products in general."  ¶212.

---

[9]      Unless otherwise noted, all emphasis is added and citations are omitted.

- In the same meeting, Culver, Lauer and Pierzchalski "indicated that its credit outlook was unchanged," creating the misleading impression that MGIC had "anticipated much of the recent credit deterioration and has avoided the 'toxic' exposures." *Id.*

- Also during the March 9, 2007 meeting, Culver, Lauer and Pierzchalski indicated that MGIC only worked with Alt-A issuers "where it was able to get the right risk profile and pricing." ¶212.

- During an April 11, 2007 earnings conference call, Culver stated that "The subprime business continues to be a hot topic, particularly the 2006 book and rightly so given the many credit practices that were abused last year. Our industry and our company did not participate a great deal in these practices." ¶221.

These statements were false because, at the time they were made, MGIC had jettisoned its previously existing professional standards to curry favor with the key mortgage lenders. For example, CW1 observed that MGIC would approve risky loans at the behest of powerful loan originators such as Countrywide because "there was a promise somewhere down the line for future business." ¶111. CW2 noticed that mortgage lenders' expectations had supplanted traditional risk analysis in deciding what loans to insure, in short, MGIC's underwriting process had become "all about politics." ¶120. Significantly, CW3, whose job responsibilities included developing new business from mortgage lenders and credit unions for MGIC's flow and bulk business, further described how she had determined that certain subprime lenders were too risky to work with but that her superior, Robin Mallory, sought to override CW3's risk assessment in order to expand MGIC's subprime business. ¶¶122, 127. Because of her lengthy tenure and the fact that she was an especially high producer of business, CW3 had a rapport with Culver and Sink, MGIC's Chief Operating Officer, and twice warned them about the dangerous breakdown in MGIC's underwriting process. ¶123. In 2006, CW3 expressed her concerns about MGIC's business practices to Culver and Sink and in March or April 2007, which is when Culver and

Sink were touting MGIC's ability to insure only those loans that conformed with superior underwriting standards, CW3 sent Culver and Sink an e-mail reiterating her concerns about the "big risks" and bad loans at MGIC. ¶¶129, 131. And CW4 stated that MGIC's largest lender, Flagstar, forced MGIC to make "exceptions" to its underwriting practice, such as by insuring homes in declining housing markets, that increased the amount of risk that MGIC took on. ¶139.

The CCAC further substantiates its allegations of falsity by pointing to the proliferation of high-risk loans on MGIC's books, showing that MGIC's subordination of its underwriting practices did lead to imprudent risk exposure. For example, 50% of the 2006 vintage year bulk business consisted of undocumented Alt-A loans. ¶197. These imprudent risks manifested in startlingly high delinquency rates for MGIC's 2005 and 2006 books of business. By September 30, 2007, 22.6% of MGIC's 2005 bulk book and 17.2% of MGIC's 2006 bulk book were already in delinquency. ¶82. Ultimately, 58% of MGIC's 2006 Wall Street bulk business would become delinquent and overall 20% of the insurance claims would be resolved through rescission of the associated policy for fraud. ¶¶85-86. These shocking statistics confirm the observations of the confidential witnesses that the recent vintages of insured loans were an entirely different animal.

Thus, MGIC was not engaged in "focused underwriting" or insuring Alt-A loans only "where it was able to get the right risk profile and pricing" because MGIC was insuring loans in order to keep its mortgage lender clients happy, whether or not the insurance should have been extended according to MGIC's stated risk principles.

> **b.    Defendants Mislead the Market About the Rate of Defaults and Impending Losses on Recent Vintage Year Business**

The CCAC adequately pleads that the MGIC Defendants' statements regarding MGIC's loan delinquencies and loss experience were false and misleading because they deliberately

masked disturbing trends in MGIC's 2005 and 2006 vintages of mortgage insurance. The CCAC

specifically identifies numerous false and misleading statements, for example:

- MGIC's October 12, 2006 and January 11, 2007 press releases portrayed delinquency trends as flat year over year by presenting aggregate delinquency data that grouped older, more conservatively underwritten books of insurance, with the 2005 and 2006 vintages. ¶¶178-179, 191.

- During an October 12, 2006 earnings conference call, Lauer denied the existence of "some kind of new worrisome trend" and stated that an increase in reserves stemmed from the fact that "underlying loan averages were increasing" and "not because of any loss development." ¶186.

- On the same earnings call, in response to a question asking whether there had been deterioration in recent vintages of insurance, Pierzchalski stated "Aside from the '03 book, the other books including the most recent books are in a pretty tight ban[d]. The newer writings are kind of in line with the prior writings." ¶187.

- During a January 11, 2007 earnings conference call, Pierzchalski reassured that there was "no significant change" in MGIC's subprime portfolio. ¶196.

- During a February 6, 2007 conference call, Culver suggested that risk management implemented by Pierchalski had inoculated MGIC against losses from its Alt-A business. ¶206.

- In March 2007, Culver met with KBW and, as indicated by the subsequent report, indicated that "current issues in the market are being born out of liquidity constraints, not credit performance per se, and that its book continues to develop as expected." ¶ 210.

- On March 9, 2007, Culver, Lauer and Pierzchalski met with Citigroup and, as indicated by the subsequent report, "indicat[ed] that nothing has materially changed in terms of the credit and growth outlook." ¶212.

- During an April 11, 2007 earnings conference call, Culver suggested that the 2006 book of business would provide a "20% margin to MGIC." ¶221.

- During the same April 11, 2007 earnings call, Pierzchalski stated that MGIC had not seen an increase in the "percentage" of insured mortgages that were fraudulent. ¶223.

These statements were false at the time they were made because MGIC's 2005 and 2006

vintage year books of business were performing far worse – and were seeing alarmingly high

rates of delinquencies – than the earlier vintage years by late 2006 and early 2007. Indeed, in late 2006, the Individual Defendants admitted that they were tracking MGIC's delinquencies, trends and losses by vintage year but rebuffed analysts' specific requests for this information. ¶184. For example, MGIC tracked the incidence of borrower default by individual vintage year, *i.e.,* by the year that the new insurance had been originated, in connection with the setting of loss reserves. ¶8. Furthermore, on a quarterly basis, MGIC calculated expected default rates based on trends, per vintage year of insurance, for the purposes of calculating deferred acquisition costs and premium deficiencies. ¶40. This internal data, however, was not reported on MGIC's financial reports because MGIC reported its loan delinquency rates on an aggregate basis using prior year loans, so that the combined loss rates smoothed out the trends and hid the increased risk and resulting losses. *Id.*

It is reasonable to infer that this internal data – which analysts specifically requested and Defendants Culver, Lauer and Pierzchalski refused to provide  – showed that the 2005 and 2006 vintage year books of business were far worse than prior vintage years in terms of delinquency rates and resulting losses, given the astonishing rate of delinquencies that MGIC disclosed to the investing public when the truth about the 2005 and 2006 books of business came to light. Indeed, in October 2007, MGIC reported that in less than a year 17% of its 2006 bulk insured mortgages had gone into default. ¶83. Similarly, 22.6% of MGIC's 2005 bulk insured mortgages had gone into default. *Id.* These default rates significantly outpaced the default rates for earlier vintage year books of business – something that obviously did not happen overnight. Moreover, MGIC received its data on the default rates over time, and undeniably would have had data showing alarming trends calling into question the 2005 and 2006 books of business long

before October 2007.  Ultimately, a stunning 58% of 2006 Wall Street securitized loans would go into default.  ¶86.

The fact that the 2005 and 2006 vintage years were beset by such extraordinary defaults and fraud further shows that Defendants' class period statements touting their 2005 and 2006 books of business as being similar to prior vintage years were false when made.  In the first quarter of 2009, MGIC reported that 20.4% of the insurance claims had been denied, and the business rescinded, for fraud.  ¶87.  High rates of fraud go hand-in-hand with high rates of EPD's, which are defaults that occur during the first year of the loan.  Given that the 2005 and 2006 books of business were riddled with fraud, this would have started to show up in the latter part of 2006 and first part of 2007, during the same time when Defendants were touting the 2005 and 2006 vintage year books of business as being no worse than the prior vintage years.

> ### c.     Defendants Falsely Reassured the Market About C-BASS and Hid Its Crippling Margin Calls

The CCAC adequately pleads that Defendants' July 19, 2007 statements regarding C-BASS were false and misleading because they did not disclose that C-BASS was swamped by a torrent of margin calls, totaling $145 million in the prior eighteen days alone, that imperiled C-BASS's viability and signaled that C-BASS had grossly over-valued its subprime assets.  The CCAC specifically identifies numerous false and misleading statements, for example:

> - During a July 19, 2007 earnings conference call for MGIC, Culver stated "[r]egarding C-BASS, even though there is much noise in their space we're pleased with the number of investors who are participating in the process which demonstrates the strength of the C-BASS franchise and its long-term opportunities." ¶240.
>
> - During the same conference call, Williams stated "[o]ur bond valuation method has not changed.  Our book value approximates market value, assuming orderly transactions that are not distressed sales or liquidations." ¶244.
>
> - Similarly, Draghi stated during the same conference call that C-BASS was "able to continue to access the market" and suggested that this "demonstrat[ed] the

29

strength of [C-BASS's] franchise. Draghi also stated that "for the full year, we expect pretax earnings to be between $125 and $175 million." *Id.*

- In a press release issued the same day, MGIC comforted the market by stating "C-BASS maintains substantial liquidity to cover margin calls in the event of substantial declines in the value of its mortgages and securities." ¶236.

These statements were false because, in the second quarter of 2007, C-BASS had received $90 million in margin calls and because, between July 1, 2007 and July 18, 2007, C-BASS received another unprecedented volume of margin calls that greatly reduced its liquidity and signaled that C-BASS's subprime assets had severely depreciated to the point of threatening its existence. ¶¶237, 245, 248, 255. As reported in MGIC's August 1, 2007 SEC Form 8-K, in the second quarter of 2007, *i.e.*, between April and June 2007, C-BASS paid $90 million in margin calls. In the 18 days immediately preceding the July 19th second quarter earnings call, from July 1, 2007 through July 18, 2007, C-BASS paid another $145 million in margin calls. For investors critically concerned about C-BASS's ability to survive the current subprime crisis, these margin calls were obviously critical information and their concealment during the July 19th call became all the more fraudulent as Defendants sought to reassure analysts about the sufficiency of the Company's liquidity and the correctness of C-BASS's subprime loan valuations. Moreover, Defendants obviously recognized the importance of these margin calls because this same August 1, 2007 Form 8-K reported that on July 26, 2007 MGIC had determined that its $500 million investment was impaired when another $140 million in margin calls was paid between July 19 and July 26, 2007, indicating that margin calls were "accelerating." ¶¶99-101.

Thus, MGIC's statement that C-BASS "maintains substantial liquidity to cover margin calls in the event of substantial decline in the value of its mortgage and securities" (¶236) was false because C-BASS was not maintaining "substantial liquidity" when measured against the

cascading margin calls. Moreover, this statement was false because the language "in the event" suggested that a "substantial decline in the value of its mortgages and securities" had not yet occurred when, in fact, there had already been a substantial decline as evidenced by the most recent $145 million in margin calls. ¶237. Similarly, statements about C-BASS's "strength," "long-term opportunities" and expected profits were false because they created an overly positive impression of C-BASS's business "that differ[ed] in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1005-06 (9th Cir. 2002).

### 2. Federal Courts Have Repeatedly Found that Statements Regarding Underwriting Quality Are Actionable Under Federal Securities Law

Numerous federal courts have found that allegations concerning deteriorating loan quality that are substantially similar to the allegations in this case adequately plead falsity. In *In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008), the complaint alleged material misstatements regarding "loan quality and underwriting." *Id.* at 1225. Plaintiff alleged that defendant's statements that it had "improved underwriting controls and appraisal review process" and "strict underwriting and risk management disciplines" were false in light of confidential witness statements attesting to riskier loan origination practices, data indicating "rising default and delinquent loans," and data showing a "proliferation of high-risk loans." *Id.* The *New Century* court held that such "pleadings adequately support a finding that these statements were false and misleading when made." *Id.* The *New Century* court further noted that two other decisions, *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008) and *In re Countrywide Fin. Corp Deriv. Litig.*, 542 F. Supp. 2d 1160 (C.D. Cal.) had found that "similar statements regarding loan quality and underwriting" provided "a basis for actionable securities law violations." 588 F. Supp. 2d at 1225. Similarly, in *Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871 (N.D. Ill. 2004), plaintiff alleged that defendant "misled investors by

repeatedly assuring them that the company's underwriting standards were 'targeted' and 'prudent'" when, in fact, defendant "had actually lowered its underwriting standards." *Id.* at 898. As in *New Century*, the *Ong* court held that such allegations adequately plead falsity. *Id.*

The Court should reach the same result here and hold that Plaintiff has adequately pled falsity with respect to: (1) Defendants' false reassurances that MGIC's purportedly superior underwriting quality had insulated the Company from the subprime mortgage crisis; (2) Defendants' misleading statements about the rate of defaults and impending losses on recent vintage year business; and (3) Defendants' false reassurances about C-BASS and the its hiding of its crippling margin calls.

### 3. Defendants' Arguments Are Easily Dismissed

#### a. None of Defendants' Purported "Disclosures" Render Their Statements Non-Misleading

Defendants spend a significant amount of effort attempting to argue that they somehow disclosed facts rendering their statements not misleading. *See* MGIC Mtd Brief at 12-22, 43-46, 51-52; C-BASS Mtd. Brief at 15-16. These arguments fail because Defendants did not, in fact, disclose the relevant truth regarding MGIC's deteriorating underwriting standards, MGIC's delinquency trends or the liquidity crisis threatening C-BASS. Accordingly, none of Defendants' supposed disclosures render their statements non-misleading. *See In re PMI Group, Inc. Sec. Litig.*, No. 08-1405, 2009 WL 1916934 (N.D. Cal. July 1, 2009) (disclosures irrelevant where they did not sufficiently dispel false impression created by statements); *Sequel Capital, LLC v. Rothman,* No. 03 C 0678, 2003 WL 22757758, at *11 n.7 (N.D. Ill. Nov. 20, 2003) (the "disclosures" relied upon by defendants did not "accurately inform rather than mislead prospective buyers.").

The court in *PMI* addressed and rejected a similar argument from defendants who contended that their statements were not false in light of "disclosed information about its underwriting practices and the characteristics of the loans that it insured." 2009 WL 1916934, at *7. The *PMI* court rejected this argument, holding that PMI's supposed "disclosures" had to "be viewed along with defendants' repeated statements about PMI's prudent and careful risk management" and the allegations that PMI's practices had deteriorated. *Id.* Thus, despite the disclosures, defendants' statements were still misleading because they "'create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exists.'" *Id.* (quoting *Brody*, 280 F.3d at 1005-06; *Sequel Capital*, 2003 WL 22757758, at *11 n.7; *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow.").[10]

In addition, Defendants' arguments are merely variations of the "truth on the market" defense, which is not available at the "pleading stage." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). "The 'truth on the market' defense provides that 'a misrepresentation is immaterial if the information is already known to the market because the misrepresentation

---

[10]    In a variation of this argument, Williams and Draghi argue that they disclosed that C-BASS was facing "increased margin calls." *See* C-BASS Mtd. Brief at 15-16. In support of their argument, Williams and Draghi point to a general statement by Williams that "[l]iquidity remains a primary issue for subprime market participants as illustrated by . . . increased margin calls from all lenders." *Id.* Williams and Draghi also point to Draghi's statement on July 19, 2007 that C-BASS had "$150 million in cash resources," which they contrast with Williams' statement on April 11, 2007 that C-BASS had "approximately $200 million in cash reserves." (*Id.* citing ¶¶226, 244.) These statements obviously do not disclose that C-BASS was subject to a severe run of margin calls, first between April and June 2007 for $90 million and then for another $145 million between July 1, 2007 and July 18, 2007, as a result of the plunging value of its assets. Accordingly, they cannot render Defendants' statements non-misleading. *See PMI*, 2009 WL 1916934, at *7. Even if these statements did reveal some aspect of the truth, they are too obscure to immunize Defendants' statements. *Lindelow v. Hill*, No. 00-3727, 2001 WL 830956, at *3 (N.D. Ill. July 20, 2001) ("[T]he disclosure required by the securities law is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.").

33

cannot then defraud the market.'" *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-5893, 2006 WL 3332917, at *2 (N.D. Ill. Nov. 13, 2006) (quoting *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 167 (2d Cir. 2000)). The truthful corrective information, however, "must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Id.* (quoting *Ganino*, 228 F.3d at 167). As indicated by the Seventh Circuit, this is not the appropriate stage to entertain Defendants' argument that their other public statements somehow divulged the truth to the market.

### b.     The Defendants Had a Duty to Disclose

Defendants argue that they did not have a duty to disclose C-BASS's margin calls (MGIC Mtd. Brief at 59; C-BASS Mtd. Brief at 16-18), and the MGIC Defendants also argue that they did not have a duty to disclose MGIC's rising loan delinquencies. MGIC Mtd. Brief at 50-51.

However, it is established that a party has a duty to speak if omitting particular facts makes an existing statement misleading. *Zurich Capital Markets Inc. v. Coglianese*, No. 03-7960, 2005 WL 1950653, at *4 (N.D. Ill. Aug. 12, 2005) ("a party has a duty to disclose when a failure to speak renders its prior statements misleading") (citing *Tricontinental Indus., Ltd. v. Anixter*, 184 F. Supp. 2d 786, 788 (N.D. Ill. 2002)). "If one speaks, he must speak the whole truth." *Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir. 1991); *W. Pennsylvania Elec. Employees Pension Trust v. Plexus Corp.*, No. 07-582, 2009 WL 604276, at *2 (E.D. Wis. Mar. 6, 2009) (Adelman, J.) ("An issuer of stock need not disclose the hazards of its business, but the data it discloses must be accurate and sufficient to enable investors and analysts to draw conclusions about the company's condition.") (citing *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir. 1989)).

In this, Defendants do not (and cannot) dispute that they made numerous statements that specifically addressed MGIC's underwriting standards and loan delinquencies and C-BASS's liquidity, subprime assets valuations and business prospects. Furthermore, accepting the CCAC's allegations as true, these statements were misleading for the reasons discussed *supra*, including that they misleadingly conveyed an impression that the delinquencies in MGIC's 2005 and 2006 books of business were not escalating dangerously. Defendants' half-truths further misled investors by suggesting that C-BASS had ample liquidity and was not experiencing a ruinous assault of margin calls that threatened its viability. Accordingly, when Defendants chose to speak about MGIC's loan delinquencies and C-BASS's liquidity and business status, they incurred a duty to speak. *In re Shopko Sec. Litig.*, No. 01-1034, 2002 WL 32003318, at *11 (E.D Wis. Nov. 5, 2002) (Adelman J.) ("defendants argue that regardless of whether plaintiffs have pled with particularity, plaintiffs fail to state a claim because defendants had no duty to disclose . . . . However, when defendants chose to speak about the financial difficulties [the company] faced, they had a duty not to provide false information or omit material information so as to mislead investors . . . .").

### c. The MGIC Defendants Endorsed Analyst Statements

Citing to *Southland Sec. Corp. v. INspire Ins. Solutions, Inc.*, 365 F.3d. 353, 374 (5th Cir. 2004), the MGIC Defendants argue that they are not liable for a statement in a Citigroup analyst report based on a March 9, 2007 meeting between Citigroup analysts and Culver, Lauer and Pierzchalski. *See* MGIC Mtd. Brief at 54 (quoting ¶212).[11] This is not true because, as indicated in the portion of the *Southland* opinion cited by the MGIC Defendants, a party will be liable for analyst statements where it has "sufficiently entangled [itself] with the analysts' forecasts [so as]

---

[11] The challenged statement is: "we believe MTG had anticipated much of the downturn in subprime mortgage (albeit not the rapid pace of the decline) and had avoided the more 'toxic' and aggressively underwritten loans . . . .'" ¶212.

to render those predictions 'attributable to [the issuers].'" *Southland*, 365 F.3d at 373. For instance, a plaintiff may show that "officials of a company 'have, by their activity, made an implied representation that the information they have reviewed is true or at least in accordance with the company's views.'" *Id.* "The investors could also allege that the defendants used the analysts as a conduit, making false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market." *Id.*

It is clear in this case that the statements in Citigroup's report, including the one challenged by the MGIC Defendants, are based on and carry the implied endorsement of Culver, Lauer and Pierzchalski. Indeed, the entire report is premised on a meeting between "MGIC's senior management team, including CEO Curt Culver, CFO Matt Lauer and EVP of risk management Larry Pierzchalski on Friday (3/9/07) at the company's headquarters in Milwaukee" and the report is riddled with statements and representations attributed to the MGIC Defendants. ¶212. Such allegations are sufficient to hold the MGIC Defendants accountable. *See Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980) ("We have no doubt that a company may so involve itself in the preparation of reports and projections by outsiders as to assume a duty to correct material errors in those projections."); *see also In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1467 (N.D. Cal. 1996) (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

> **d.    The MGIC Defendants Are Liable for the Statements of Williams and Draghi at MGIC Earnings Calls**

The MGIC Defendants incorrectly assert that they are not liable for the statements made in their presence by Williams and Draghi at MGIC's earnings calls.

The *Tellabs II* court held that a corporation and its officers may be liable for statements where under the circumstances, it is clear that the statement could not have been made without

being "approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."[12] 513 F.3d at 710; *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) ("[Defendants] cannot escape liability simply because [they] carried out [their] alleged fraud through the public statements of third parties."). This case, in which it is alleged that Williams and Draghi spoke on MGIC earnings conference calls in the presence of Culver, Lauer and Pierzchalski (¶¶219, 238), inarguably presents such circumstances. The only reasonable conclusion that an investor could draw is that Williams and Draghi were speaking with the full approval of Culver, Lauer and Pierzchalski. Accordingly, the MGIC Defendants are liable for Williams' and Draghi's statements. *Tellabs II,* 513 F.3d at 710; *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005) ("Where it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not alleged which defendant made the statement and which defendant did not correct it, the fraud is sufficiently pleaded as to each defendant. This is not inconsistent with the plain language of subsection (1) of 15 U.S.C. §78u-4(b), and accords with common sense and the policy considerations underlying the heightened pleading requirements.").

Moreover, Culver, Lauer and Pierzchalski are equally liable because they knowingly failed to correct the misstatements that Williams and Draghi made during the July 19, 2007 conference call. *See, e.g,* *Intervoice Brite*, 397 F.3d at 262 (where "one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not alleged which defendant spoke and which defendant failed to speak, the fraud is sufficiently pleaded as to each defendant"); *In re SmarTalk Teleservices, Inc. Sec. Litig.,* 124 F. Supp. 2d

---

[12]     This point was not argued in the case cited by the MGIC Defendants, *Pugh v. Tribune Co.*, 521 F.3d 686, 697 n.5 (7th Cir. 2008) ("While 'it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud,' [citation to *Tellabs II*, 513 F.3d at 710], the plaintiffs do not make that argument here.").

527, 543 (S.D. Ohio 2000) ("[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements. If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context."); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 764 (N.D. Cal. 1997) (same).

### e. Cautionary Language Does Not Render the Alleged Misrepresentations and Omissions Immaterial or Protect Defendants from Liability

Defendants further argue that their class period statements are rendered non-actionable by PSLRA's safe harbor provision. *See* MGIC Mtd. Brief at 60-65; C-BASS Mtd. Brief at 26-28. This defense is not available as most of the challenged statements are not forward-looking and, to the extent that some are, Defendants' cautionary language is insufficient to invoke the narrow defense of the PSLRA's safe harbor provision.

As an initial matter, it is clear that the issue of whether cautionary language is sufficient is an intensive fact issue that is not resolvable on a motion to dismiss. Indeed, because "the effect of cautionary language on an otherwise misleading statement must be assessed on a case-by-case basis," these defenses require a fact-specific showing that is generally inappropriate on a motion to dismiss. *See U.S. v. Morris*, 80 F.3d 1151,1167 (7th Cir. 1996) (noting that "we have yet to encounter a case where the [bespeaks caution] doctrine applied to negate the materiality of a misleading statement as a matter of law"); *see also Blatt v. Corn Products Int'l, Inc.*, No. 05-3033, 2006 WL 1697013, at *5 (N.D. Ill. June 14, 2006) (holding that the sufficiency of cautionary language may present a question of fact or law that cannot be determined on a motion to dismiss).

More importantly, Defendants have mischaracterized many of their statements as forward-looking in nature. However, a cursory review of these statements demonstrates that

many are not forward-looking at all but rather are statements of past or present fact that are not entitled to protection under the bespeaks caution doctrine or the safe harbor provision. *See Takara Trust v. Molex Inc.,* 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006) (safe harbor did not apply to statements regarding company's ability to absorb raw material costs because they referred to "past, not future, performance").

For example, by their nature, Plaintiff's allegations regarding MGIC's deteriorating underwriting almost exclusively refer to the past, *e.g.*, statements asserting that MGIC had protected itself with "focused underwriting and risk layering in its bulk transactions." ¶210. Plaintiff's statements regarding loan delinquencies also generally concern past or present fact, *e.g.*, on January 11, 2007, Pierzchalski reassured that there was "no significant change" in MGIC's subprime portfolio. ¶196. Finally, Plaintiff's allegations regarding statements at the July 19, 2007 conference call are generally historical, *e.g.*, MGIC's press release stated that "C-BASS maintains substantial liquidity to cover margin calls in the event of substantial declines in the value of its mortgages and securities." ¶236. Though this statement was in a section described as forward-looking, the use of the present tense, "maintains," indicates that the statement is not forward-looking while the language "in the event of substantial declines" conveys the historical implication that no "substantial declines" had occurred. Furthermore, many statements on July 19, 2007 involve omissions, which cannot be forward-looking in nature. *See Takara*, 429 F. Supp. 2d at 974 (holding that "it is axiomatic that the failure to make a statement cannot be forward-looking").

Additionally, the cautionary language cited by Defendants is not sufficient to invoke the protection that Defendants seek. Cautionary language accompanying forward-looking statements must be meaningful in nature, *i.e.*, "'substantive and tailored to the specific future

projections, estimates or opinions' that are alleged to be misleading." *Morris*, 80 F.3d at 1167 (quoting *In re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*, 7 F.3d 357, 372 (3d Cir. 1993)). In other words, it must "'mention[] those sources of variance that (at the time of the projection) were the principal or important risks.'" *Takara,* 429 F. Supp. 2d at 974 (quoting *Tellabs I*, 437 F.3d at 599). Further, as one court has held with respect to the bespeaks caution doctrine, "[the] cautionary statement must discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to nil.'" *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d. 901, 928 (D.N.J. 1998) (quoting *Virginia Bankshares*, 501 U.S. 1083; *see also White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 986 (E.D. Wis. 2002). Here, the MGIC Defendants point to **general** factors such as the value of housing or a general deterioration of economic conditions that do not encompass the specific risk. *See* MGIC Mtd. Brief at 63-64.

In any event, Defendants only challenge a handful of statements as forward-looking. *See* MGIC Mtd. Brief at 61-62; C-BASS Mtd. Brief at 27.

### f.    Defendants' Statements Are Not "Corporate Puffery"

Defendants do not contest that the CCAC pleads numerous misleading statements and omissions that clearly do not fall within the scope of puffery. Rather, Defendants assert that a few of the statements by the CCAC are too vague to be material. *See* MGIC Mtd. Brief at 66-67; C-BASS Mtd. Brief at 28-29.

Defendants' arguments regarding these statements are unsuccessful because misrepresentations cannot be considered puffery or expressions of corporate optimism just because some of the statements traversed into "matters of opinion and hope." *Lindelow*, 2001 WL 830956, at *4. "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Tellabs I*, 437 F.3d at 596. Courts have routinely held that statements conveying corporate

aspirations or forecasts are actionable where, as here, the speaker failed to disclose existing facts that undermined those representations. *See, e.g., Lindelow*, 2001 WL 830956, at * 4 (statements of "strategy" and "goals" were actionable where "the stated goals were not obtainable"); *In re Next Level Systems, Inc.*, No. 97-7362, 1999 WL 387446, at *7 (N.D. Ill. Mar. 31, 1999) (company's failure to address facts undermining its forecasts was a material omission); *see also Tellabs I,* 437 F.3d at 598 (alleged false statements were not mere corporate puffery, but were material to markets as evidenced by the fact that analysts were asking questions relating to statements during analysts' conference calls).

### g. Defendants' False Statements and Omissions Are Material

Defendants do not contest that the statements and omissions pleaded in the CCAC are material and as the Seventh Circuit has held, the determination is generally not appropriate at the motion to dismiss stage. *Marks v. CDW Computer Centers, Inc*., 122 F.3d 363, 370 (7th Cir. 1997) ("'[t]he determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact;' thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss") (quoting *TSC Industries, Inc. v. Northway, Inc*., 426 U.S. 438, 450 (1976)).

Nevertheless, it is clear that Defendants' false and misleading statements regarding MGIC's underwriting practices and exposure to risk are material because they go to the heart of MGIC's profitability as a company. *See Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) ("[M]ateriality depends on the significance the reasonable investor would place on the withheld

or misrepresented information.")  Defendants' false and misleading statements regarding margin calls at C-BASS are clearly material for the same reason.[13]

## C.    The CCAC Adequately Pleads Scienter

Defendants also argue that the CCAC should be dismissed for failing to adequately plead scienter.  A plaintiff may plead scienter by alleging facts which demonstrate that a defendant knowingly made a false statement or recklessly disregarded "a substantial risk that it was false." *Tellabs II,* 513 F.3d at 704.  "A plaintiff may satisfy the heightened requirements for falsity and scienter and thus, raise a strong inference of fraud, by pointing to specific facts indicating that (1) the defendants' statements were false or misleading at the time they were made, and (2) the defendants either actually knew they were false or misleading, or 'egregiously refused to see the obvious, or to investigate the doubtful.'"  *Shopko*, 2002 WL 32003318, at *6.  As the Seventh Circuit has stated, "[s]cienter is normally a factual question to be decided by a jury, but the complaint must at least provide a factual basis for its scienter allegations." *Tellabs I*, 437 F.3d at 602.  In this context, recklessness is defined as "an extreme departure from the standards of ordinary care, [] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id.* at 600 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033,1045 (7th Cir. 1977); *see also Tellabs II*, 513 F.3d at 704 (same).  In addition, allegations of motive and opportunity to commit fraud may further support a strong inference of scienter, but are by no means a prerequisite to pleading a strong inference of scienter under the PSLRA.  *See Tellabs I*, 437 F.3d at 601.

In addition, a court must consider the totality of the facts alleged to determine whether they give rise to '"an inference of scienter ***at least as likely*** as any plausible opposing

---

[13] Furthermore, the CCAC is not a so-called "puzzle pleading."  As explained throughout this brief, the CCAC sets forth in clear detail allegations describing which of Defendants' statements were false at the time they were made. *See, e.g.,* ¶¶ 177-271.

inference.'"  *See Tellabs II*, 513 F.3d at 705 (quoting *Tellabs*, 127 S. Ct. at 2513).  "The inference favoring plaintiff's claim 'need not be irrefutable, . . . of the 'smoking-gun' genre, or even the most plausible of competing inferences.'  Rather, plaintiff's complaint survives if a 'reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged.'"  *Lewis v. Straka,* 535 F. Supp. 2d 926, 928-29 (E.D. Wis. 2008) (Adelman, J.).

1.    **Defendants Culver, Lauer and Pierzchalski Either Knew or Were Reckless in Not Knowing that Their Statements About MGIC's Underwriting Practices and Delinquencies Were False**

The CCAC contains several particularized facts that, when considered in their totality, give rise to a compelling inference that Defendants Culver, Lauer and Pierzchalski knew, or at a minimum were reckless in not knowing, that their class period statements about MGIC's underwriting standards and delinquency rates were false at the time they were made.  These facts include, among others:

- **Testimony of Confidential Witnesses:**  Several of the confidential witnesses testified that Culver, Lauer and Pierzchalski knew that their statements regarding MGIC's superior underwriting practices and delinquency rates were false when made, including CW3, who discussed the issue directly with Culver shortly before she was terminated from the Company for voicing her concerns.

- **Defendants' Own Class Period Statements:**  Culver, Lauer and Pierzchalski all made highly detailed statements about MGIC's underwriting practices and delinquency rates during the class period showing that they were knowledgeable about these particular issues, which is sufficient to raise a strong inference that these Defendants knew or were reckless in not knowing that their class period statements were false.

- **Defendants' Access to Contrary Information:** Defendants Culver, Lauer and Pierzchalski told analysts during conference calls that they had personal access to undisclosed detailed information about MGIC's underwriting practices and delinquency rates that would have shown that their class period statements were false.

- **Severity of the Problems:** The fact that MGIC at the end of the day had an astonishing 58% delinquency rate shows how shocking these problems were and raises a strong inference that Defendants could not possibly have missed the rampant weaknesses in the loans they were insuring.

- **The Fact that Statements Went to MGIC's Core Operation:** The problems regarding MGIC's subordination of its loan origination standards and its current delinquency rates went to the Company's core business operations, which is also sufficient to give rise to a strong inference of scienter.

Considered in their totality, these facts easily give rise to a compelling inference that Defendants Culver, Lauer and Pierzchalski knew or recklessly disregarded that their Class Period statements about MGIC's superior loan underwriting standards and delinquency rates were false. As this Court has held in *Lewis*: "Assuming, as I must, that the facts alleged in the complaint regarding the deterioration of the quality of the loan portfolio and the inadequacy of credit review procedures and loan loss reserves are true, it is difficult not to draw a strong inference that an individual involved . . . . was aware of these problems. The inference is that [defendant] recklessly turned a blind eye to the financial health of the [company] with which he was personally involved or that he had knowledge of the deterioration in the health of the company but, in order to buy time to fix the problem, opted not to initially disclose the truth." 535 F. Supp. 2d 926 at 931. The same reasoning holds true here, and, accordingly, Defendants' motions to dismiss should be denied.

### a. The Confidential Witnesses

The CCAC alleges a strong inference of scienter – first and foremost – because the confidential witnesses all testified that the MGIC Defendants knew that their public statements about the Company's superior underwriting practices and delinquencies were false when made. ¶¶107, 113, 122, 133.

One of the confidential witnesses, CW3, specifically states that she twice warned Culver and MGIC COO Sink about MGIC's dangerously lax underwriting practices. ¶¶129, 131. CW3 reports that she first warned Culver and Sink about MGIC's practices in 2006 and that she warned them a second time, by e-mail, in late March to April 2007. *Id.* CW3 alleges that, in her email, she "called [Culver and Sink] on the carpet for their bad behavior" and questioned their willingness to take such "big risks." ¶131. CW3 also asked Culver and Sink why they allowed MGIC to insure large numbers of bad loans. *Id.* Importantly, this is precisely when Culver and the other top MGIC executives were hawking the strength of MGIC's underwriting in meetings with KBW and Citigroup.

Such allegations support a strong inference of scienter. For example, *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004), plaintiff alleged, *inter alia*, that the defendant was "informed in a series of meetings by at least one employee that [the company] was 'living on revenue that was not of the highest quality,'" but that the defendant continued to "tout[] the strength of [the company's] advertising and commerce revenues." ¶221. Accordingly, the *AOL* court held that "[g]iven the allegedly stark contrast between [defendant's] knowledge and [defendant's] public statements, the Court is satisfied that plaintiff has adequately pled that [defendant] 'knew facts or had access to information suggesting that [his] public statements were not accurate; or failed to check information [he] had a duty to monitor.'" *Id.; see also Stavros v. Exelon Corp.,* 266 F. Supp. 2d 833, 849 (N.D. Ill. 2003) (stating that plaintiffs "must plead with particularity facts that imply that a defendant knew that the projection was false. For example, a plaintiff might present circumstantial evidence . . . . that a witness informed a defendant of the falsity of the statement before it was made"); *In re Northpoint*

*Communications Group, Inc., Sec. Litig.*, 184 F. Supp. 2d 991, 997-98 (N.D. Cal. 2001) (same).[14]

Furthermore, all the confidential witnesses indicated that MGIC's underwriting practices had degenerated as MGIC gave in to the demands of mortgage lenders who demanded that unduly risky loans be insured. CW1 noted that MGIC "acquiesced" and "capitulated" to the pressure to insure "bad loans," noting that "all kinds of high risk loans were insured." ¶110. CW2 explained that MGIC's underwriting process was "all about politics," meaning that whether or not a loan was approved for insurance had less to do with its risk and more to do with how approving the loan might win favor from mortgage lenders such as Countrywide. ¶120. CW3 stated that her supervisor personally directed her to pursue business with excessively risky subprime mortgage originators despite being informed that these originators were too risky. ¶127. CW3 also sat in on sales conference calls where changing underwriting practices were discussed. ¶124. CW4 described how Flagstar took control of MGIC's underwriting process and forced MGIC to make "exceptions" to its underwriting process by, for example, insuring loans in housing markets that MGIC had classified as "declining." ¶139. These witnesses also stated that the degeneration of MGIC's underwriting was widely known and discussed because MGIC's underwriting practices were relevant on a daily basis to the job responsibilities of many employees at MGIC. ¶¶121, 125, 127-129, 131-132, 136-138. These allegations show that the

---

[14] The cases cited by the MGIC Defendants (MGIC Mtd. Brief at 43), do not say otherwise. The court in *In re Downey Sec. Litig.*, No. 08-3261, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) found that the statement that "all of the top executives at [the defendant company] knew that dangerously loose underwriting was occurring" was not sufficient to show scienter because it was "not supported by any facts or additional statements of confidential witnesses" and because it was "vague and conclusory." *Id.*, at *13. Thus, this case has no application to the present situation, where the CCAC has supported its allegations by setting forth the "who, what, where, how and when" of CW3's warnings to Culver and Sink. Moreover, the allegations that Sink responded to CW3's e-mails by calling her from his vacation demonstrates that CW3 caught Defendants' attention. ¶¶131-132.

deterioration at MGIC was widespread and well-known, supporting a strong inference of scienter. *Tellabs*, 513 F.3d at 710; *Shopko,* 2002 WL 32003318, at *9 ("the above factual allegations indicate that the problems . . . . were substantial, thereby raising a strong inference that defendants must have known about them."); *New Century*, 588 F. Supp. 2d at 1229 (finding a strong inference of scienter as to allegations that defendant made misleading statements about its underwriting practices where "the confidential witness statements describe a staggering race-to-the-bottom of loan quality and underwriting standards as part of an effort to originate more loans").

### b.    Defendants' Own Statements

In addition, Culver's own writing evinces knowledge that a deterioration in underwriting standards leading to the insurance of stated income loans, particularly for wage-earners, would cause high levels of losses – which he estimated at five times the normal rate.  As alleged in the CCAC, Culver described in a 2004 article how many "stated income" or Alt-A loans, particularly to wage-earners who could easily document their incomes if they were being truthful, are procured through fraud by individuals whose incomes were inadequate to meet their monthly mortgage payments.  ¶¶70-71.  He also observed that these losses would materialize when housing prices stopped appreciating.  Although Culver  says in the article that MGIC had underwriting standards that bar these loans, even he acknowledged that during the Class Period MGIC did, in fact, insure these obviously fraudulent stated income loans until, in November 2007, he decided these loans were "silly."

Furthermore, Culver, Lauer and Pierzchalski each specifically addressed MGIC's underwriting practices and loan delinquencies in ways that minimized the problems, which gives rise to a strong inference of scienter.  *Shopko*, 2002 WL 32003318, at *10 ("defendants' particular insistence that the problems lay with external factors, such as the economy, supported

an inference of at least reckless disregard for the truth.")  A strong inference of scienter further arises from Culver's, Lauer's and Pierzchalski's "special roles and responsibilities in communicating information to the investment community" and their assertions of knowledge support a strong inference of scienter.  *See In re Vicuron Pharm., Inc. Sec. Litig.*, No. 04-2627, 2005 WL 2989674, at *6 (E.D. Penn. July 1, 2005); *see also In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1028 (N.D. Ohio 2000).  Comparing the scienter element to common law fraud requirements, the Sixth Circuit in *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558 (6th Cir. 2001) noted that: "'[a] defendant who asserts a fact as of his own knowledge or so positively as to imply that he has knowledge, under the circumstances when he is aware that he will be so understood when he knows that he does not in fact know whether what he says is true, is found to have intent to deceive'" and is reckless in not ascertaining the truth.  251 F.3d at 558 (quoting W. Page Keaton et al., *Prosser and Keaton on the Law of Torts*, 741-42 (5th ed. 1984)).

This is exactly what has happened here.  For example, Lauer explained away rising loss provisions caused by bad underwriting with "reassuring spin" that the increase stemmed from the increase of the size of loans insured rather than any worrisome trend in the frequency of nonpayment.  ¶222.  Similarly, on January 11, 2007, Culver misled analysts about increased losses and delinquency rates by suggesting that MGIC's increased losses were the result of a "customary seasonal increase in delinquencies" (¶193) and, on April 11, 2007, Pierzchalski suggested that MGIC's experience was different from others in the market.

### c.    Defendants Had Access to Contrary Information

During the Class Period, Culver, Lauer and Pierzchalski were high-level executive officers who were responsible for running MGIC's day-to-day operations.  ¶¶14-16.  In the context of performing their responsibilities, the MGIC Defendants had access to information concerning MGIC's underwriting quality and loan delinquency rate that contradicted their public

statements. For example, as Lauer indicated during the Class Period, he and Culver were responsible for considering the appropriateness of MGIC's loss reserves, and, in connection with these responsibilities, closely followed delinquency trends in MGIC's insurance business, by vintage year. ¶222. Similarly, Pierzchalski, who served as MGIC's risk officer during the Class Period, indicated that he followed delinquencies in MGIC's insurance business by vintage year. ¶185; (stating that "[b]ook to book to book, I think delinquencies and claims paths are pretty much in line with one another. . . .").

The trend delinquencies in MGIC's 2005 and 2006 books of insurance were escalating dramatically throughout the Class Period in contradiction to the MGIC Defendants' representations. For example, as of September 30, 2007, MGIC's 2005 and 2006 bulk insurance portfolio had already suffered severe delinquency rates of 22.6% and 17.2% respectively. ¶¶82-83. On February 13, 2008, MGIC was forced to reveal that, in 2005 and 2006, it had insured large volumes of Wall Street bulk mortgages that suffered from severe delinquency rates of 32.97% and 30.17% respectively. ¶85. The delinquency rates for the 2005 and 2006 Wall Street bulk insurances significantly exceeded the delinquency rates for Wall Street bulk transactions from earlier years. *Id.*

Accordingly, Culver's, Lauer's and Pierzchalski's access to contradictory information supports a strong inference of scienter in this case. "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Lewis*, 535 F. Supp. 2d at 928-29. *See Tellabs II*, 513 F.3d at 704 ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk."). It would be implausible for the highest level executives at MGIC – such as the CEO (Culver),

CFO (Lauer) and Executive Vice President of Risk Management (Pierzchalski) – to be so utterly out of touch as to be unaware of MGIC's underwriting practices and risk during 2005 and 2006.

### d. The Severity of Problems

The severity of the deterioration in MGIC's underwriting practices and the consequent surge in delinquencies supports a strong inference of scienter. MGIC's problems during the class period were neither insignificant nor intermittent. Rather, the CCAC alleges a substantial and pervasive break down in MGIC's underwriting practices that led to imprudent risk taking. MGIC's largest client, Flagstar, leveraged its importance to force MGIC to make "exceptions" to its underwriting policy and, for example, insure mortgages in declining residential markets. ¶¶139, 110, 120 (discussing MGIC's subordination to lenders). And MGIC's management relentlessly pursued subprime business despite objections from lower level employees that certain subprime lenders were too risky. ¶127. Moreover, MGIC's weakening underwriting caused a shocking collapse in the credit quality of MGIC's 2005 and 2006 vintage books that occurred during the Class Period and resulted in more than a billion dollars in losses. ¶¶82-87, 285-286 (MGIC unexpectedly announced $1.2 billion "pre-tax premium reserve deficiency relating to Wall Street bulk transaction").

Such circumstances give rise to a strong inference of scienter. *Shopko,* 2002 WL 32003318, at *9 (factual allegations indicating that problems were substantial raised a strong inference that defendants must have known about them) (citing *Rehm v. Eagle Finance Corp.,* 954 F. Supp. 1246, 1256 (N.D. Ill. 1997)).

### e. Defendants' Misrepresentations Went to MGIC's Core Operations

The centrality of MGIC's underwriting practices and delinquency rates to MGIC's business gives rise to a strong inference of scienter. MGIC's core operations during the Class Period involved determining what mortgages to insure and what mortgages were too risky to

insure and the collection of an appropriate amount of premium to insure the risks that MGIC chose to take on. ¶¶2, 29 (describing MGIC's business). Therefore, the process by which MGIC determined which mortgages were too risky to insure and what premiums should be collected were part of MGIC's core operations as a business. The rate at which insured mortgages went delinquent was also a core aspect of MGIC's business because it was a primary driver of MGIC's expenses, and therefore, overall profits. ¶¶34-39; 222.

It is well-established in this Circuit that such circumstances support a strong inference of scienter. *See, e.g., Tellabs II*, 513 F.3d at 709 (where defendants made representations regarding company's "most important products," it was "exceedingly unlikely" that such statements were not made with scienter); *Shopko,* 2002 WL 32003318, at *11 (holding that because business was "so important," it was "highly likely" that defendants "knew that the [business] was not meeting expectations" and that the allegations of the complaint raised a strong inference of scienter); *Selbst v. McDonald's Corp.,* No. 04-3635, 2005 WL 2319936, at *20 (N.D. Ill. Sept. 21, 2005) (holding that "high-level [] managers . . . may be presumed to have been aware of [] problems' at their company") (quoting *Danis v. USN Communs., Inc*., 73 F. Supp. 2d 923, 938-39 (N.D. Ill. 1999)); *In re Sears, Roebuck & Co. Sec. Litig*., 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (holding that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance'").

### 2. C-BASS Defendants and the MGIC Defendants Knew or Were Reckless in Not Knowing that Their Statements About C-BASS Were Misleading

The CCAC also sets forth numerous particularized facts showing that both the C-BASS Defendants (Williams and Draghi) and MGIC Defendants (Culver, Lauer and Pierzchalski) either knew or were reckless in not knowing that the statements they made about C-BASS on the July 19, 2007 conference call were false.

### a.    The C-BASS Defendants

First, with respect to Williams and Draghi, who served as C-BASS's CEO and COO, respectively, during the relevant period, the CCAC's allegations establish a strong inference of scienter that is at least as cogent and compelling as any plausible opposing inference for the following reasons:

- **Access to contrary information**: The complaint shows in detail that, throughout the relevant period, Williams and Draghi had access to information about C-BASS's liquidity situation and the value of C-BASS investments that contradicted their public statements. As alleged by CW6, Williams and Draghi received updates from C-BASS's staff concerning C-BASS's business at C-BASS Board meetings and ahead of appearances at MGIC analyst calls.  ¶¶147-148.  Indeed, as the C-BASS Defendants point out, Draghi knew about C-BASS's liquidity position on July 19, 2007 as shown by his statement that C-BASS had $150 million in cash resources.  C-BASS Mtd. Brief. at 15.  This supports a strong inference of scienter.  *Lewis*, 535 F. Supp. 2d at 928-29; *Tellabs II*, 513 F.3d at 704.

- **Severity of the problem:**  Importantly, $145 million in margin calls that occurred between July 1, 2007 and July 18, 2007 knocked out approximately half of C-BASS's liquidity in two weeks and signaled a collapse in the value of C-BASS's subprime assets that threatened its existence.  The severity of these problems supports a strong inference of scienter.  *Lewis*, 535 F. Supp. 2d at 930 (holding that $200 million was "large dollar volume" and that this supported scienter); *Shopko,* 2002 WL 32003318, at *9.

- **Core Operations**:  C-BASS's predominant business involved purchasing, servicing and securitizing residential mortgages.  ¶88.  Accordingly, the value of C-BASS's mortgage-backed securities was part of C-BASS's core operations.  C-BASS's liquidity and "access to the market" were also aspects of its core operations.  ¶226.  This supports a strong inference that Williams and Draghi knew about the margin calls that threatened C-BASS's liquidity and indicated that its mortgage-backed securities had fallen in value. *Tellabs II*, 513 F.3d at 709.

- **Proximity Between Misrepresentation and Revelation of Contrary Information:**  As described in the CCAC, Williams and Draghi made their misstatements on July 19, 2007 in the midst of an unprecedented wave of margin calls.  ¶¶244, 255.  Seven days later, margin calls of a lesser amount led MGIC to determine that its $500 million investment in C-BASS was impaired.  ¶252.  This close proximity supports a strong inference of scienter.  *See, e.g.*, *Helwig*, 251 F.3d at 552 ("closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" can support scienter) (abrogated on other grounds); *Greebel v. FTP Software, Inc*., 194 F.3d 185, 196 (1st Cir. 1999) (same).

When considered in their totality, these facts are sufficient to give rise to an inference that Defendants knew or were reckless in not knowing that their statements about C-BASS were misleading. Certainly, these facts give rise to an inference that is at least as compelling as non-fraud interpretation of the facts.

### b. The MGIC Defendants

The CCAC also contains particularized facts that give rise to a strong inference that Defendants Culver, Lauer and Pierzchalski knew or were reckless in not knowing that the statements and omissions about C-BASS during the July 19, 2007 conference call were false and misleading. These facts include:

- **Lauer Had Access to Contrary Information**: The CCAC's allegations that Defendants Culver, Lauer and Pierzchalski had access to internal information that contradicted the public statements made during the July 19, 2007 conference call. As described in the CCAC, Lauer served on the Board of C-BASS during the relevant period (¶16) and received regular reports from C-BASS's staff concerning C-BASS's financial information and business. ¶148. Thus, as with Williams and Draghi, Lauer's position at C-BASS put him in a position to know that his statements regarding C-BASS were false. *Lewis*, 535 F. Supp. 2d at 930.

- **Culver and Pierzchalski Had Access to Contrary Information:** As for Culver and Pierzchalski, the CCAC demonstrates that they had access to detailed information about C-BASS's through multiple channels. As detailed by CW6, MGIC's senior executives, including Lauer, closely monitored C-BASS's business. Throughout the relevant period, Pat Sink, MGIC's President and Chief Operating Officer, Bernie Verhoven, a vice president at MGIC, and Jeff Lane, MGIC's General Counsel, received information about C-BASS in connection with MGIC's quarterly reports and forecasts. ¶¶144-147. In addition, executives at MGIC and C-BASS received monthly earnings reports for C-BASS and there were executive management calls that occurred twice per month between C-BASS, MGIC and Radian. ¶¶147-148.

- **The Seriousness of the Credit Problems at C-BASS:** The fact that on or about July 19, 2007, MGIC and C-BASS negotiated for MGIC to extend C-BASS $50 million in additional credit provides additional evidence that Culver, Lauer and Pierzchalski knew about the liquidity at C-BASS. It is highly unlikely that the extension of such a significant amount of credit could occur without questions being asked about C-BASS's margin calls and with without the knowledge of Culver, MGIC's CEO, and Pierzchalski, MGIC's Vice President for risk

management.  *See Shopko,* 2002 WL 32003318, at *10 (explaining that a company's executive officers are likely to have knowledge about a company's significant transactions).  And this request would have put Culver, and Pierzchalski on notice that C-BASS was grossly overstating the value of its subprime assets.  As the Seventh Circuit asked in *Tellabs II*: "Is it conceivable that he [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company?  It is conceivable, yes, but it is exceedingly unlikely." 513 F.3d at 709.

- **Core Operations**: C-BASS was part of MGIC's core operations.  In 2006, C-BASS contributed 24% of MGIC's profits and represented a $450 million investment.  ¶88.  Furthermore, C-BASS was prominent in MGIC's near-term plan to merge with Radian.  ¶90.  This significance further supports a strong inference that the MGIC Defendants acted with scienter.  *Tellabs II*, 513 F.3d at 709.

- **Proximity Between Misrepresentation and Revelation of Contrary Information**:  As described in the CCAC, the MGIC Defendants made their misstatements on July 19, 2007 in the midst of an unprecedented wave of margin calls.  ¶¶236, 240, 255.  Seven days later, those margin calls led MGIC to determine that its investment in C-BASS was impaired, and to disclose the impairment a few days later.  ¶252.  Numerous courts have found that this type of close proximity between the false statements and the corrective disclosures support a strong inference of scienter.  *See*, *e.g.*, *Helwig*, 251 F.3d at 552; *Greebel,* 194 F.3d at 196.

- **Williams' and Draghi's Statements Can Be Attributed to Culver, Lauer and Pierzchalski**:  Moreover, there simply is no question in this case as to whether Williams' and Draghi's false statements can be attributed to Culver, Lauer, Pierzchalski and MGIC itself.  They can.  *See, e.g, Intervoice Brite*, 397 F.3d at 262 (where "one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not alleged which defendant spoke and which defendant failed to speak, the fraud is sufficiently pleaded as to each defendant"); *In re SmarTalk Teleservices, Inc. Sec. Litig.,* 124 F. Supp. 2d 527, 544 (S.D. Ohio 2000) ("[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements.  If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context."); *Silicon Graphics*, 970 F. Supp. at 764 (N.D. Cal. 1997) (same).

Considered in their totality, the most plausible inference to draw from these facts is that Culver,

Lauer and Pierzchalski knew on July 19, 2007 that C-BASS was experiencing a crushing wave

of margin calls indicating a severe deterioration in its business but made, or allowed Williams

and Draghi to make, numerous misleading statements that omitted information about the margin calls in a desperate attempt to buy more time to merge with Radian.[15]  These facts are sufficient to establish a strong inference of scienter and, accordingly, the motions to dismiss should be denied.[16]

### 3. Defendants' Alleged Motives Further Support a Strong Inference of Scienter as to Both Sets of Misstatements

The Seventh Circuit has held that "[m]otive and opportunity may be useful indicators," but motive and opportunity are by no means required to allege a strong inference of scienter under the PSLRA.  *Tellabs I*, 437 F.3d at 601.  In their motions to dismiss, Defendants devote the vast majority of their briefs to the claim that they had no motive to make the false statements set forth in the CCAC.  Even if Defendants' arguments were correct (and it is not), this would not provide a valid basis for dismissing the CCAC because motive and opportunity is not a necessary prerequisite to pleading a strong inference of scienter.  *Id.*  Nevertheless, in this case, the CCAC's allegations regarding the Defendants' motives supplement the strong inference of scienter established by the CCAC's allegations showing that Defendants made material misstatements with knowledge or reckless disregard for the truth.

For starters, Culver, Pierzchalski and Lauer were motivated throughout the Class Period by a desire to hide their mistakes in allowing MGIC's underwriting practices to deteriorate and

---

[16]     Furthermore, contrary to what the MGIC Defendants assert (MGIC Mtd. Brief at 57-58), the CCAC's allegations concerning MGIC's July 19, 2007 press release are not impermissible group pleading.  As indicated by the Seventh Circuit, the press release is attributable to MGIC itself.  *See Tellabs II*, 513 F.3d at 709.  Furthermore, the CCAC sufficiently attributes this statement to Lauer as well, whose job responsibilities during the class period included MGIC's "investor relations" function.  ¶16; *see Southland*, 365 F.3d at 365 ("corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue.)  For the same reasons, the MGIC Defendants' similar argument concerning statements reported by KBW (MGIC Mtd. Brief at 47 n.46) fails.

MGIC to take on a ruinous amount of risk. At the end of the day, the present case is virtually

identical to the one that the Seventh Circuit considered in *Tellabs II*. In that case, the plaintiff

alleged a strong inference of scienter by pointing to the contrary information to which defendant

had access when making the alleged misstatements. 513 F.3d at 708-09. In response, defendant

argued that an inference was not warranted on the grounds that it had no motive to commit fraud.

*Id.* at 710 ("[a]gainst all this the defendants argue that they could have had no motive . . . .

because within months they acknowledged their mistakes and disclosed the true situation of the

two products, and because there is no indication that [defendant] or anyone else who may have

been in on the fraud profited from it financially.") In rejecting this argument and finding a

strong inference of scienter, the Seventh Circuit stated that defendant's "argument confuses

expected with realized benefits. . . . [defendant] may have thought that there was a chance that

the situation regarding the two key products would right itself. If so, the benefits of concealment

might exceed the costs." *Id.* The Seventh Circuit went on: "[t]he fact that a gamble - concealing

bad news in the hope that it will be overtaken by good news - fails is not inconsistent with its

having been a considered, though because of the risk a reckless, gamble." *Id.* The same

reasoning applies here.[17]

Culver, Pierzchalski and Lauer were also motivated to commit fraud by incentive

compensation arrangements tied to financial performance metrics and, to a lesser extent,

---

[17]         Defendants rely on the Eastern District of Pennsylvania's opinion in *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594 (E.D. Pa. 2009), when arguing that the CCAC does not raise a strong inference of scienter. However, *Radian* is not on point for several reasons: (1) unlike the present case, in *Radian* there were no confidential witnesses showing a flood of information from C-BASS to MGIC, (2) unlike in *Radian,* Lauer was a member of the C-BASS Board, and therefore in a position to know about C-BASS's core business problems, (3) here, there was a much closer relationship between C-BASS's officers and MGIC because Williams and Draghi were produced at MGIC's own earnings calls to speak on MGIC's behalf about matters that affected MGIC's earnings and prospects, (4) unlike in *Radian*, the CCAC adequately pleads the importance of C-BASS to MGIC (¶88) and (5) unlike in the Third Circuit, where the issue is apparently undecided, *Tellabs II* established that knowledge of core business is a very strong factor supporting scienter.

performance and longevity, such that by lying to increase the appearance of MGIC's profitability, Culver, Pierzchalski and Lauer also increased their material wealth. ¶¶292-295. MGIC's 2007 Proxy Statement described this dynamic when it stated that "[t]he executive officers' bonus opportunities are substantially more significant than their salaries because, as noted above, bonuses are more directly linked to company and individual performance." ¶292.

A third motivation for the individual MGIC Defendants was the merger with Radian and the planned $1.75 billion buy-back of MGIC stock. The individual MGIC Defendants had a strong stake in the new, larger mortgage insurance company that they were going to dominate. ¶¶298-301. For example, Culver would serve as Chairman and CEO of the new company. ¶298. Lauer and Pierzchalski, respectively, were to assume the responsibilities of CFO and Head of Risk Management in Mortgage Insurance at the new company. ¶301. Thus, since the partial sale of MGIC's stake in C-BASS was a condition predicate for the merger, the Individual MGIC Defendants had motive to hide the fact that margin calls were threatening C-BASS's viability as a company, as this knowledge would make it more difficult to sell MGIC's stake.

The C-BASS Defendants had motive to inflate the value of C-BASS because they had or likely had ownership interests in C-BASS that would have been monetized by the sale. ¶¶302-303. This would be highly desirable for the C-BASS Defendants because, since C-BASS was a closely held joint venture, there was no public market available that would allow the C-BASS Defendants to otherwise sell their shares. ¶303.

### 4. There Is No Merit to Defendants' Standing Argument

Defendants argue at the end of their brief that all claims based on the false statements they made after February 28, 2007 should be dismissed because Lead Plaintiff did not purchase any MGIC shares after February 28, 2007. According to Defendants, Lead Plaintiff Fulton County lacks standing to assert claims based on the post-February 28, 2007 false statements

because it did not purchase its MGIC shares after these statements were made. In making this argument, Defendants conveniently overlook the fact that certain of the other Plaintiffs who filed Complaints against MGIC and C-BASS in this action purchased shares after February 28, 2007, and that these actions were consolidated with the claims of Fulton County Employees Retirement System. For instance, the Wayne County Employees' Retirement System ("Wayne County") purchased its shares on numerous dates between March 7, 2007 and December 31, 2007, which is after all of the false statements at issue in this case but before the corrective disclosures. *See* Wayne County Certification attached to the Complaint in *Wayne County Employees' Retirement Sys. v. MGIC, et al.,* Case No. 09-cv-00275 (Dkt. No. 1).

In sum, Wayne County undeniably has standing to pursue claims based on false statements that Defendants made after February 28, 2007, and Lead Plaintiff undeniably has standing to pursue claims based on false statements Defendants made before February 28, 2007. Moreover, Wayne County's case has been consolidated with this action, and Wayne County has agreed to serve as a class representative along with Lead Plaintiff Fulton County during the Class certification phase of this case. Thus, there is no merit to Defendants' standing argument and it is easily dismissed.[18]

Dated: October 6, 2009

Respectfully submitted,

PREVIANT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.

_____

Jason R. Oldenburg

---

[18] There also is no merit to Defendants' claim that the Section 20(a) claims should be dismissed. As Defendants concede in their motion, the Section 20(a) claims are derivative upon the underlying Section 10(b) claims. MGIC Mtd. at 68. Here, for the reasons explained above, Plaintiffs have pled a viable Section 10(b) claim, and, accordingly, the Section 20(a) control persons claims should not be dismissed.

1555 North RiverCenter Drive, Suite 202
P.O. Box 12993
Milwaukee, WI 53212
Telephone: 414-271-4500 or 800-841-5232
Facsimile: 414-271-6308

SCOTT + SCOTT LLP
Arthur L. Shingler III
600 B Street, Suite 1500
San Diego, CA  92101
Tel: 619/233-4565
Fax: 619/233-0508
Email: ashingler@scott-scott.com
 -and-
Geoffrey Johnson
12434 Cedar Road
Cleveland Heights, OH  44106
Tel: 216/229-6088
Fax: 216/229-6092
Email: gjohnson@scott-scott.com

 -and-
Beth Kaswan
Thomas Laughlin
29 West 57th Street, 14th Floor
New York, NY 10019
Tel: 212/223-6344
Fax: 212/223-6334
Email: bkaswan@scott-scott.com
        tlaughlin@scott-scott.com

Attorneys for Plaintiff Fulton County
Employees' Retirement System