# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**FULTON COUNTY EMPLOYEES' RETIREMENT SYSTEM,**
**individually and on behalf of all others similarly situated,**
                    **Plaintiff,**

         **v.**                                    **Case No. 08-C-0458**

**MGIC INVESTMENT CORPORATION, et al.,**

              **Defendants.**

---

## DECISION AND ORDER

        In this consolidated class action, lead plaintiff Fulton County Employees' Retirement System ("Fulton County") alleges that defendants MGIC Investment Corporation ("MGIC"), Curt S. Culver, Larry Pierzchalski, J. Michael Lauer, Bruce Williams and John Draghi committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiff is an institutional investor that brings this action on behalf of itself and other investors who purchased MGIC common stock between October 12, 2006 and February 12, 2008. Before me now are defendants' motions to dismiss the complaint.[1]

---

        [1]On March 27, 2009, I issued an order consolidating this action with four other actions involving similar allegations and the same defendants. See Plumbers & Pipefitters Local 562 Pension Fund v. MGIC Investment Corp., 256 F.R.D. 620 (E.D. Wis. 2009). In that same order, I named Fulton County lead plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3). On June 22, 2009, Fulton County filed a consolidated class action complaint. This complaint contains a few technical errors. First, although Fulton County identifies itself as the named plaintiff in the caption of the complaint, in the body of the complaint, it identifies Plumbers' & Pipefitters' Local #562 Pension Fund (the named plaintiff in one of the member actions that have been consolidated under the above case number) as the sole named plaintiff. (Compl. [Docket #49] ¶ 12.) Second, although Fulton County is the lead plaintiff for purposes of this litigation, all of the plaintiffs in the member cases should have

## I. BACKGROUND

This case involves a somewhat complicated series of events involving two different, but affiliated, companies – MGIC and Credit-Based Asset Servicing and Securitization ("C-BASS") – both of which suffered severe losses as a result of the subprime mortgage crisis that materialized in 2007. MGIC, through its principal subsidiary, is an insurer of residential home mortgages. During the class period, it insured a fair number of subprime mortgages and other types of risky mortgages. MGIC also owned a 46% interest in C-BASS, a joint venture of MGIC and another mortgage insurer, Radian Group Inc. ("Radian"). Like MGIC, Radian owned a 46% interest in C-BASS. C-BASS specialized in purchasing subprime single-family residential mortgages and packaging them into mortgage-backed securities.

Plaintiff alleges that as the subprime crisis began to unfold, MGIC, three executives at MGIC (Curt Culver, J. Michael Lauer and Larry Pierzchalski) and two executives at C-BASS (Bruce Williams and John Draghi) all made false and misleading statements designed to mask the true impact of the crisis on the companies' businesses. These statements can be divided into three categories. In the first category are statements about MGIC's underwriting practices during the time period leading up to the subprime crisis.

---

been identified as named plaintiffs in the consolidated class action complaint. Fulton County's failure to include all of the plaintiffs in the member cases as named plaintiffs in the consolidated class action complaint has caused defendants to argue that, since Fulton County did not purchase MGIC stock after February 28, 2007, it lacks standing to assert claims based on statements made after that date. However, Wayne County – a named plaintiff in one of the member cases – did purchase MGIC stock after February 28, 2007, and thus it has standing to assert claims based on defendants' later statements. Because Wayne County should have been identified as a named plaintiff in the consolidated class action complaint, and because the complaint could be amended to add Wayne County as a named plaintiff, I will not dismiss the claims based on statements made after February 28, 2007 for lack of standing.

Plaintiff argues that such statements were false because they implied that MGIC had been following "superior" underwriting practices when, in fact, its underwriting was lax. In the second category are statements about the mortgages that MGIC insured during 2005 and 2006. As the subprime crisis developed, an unusually large percentage of those mortgages went into default and eventually resulted in claims that MGIC had to pay. Plaintiff alleges that MGIC's executives knew early in the class period that these claims were coming but made statements designed to mislead investors into thinking that the 2005 and 2006 business was problem-free.

The final category of statements concerned C-BASS. Plaintiff alleges that both the MGIC defendants and the C-BASS defendants misled investors by failing to disclose during an investor conference call held on July 19, 2007 that C-BASS had received $145 million in margin calls between July 1st and the date of the call.[2] In the days following this conference call, C-BASS received another $470 million in margin calls, and C-BASS did not have the liquidity needed to pay them. This eventually led MGIC to decide that its entire investment in C-BASS (about $516 million) had been materially impaired.

Plaintiff alleges that defendants' fraudulent statements and failures to disclose caused MGIC's stock to trade at artificially high prices during the class period. Plaintiff did not purchase C-BASS securities, and thus any statements about C-BASS are actionable only insofar as they affected MGIC's stock price.

---

[2]C-BASS financed its business primarily by borrowing money from various financial institutions, using its portfolio of mortgages as collateral. As the subprime crisis developed and financial institutions began to doubt the value of these mortgages, they made "margin calls" demanding that C-BASS either put up additional collateral or pay cash to make up the difference.

3

Before turning to an analysis of plaintiff's claims, I must provide some additional background concerning MGIC's business. This background relates to all of plaintiff's claims. I note that in addition to this background, I will provide further details, as needed, in the course of my analysis of plaintiff's specific claims in the discussion section that follows.

**A.    The Nature of Private Mortgage Insurance**

Private mortgage insurance, or "PMI," insures the owner of a residential first mortgage loan against the borrower's default. It covers unpaid loan principal, delinquent interest, and certain expenses associated with the default and subsequent foreclosure. One of its major roles is to allow mortgage lenders to sell riskier mortgages to third parties such as Fannie Mae and Freddie Mac. Due to governmental restrictions on how much risk Fannie and Freddie can assume, these entities cannot purchase a mortgage with a loan-to-value ratio higher than 80% – i.e., mortgages in which the borrower did not make a down payment equivalent to 20% of the loan's value. Mortgage insurance generally limits the risk of loss in connection with a default to 80% of the loan's value, even if the loan-to-value ratio is greater than 80%. It thus allows lenders to sell loans to Fannie and Freddie even if the borrower did not put 20% down. In exchange for assuming the excess default risk, mortgage insurers charge premiums. The premium charged varies depending on the amount of risk assumed, with higher premiums charged on riskier loans.

**B.    MGIC's Book of Business**

During the class period, MGIC insured mortgages through two principal channels. In the first channel, known as the "flow" channel, MGIC insured individual mortgages on

4

a one-by-one basis. In the second channel, known as the "bulk" channel, MGIC insured a substantial number of mortgages that had been pooled and packaged into securities. MGIC referred to this insurance as its "Wall Street bulk" insurance. MGIC also used its bulk channel to insure individual loans that were submitted to it on a portfolio basis. MGIC eventually began referring to this bulk business as its "remaining bulk," to distinguish it from the more volatile Wall Street bulk business. A substantial portion of MGIC's Wall Street bulk business consisted of insuring subprime and Alt-A loans. As the parties use the terms, subprime loans are those made to borrowers with low credit scores, and Alt-A loans (also known as "stated income" or "reduced doc" loans) are loans in which the lender does not obtain documentation verifying the representations made by the borrower concerning his or her income.

### C.  MGIC's Intent to Merge with Radian and Sell Its Interest in C-BASS

On February 6, 2007, MGIC and Radian announced that they planned to merge with each other through a stock-for-stock exchange scheduled to close during the fourth quarter of 2007. The merger plan assumed that MGIC and Radian would reduce their joint interest in C-BASS to less than 50%. The reason for this was that if the post-merger entity continued to own almost all of C-BASS, the combined entity would have been required to carry C-BASS's assets and liabilities on its balance sheet, which would have threatened the combined entity's credit rating. In order to reduce its interest in C-BASS and facilitate the merger, MGIC planned to sell much of that interest. Besides facilitating the merger, MGIC's sale of its interest in C-BASS was designed to raise $1.75 billion in cash, which MGIC planned to use to repurchase some of its shares. This share repurchase was

designed to raise MGIC's stock price.  Ultimately, because of the problems that developed at C-BASS at the end of July 2007, MGIC and Radian abandoned their merger plans.

## II.  DISCUSSION

Plaintiff alleges two theories of liability: (1) securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5 against MGIC and the individual defendants, and (2) control person liability under Section 20(a) of the Securities Exchange Act against the individual defendants.  Both the MGIC defendants (MGIC, Culver, Lauer and Pierzchalski) and the C-BASS defendants (Williams and Draghi) have moved to dismiss the consolidated class action complaint for failure to state a claim on which relief may be granted, Fed. R. Civ. P. 12(b)(6), failure to plead fraud with particularity, Fed. R. Civ. P. 9(b), and failure to comply with the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1) & (2).

### A.    Pleading Standards for Section 10(b) Claims

Section 10(b) of the Securities Exchange Act forbids the use or employment of any deceptive device in connection with the purchase or sale of any security.  15 U.S.C. § 78j(b).  Rule 10b-5 forbids the making of any "untrue statement of a material fact" or the omission of any material fact needed to make the statements not misleading.  17 C.F.R. § 240.10b-5.  To satisfactorily plead a violation of Section 10(b) and Rule 10b-5, a plaintiff must allege facts indicating that (1) defendants made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which plaintiff justifiably relied and (6) the false statement or omission proximately caused the plaintiff's damages.  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588,

6

595 (7th Cir. 2006) (Makor I), vacated and remanded on other grounds, 551 U.S. 308 (2007).

To plead a false statement of material fact, a plaintiff must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." Id. (citing 15 U.S.C. § 78u-4(b)(1)). The facts alleged must be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." Id. (internal quotation marks omitted).

A statement is material if it is likely that a reasonable purchaser or seller of a security (1) would consider it important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by the statement. Id. at 596. However, mere puffery is not actionable under Rule 10b-5. "If the statement amounts to vague aspiration or unspecific puffery, it is not material." Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir. 1997).

Scienter involves a "mental state embracing an intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). Misstatements or omissions made recklessly are also made with scienter. To plead scienter, a complaint must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In determining whether plaintiff's allegations are adequate to give rise to a strong inference of scienter, I accept the allegations as true and consider the complaint in its entirety as well as other sources that I would ordinarily review, such as documents attached to the complaint or those subject to judicial notice. Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). I then ask whether the allegations taken collectively establish a "strong inference of

7

scienter." Id. at 323.  In doing so, I weigh plausible nonculpable inferences against inferences favoring plaintiffs' claim.  Id. at 323-24.  The inference favoring plaintiff's claim "need not be irrefutable, . . . of the 'smoking-gun' genre, or even the most plausible of competing inferences."  Id. at 324.  Rather, plaintiff's complaint survives if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged."  Id.

**B.    Plaintiff's Allegations**

**1.    Allegations Concerning MGIC's Underwriting**

As noted, the first category of allegedly fraudulent statements concerns MGIC's underwriting standards.  As used in the complaint, "underwriting" refers to the process by which MGIC would decide whether to insure a mortgage and what the premiums should be.   Plaintiff contends that, as the subprime crisis began to unfold,[3] MGIC made statements that were designed to assure the market that MGIC's "superior" underwriting practices had "insulated" it from the developing crisis.  (Pl.'s Br. in Opp. [Docket #65] at 24.)  Plaintiff contends that these statements were false and misleading because, in fact, MGIC had employed loose underwriting standards and insured risky subprime and Alt-A mortgages.

Plaintiff identifies the following statements in support of this claim:

(1)  During a February 6, 2007 conference call, in discussing the merger with Radian, Culver (MGIC's CEO) stated that with respect to "the loss side" of the business, "both [MGIC's and Radian's] portfolios are well-managed" and "well controlled."

---

[3]The subprime crisis began to seriously affect financial markets in February 2007, when HSBC, the world's largest bank, reported major subprime losses.  (Compl. [Docket #49] ¶ 54.)

8

(2)  In early March 2007, Culver met with analysts at Keefe, Bruyette & Woods, Inc. ("KBW") and, as indicated by the subsequent KBW analyst report, "stressed" that MGIC had protected itself with "focused underwriting and risk layering in its bulk transactions."  The KBW report stated that it was "[t]his underwriting and other qualitative considerations" that "reinforce[d] [KBW's] belief and management's that the [mortgage insurance] exposure is not a proxy of the broader mortgage credit market" and noted that "Mr. Culver's tone regarding MGIC . . . was the most bullish [KBW had] heard in several years."

(3)   On March 9, 2007, Culver, Lauer (MGIC's CFO) and Pierzchalski (MGIC's Vice President of Risk Management) met with Citigroup analysts. The analysts' subsequent report stated: "In our meetings, management exuded confidence in [MGIC's] positioning vis-à-vis the recent credit issues that have arisen in subprime mortgages. In particular, [MGIC] has not written insurance on most of the loans that were apparently subject to lax underwriting standards during the second half of 2005 and the first half of 2006. In fact, the CEO stated that a lot of the 'goofy' stuff was done in order to avoid mortgage insurance products in general."

(4)  In the same meeting, Culver, Lauer and Pierzchalski "indicated that [MGIC's] credit outlook was unchanged," and the analysts reported that MGIC had "anticipated much of the recent credit deterioration" and had "avoided the 'toxic' exposures."

(5)  Also during the March 9, 2007 meeting, Culver, Lauer and Pierzchalski indicated that MGIC only worked with Alt-A issuers "where it was able to get the right risk profile and pricing."

(6)  During an April 11, 2007 earnings conference call, Culver stated: "The subprime business continues to be a hot topic, particularly the 2006 book and rightly so given the many credit practices that were abused last year. Our industry and our company did not participate a great deal in these practices."

(Br. in Supp. [Docket #65] at 24-25.)

An initial problem with plaintiff's claim is that the quoted statements do not state or imply that MGIC employed "superior" underwriting practices or that those practices had "insulated" MGIC from the subprime crisis.  None of the statements uses the word "superior" or any other adjective that would cause a reasonable investor to believe that

9

MGIC's underwriting was better than the underwriting employed by others in the industry.[4] Nor does any statement suggest that MGIC was "insulated" from the losses affecting other participants in the subprime market. Thus, taken as a whole, the alleged statements do not support a reasonable belief that MGIC misled investors into thinking that MGIC employed superior underwriting practices that would insulate it from losses in the subprime market.

To be sure, some of the above statements cast MGIC's underwriting practices in a positive light and suggested that MGIC's underwriting would help it deal with the issues emerging in the subprime markets. However, viewing each of the six statements closely and in light of the circumstances in which it was made, I find that the statements are not actionable because most of them were immaterial. To the extent that some of them could be considered material, I find that they were not misleading. I address each statement in turn.

(1) The first statement quoted above occurred during a February 6, 2007 conference call about the MGIC-Radian merger. During that conference, an analyst asked Culver about the strategic rationale for the merger, noting that the mortgage market had not been in very good shape during the past few quarters. As part of his answer, Culver acknowledged that paid claims were increasing at each company, but added that he thought that both companies' portfolios were "well managed" and "well controlled." (Chester

---

[4]Regarding plaintiff's use of the word "industry," it is not clear whether plaintiff means the mortgage-insurance industry or the entire mortgage industry. In any event, MGIC did not state that its underwriting was superior to either the underwriting employed by other mortgage insurers or others in the mortgage industry.

Decl. [Docket #62] Ex. 9 at 18-19.) Culver went on to describe what he thought were the benefits of combining the two companies.

In his statement, Culver did not say anything about MGIC's underwriting standards, but plaintiff argues that when Culver stated that the companies' portfolios were "well managed" and "well controlled" he was implying that both companies employed superior underwriting practices. However, Culver's use of the terms "well managed" and "well controlled" was so vague that it is hard to know what he was talking about. Because this statement was so vague, no reasonable investor would have considered it important in deciding whether to buy or sell MGIC stock. Thus, even if it could be considered false or misleading, this statement was not material.

(2) The second statement was not made by MGIC or its executives. Instead, analysts made this statement in a report they prepared after meeting with Culver and another executive of MGIC who is not a defendant in this case. Most of this statement consists of conclusions that the analysts drew after meeting with Culver, rather than direct quotes from Culver, and thus this statement may not be attributable to Culver or MGIC.[5] But even if it could be attributed to Culver or MGIC, it is not actionable, for the reasons explained below.

The heart of the statement is the following sentence: "The company noted that focused underwriting and risk layering in its bulk transactions continues to differentiate the

_____

[5] See, e.g., Southland Sec. Corp. v. Inspire Ins. Solutions Inc., 365 F.3d 353, 373 (5th Cir. 2004) ("Generally, securities issuers are not liable for statements or forecasts disseminated by securities analysts or third parties unless they have sufficiently entangled themselves with the analysts' forecasts so as to render those predictions attributable to the issuers." (Internal citations and alterations omitted)).

11

credit performance in its insured portion of a transaction versus the performance of the overall transaction." (Compl. [Docket #49] ¶ 210.) Plaintiff argues that the phrase "focused underwriting and risk layering" conveyed the false impression that MGIC's underwriting was so superior to others' that it would insulate MGIC from subprime losses. However, the full sentence reveals that plaintiff's interpretation is not a plausible interpretation of the statement. To understand why, some further background on MGIC's underwriting practices is necessary.

The statement was made in reference to MGIC's Wall Street bulk insurance – i.e, insurance on mortgages that had been packaged into securities. When MGIC wrote this kind of insurance, it did not automatically insure every loan that had been included in the security. Rather, during the underwriting process, MGIC selected specific loans within the pool and insured only those loans. Thus, as the complaint alleges, when a securitization started to lose value, "MGIC's loss experience did not necessarily mirror that of the overall securitization transaction." (Compl. [Docket #49] ¶ 31.)

With this background in mind, it is clear that the statement that the analysts attributed to MGIC was, based on the allegations in the complaint, true. MGIC had simply stated that, due to its ability to insure only the loans selected during its underwriting process, MGIC's loss experience would not necessarily mirror the loss experience of the overall securitization. To be sure, the phrase "focused underwriting" conveys the impression that MGIC's underwriting would result in a better loss experience. However, this phrase is so vague that it cannot be deemed material. And even if it were material, the allegations in the complaint do not create a reasonable belief that it was false or misleading. Although the complaint contains numerous allegations from confidential

12

witnesses stating that MGIC had loosened its underwriting standards and insured risky loans as part of its bulk business, no witness claims to know anything about the selection criteria that MGIC employed when picking mortgages out of a securitization pool. Thus, as far as the complaint reveals, MGIC may have engaged in "focused underwriting" (whatever that means) when it identified the segment of a mortgage-backed security that it would insure.

(3) The third statement was also made by analysts rather than MGIC or its executives and therefore may not be attributable to MGIC. See supra note 5. But again, even if it is attributable to MGIC, it is not actionable. The full statement reads as follows:

> In our meetings, management exuded confidence in [MGIC's] positioning vis-a-vis the recent credit issues that have arisen in subprime mortgage. In particular, [MGIC] has not written insurance on most of the loans that were apparently subject to lax underwriting standards during the second half of 2005 and the first half of 2006. In fact, the CEO [i.e., Culver] stated that a lot of "goofy" stuff was done by lenders over the past few years in order to avoid mortgage insurance products in general. He indicated that the mortgage insurance industry didn't have a chance to insure a lot of the business that was getting done, because it was done with unacceptable underwriting or with "piggybacks" (home equity second lien loans).

(Compl. [Docket #49] ¶ 212 (sixth quoted par.).) Plaintiff considers MGIC's statement that it "ha[d] not written insurance on most of the loans that were apparently subject to lax underwriting standards during the second half of 2005 and the first half of 2006" to be false because plaintiff's confidential witnesses describe instances in which MGIC insured subprime and Alt-A loans.

However, MGIC did not state that it had not written any insurance on subprime or Alt-A loans or loans that were subject to lax underwriting standards. Rather, the statement was that MGIC had not written insurance on most of those kinds of loans. What "most"

means in this context is vague and therefore cannot be deemed material. Further, this vague use of the word "most" must be considered along with the fact that, in the same report, analysts identified the precise extent to which MGIC had insured subprime and Alt-A mortgages. Specifically, the report stated that MGIC's exposure to subprime and Alt-A mortgages was "$14 billion of risk in force," and that "Alt-A comprised 42% of [MGIC's] bulk business last year, but 94% of flow and 65% of bulk loan risk in force in 2006 had FICO scores of at least 620 (up from 60% in 2005)." (Compl. [Docket #49] ¶ 212 (quoted pars. under heading "Framing MTG's Exposure").) Thus, to the extent that investors considered MGIC's statement that it had avoided "most" of the loans that were subject to lax underwriting important, they could have evaluated that statement in light of the more detailed information made available in the same report. Considering the report as a whole, then, MGIC's statement cannot be considered false or misleading.

(4) The key language in the fourth statement – which again was written by analysts rather than MGIC – is the following: "Regarding recent subprime credit concerns . . . , we [i.e., the analysts] believe [MGIC] had anticipated much of the downturn in subprime mortgage (albeit not the rapid pace of the decline) and had avoided the more 'toxic' and aggressively underwritten loans at subprime monolines,[6] including New Century, Fremont, and Ownit." (Compl. [Docket #49] ¶ 212 (third quoted par.).)

Initially, I note that this statement is merely a statement of the analysts' belief, not a direct quote of a statement made by MGIC. Further, the report does not quote any statements made by MGIC that could have reasonably led the analysts to form this belief.

---

[6]"Monoline," as used in this context, means an entity that specializes in one type of loan, such as subprime loans having 100% loan-to-value ratios.

14

The only words attributed to MGIC in the paragraph containing this statement are the following: "[MGIC] reiterated its 2007 credit guidance, indicating that nothing has changed in the company's portfolio over the past two months since 2007 guidance was provided (on [MGIC's] 4Q06 earnings conference call)." (Id.) How the analysts extracted from this statement a belief that MGIC had "anticipated much of the downturn in subprime mortgage" and "avoided the more 'toxic' and aggressively underwritten loans" is unclear, and thus the complaint provides no basis for concluding that false statements by MGIC were the source of this belief. Further, even if it could be inferred that MGIC executives stated that they had anticipated "much" of the subprime downturn and avoided the more "toxic" loans from entities such as New Century, Fremont and Ownit, no allegations in the complaint create a reasonable belief that these statements were false and material. Saying that one has anticipated "much" of the subprime downturn is vague puffery, and the complaint does not allege that MGIC had, in fact, insured the more toxic loans from entities such as New Century, Fremont and Ownit.

(5) The fifth statement was again made by analysts rather than MGIC or its executives: "[MGIC] continued to write bulk business to Alt-A issuers, where it was able to get the right risk profile and pricing – Alt-A comprised 42% of [MGIC's] bulk business last year, but 94% of flow and 65% of bulk loan risk in force in 2006 had FICOs of at least 620 (up from 60% in 2005)." (Compl [Docket #49] ¶ 212 (eighth quoted par.).) Plaintiff contends that this statement was false because MGIC insured Alt-A loans even when it was unable to get the right risk profile and pricing. However, the phrase "right risk profile and pricing" is extremely vague and therefore no reasonable investor would consider it important in deciding whether to buy or sell MGIC stock. Further, to the extent this phrase

15

has meaning, the analysts seem to have defined the "right risk profile" as loans in which the borrowers had "FICOs of at least 620." Thus, the statement appears to be emphasizing the fact that most of the Alt-A loans that MGIC had insured involved borrowers with relatively higher credit scores, a fact which plaintiff does not dispute. As for the "right pricing," this appears to refer to the premiums that MGIC charged for insuring Alt-A loans. However, the complaint contains no allegations concerning the principles MGIC employed when setting its premiums, and thus the complaint contains no allegations giving rise to a reasonable belief that MGIC had not, in fact, "gotten the right pricing" on Alt-A loans, given the market conditions that existed when MGIC wrote the insurance.

(6) During a conference call on April 11, 2007, Culver made the following statement:

> The subprime business continues to be a hot topic, particularly the 2006 book and rightly so given the many credit practices that were abused last year. Our industry and our company did not participate a great deal in these practices, as most subprime loans were originated with 80/20 piggybacks that avoided our product. MGIC did insure approximately $4 billion of subprime business last year and by subprime, I'm talking about all loans which have FICO scores below 620[,] and about 7% of our 2006 insurance writings, we have subprime exposure[,] and relative to out entire book, we have 4% of our risk [in ]force.

(Compl. [Docket #49] ¶ 221.) Plaintiff does not allege that any of the information in this statement was false; rather, plaintiff claims that this statement was misleading because Culver failed to mention that MGIC had insured a substantial number of Alt-A mortgages in addition to the subprime mortgages described in this statement.[7] However, Culver

---

[7]As noted in the background section, "subprime" generally means that the borrower has a low credit score. An Alt-A borrower may have a "prime" credit score, but because the lender did not verify the borrower's income, the loan is considered riskier than a regular prime loan.

16

unequivocally identified the loans he was talking about: "by subprime, I'm talking about all loans which have FICO scores below 620." Further, the complaint contains no allegations creating a reasonable belief that this statement was misleading due to Culver's failure to mention MGIC's Alt-A business. The complaint does not, for example, allege that a reasonable investor would have thought that Culver was including "prime" Alt-A loans in his definition of subprime, despite his explicit definition of the word. In any event, in the press release that was the subject of the conference call, MGIC consistently distinguished between subprime and Alt-A loans (the press release uses the synonym "reduced doc" when referring to Alt-A), making clear that MGIC did not consider every Alt-A loan to also be a subprime loan. (Chester Decl. [Docket #63] Ex. 11 at 13-14.) Therefore, given the context in which this statement was made, it was not false or misleading.

* * *

Accordingly, I conclude that the complaint does not adequately plead that defendants committed securities fraud in violation of Section 10(b) and Rule 10b-5 when they made statements concerning MGIC's underwriting practices.

### 2. Allegations Relating to Impending Losses on 2005 and 2006 Insurance

The second category of allegedly fraudulent statements concerns the performance of the insurance that MGIC wrote in 2005 and 2006. Plaintiff alleges that, between October 2006 and April 2007, MGIC's executives made statements indicating that the performance of MGIC's 2005 and 2006 "books" was similar to its earlier books (i.e., insurance written in 2004 and prior years).[8] Plaintiff argues that these statements were

_____

[8]MGIC refers to the insurance it writes in a particular period as the insurance in its "book" for that period. MGIC also refers to the year in which the insurance was written as

17

false and misleading because, in fact, those books were experiencing higher delinquency rates and higher instances of fraud. To understand plaintiff's argument, some further background regarding the manner in which MGIC tracked the performance of its book of business is necessary.

The first time MGIC receives notice that a loan it has insured might result in a paid claim is when the borrower defaults, which occurs when a borrower's mortgage payment is forty-five days or more overdue. An insured lender must notify MGIC of any default within 130 days of the default, but usually the lender will notify MGIC of the default more quickly. The number of defaults is then used to calculate the "delinquency rate" of the loans in MGIC's book, which is the number of reported defaults divided by the total number of insured loans in the book.

A default does not immediately result in a paid claim. MGIC does not pay a claim until a default has caused a lender to foreclose on the mortgage and the lender reports that there is a deficiency between what the lender received at foreclosure and the value of the loan insured by MGIC. Thus, MGIC might not pay a claim until more than a year after the initial default. Further, a default may never result in a paid claim because the default might "cure," which can occur when an increase in a home's value causes the collateral to be worth more than the outstanding balance on the loan. Alternatively, MGIC might prove that the insurance was procured by fraud and thus be able to rescind or void the policy. Although a default does not immediately or necessarily result in a paid claim, MGIC uses the delinquency rate to forecast the number of paid claims on the horizon. MGIC uses the

_____

the "vintage" of that insurance. Thus, MGIC might refer to its "2005 book" or its "2005 vintage insurance."

resulting forecast to identify the amount of money it needs to keep on hand to pay future claims (i.e., its reserves).

Until the third quarter of 2007, MGIC published its delinquency rates on an aggregate basis, meaning that it divided the total number of defaults in its entire book (regardless of vintage year) by the total number of insured loans in its entire book. Starting in the third quarter of 2007, when the subprime crisis was in full swing, MGIC began to publish its delinquency data by vintage year and whether the insurance was bulk or flow. This data revealed that the delinquency rates for the 2005 and 2006 bulk books were higher than in the 2004 and earlier books. On February 13, 2008, MGIC took the further step of segregating defaults within in its bulk business into its Wall Street bulk transactions and its remaining bulk. These delinquency rates showed that, as of December 31, 2007, for Wall Street bulk insurance written in 2004 and prior years, the delinquency rate was 25.02%, whereas the delinquency rate for Wall Street bulk insurance was 32.97% in 2005 and 30.17% in 2006. As of the first quarter of 2009, for Wall Street bulk insurance written in 2004 and prior years, the delinquency rate was 25.31%, while that delinquency rate had jumped to 46.33% for the 2005 book and 58.14% for the 2006 book.

The statements about MGIC's 2005 and 2006 books that plaintiff alleges were fraudulent were made between October 12, 2006 and April 11, 2007. Plaintiff cites a number of defendants' statements in support of this claim (Pl. Br. in Opp. [Docket #65] at 27), and I will focus on the statements in which defendants unequivocally denied that the 2005 and/or 2006 books were experiencing unusual problems as compared to earlier books, namely:

19

(1) During an October 12, 2006 conference call discussing MGIC's third quarter 2006 earnings, an analyst asked Pierzchalski to "talk a little bit about the early trends in your '06 bulk writings versus the '05 and '04 vintages" and asked whether MGIC was seeing a "deterioration" in its recent books in terms of delinquency rate. Pierzchalski responded as follows: "I'd make this statement on both the bulk and the flow. If you look at the books of business since 2000, probably the best book was '03 because of the environment. Aside from the '03 book, all the other books including the most recent books are in a pretty tight ban[d]. The newer writings are kind of in line with the prior writings with the exception of '03, which is probably at the low end of delinquencies and claim spectrum." (Compl. [Docket #49] ¶ 187.)

(2) During an April 12, 2007 conference call discussing MGIC's first quarter 2007 earnings, Culver made specific comments about the performance of the insurance that MGIC wrote in 2006: "[R]egarding the 2006 writings, which have generated so much publicity, it will not be one of our better books and its loss development should closely match our 2000 book. However, even with the poor loss performance, through the combination of higher premium rates and loss deductibles, we still expect the 2006 subprime book to perform at a combined loss and expense ratio of 80% and provide a 20% margin to MGIC." (Compl. [Docket #49] ¶ 221.)

(3) During the April 12, 2007 conference call, in response to a question from an analyst about the rate of fraud among MGIC's insured loans, Pierzchalski stated that the "percentage" of loans found to be fraudulent had not changed. (Compl. [Docket #49] ¶ 223.)

MGIC made these statements during conference calls addressing MGIC's third quarter 2006 earnings and its first quarter 2007 earnings. These calls took place before the subprime crisis had had the crushing impact on MGIC's business that it would eventually have, and this is reflected in the statements that defendants made on MGIC's quarterly conference calls, as discussed below.

During the conference call addressing the third quarter of 2006, MGIC did not have much bad news to report, other than that the average severity of its paid claims was rising (due to the higher loan balances MGIC had been insuring) and that the housing market had slowed down in a few areas, such as California. By the fourth quarter of 2006, MGIC

20

had noticed that the housing market had continued to soften in Florida and California and stated that this could lead to more high-dollar paid claims.

During the conference call reporting on the first quarter of 2007 – which took place on April 12, 2007, when investors were starting to express concern over problems in the subprime market – Culver noted that MGIC's results were "disappointing." (Chester Decl. [Docket #62] Ex. 12 at 2.) Culver attributed MGIC's disappointing results to two factors – losses at C-BASS caused by "turmoil in the subprime markets" and the fact that MGIC's paid claims were continuing to come from areas of the country where loan balances were higher and home prices had been deteriorating, such as Florida and California. (Id. at 2-3.) Culver also noted that the delinquency rate was up in areas like California and that this could lead to greater losses, but added that it was too soon to tell whether this would be a substantial problem. Culver also made one of the statements quoted above – i.e., that the 2006 book would not be one of MGIC's "better books" and that he expected its performance to be closer to MGIC's 2000 book, a book that performed poorly but was not as disastrous as the 2006 book turned out to be. Finally, Pierzchalski stated that the percentage of fraud among MGIC's recent business had not increased.

By the time MGIC reported its second quarter 2007 results, the subprime crisis had started to take its toll. On the second-quarter conference call, Culver stated that MGIC had experienced a "runup in delinquencies and paid losses in the high dollar state[s] of Florida and California," and that the remainder of the year would "be a difficult one financially." (Chester Decl. [Docket #62] Ex. 14 at 3.) Another MGIC executive, Mike Zimmerman, also noted an "increase in the pure delinquency itself for the quarter," and that MGIC was

21

anticipating further increases.  (Id. at 5.)  Pierzchalski noted that, especially in California and Florida, the delinquency rate had jumped faster than MGIC had anticipated.  (Id. at 8.)

The third quarter of 2007 is when MGIC realized that it had an unprecedented problem on its hands.  Aside from the problems at C-BASS (which I discuss in the next section), MGIC experienced a substantial increase in delinquencies.  Culver stated that "the loss side has hit us much harder and more quickly than we could ever have anticipated," and that "[t]he ramp-up of loss performance relative to delinquencies, the severity [i.e., amount of the claim] and the cure rate deterioration [i.e., deterioration of the ability to mitigate losses through home appreciation] in California and Florida has been at speeds not seen in previous books of business."  (Chester Decl. [Docket #62] Ex. 20 at 3.) Later in the call, Culver stated that the severe changes in MGIC's recent books "kicked off" in July, August and September – i.e., in the third quarter of 2007.  (Id. at 9.)

Summarizing the statements defendants made during MGIC's quarterly conference calls and taking them at face value, I arrive at the following synopsis of MGIC's affairs between late 2006 and mid-2007:  Beginning in the fourth quarter of 2006, MGIC began to experience a rise in delinquencies among loans in its 2005 and 2006 books.  These delinquencies began to grow to problematic levels in the first and second quarters of 2007, but at this point the delinquency rate had not yet risen to unprecedented levels.  During the third quarter, MGIC realized that its 2005 and 2006 books were going to be far worse than any other books in recent history.  Based on this synopsis, one can reasonably infer that the severe delinquencies and other problems in the 2005 and 2006 books took MGIC and its executives by surprise in the third quarter of 2007, and that therefore defendants did not

22

intend to deceive the market when, between late 2006 and mid-2007, they informed investors that the 2005 and 2006 books were not experiencing unusual problems.

Under plaintiff's view of the facts, however, MGIC and its executives knew as early as October 2006 that its 2005 and 2006 books were going to be far worse than earlier books but falsely informed investors that the delinquency rate and other indicators of the health of those books were similar to prior years' books. To proceed past the pleading stage on this claim, plaintiff must plead facts showing that this inference is cogent and at least as compelling as the inference that the alarming delinquency rate that eventually materialized took MGIC by surprise in the third quarter of 2007. To meet this burden, plaintiff might have pleaded that Culver, Pierzchalski and Lauer had read internal reports showing, for example, that in second quarter 2006 – when Pierzchalski stated that the 2006 book was "kind of in line" with earlier books – delinquencies in that book were, in actuality, through the roof. However, plaintiff does not plead any facts of this type. Rather, plaintiff rests almost entirely on its assumption that the disastrous delinquency rate that materialized in the third quarter of 2007 "obviously did not happen overnight" and that MGIC "undeniably would have had data showing alarming trends calling into question the 2005 and 2006 books long before October 2007." (Pl. Br. in Opp. [Docket #65] at 28-29.)

However, as just discussed, aside from the smaller increase in delinquencies that MGIC disclosed during the first and second quarter conference calls in 2007, by all appearances the alarming delinquency rate did materialize overnight – specifically, during the third quarter of 2007. Thus, to proceed past the pleading stage, plaintiff cannot simply rest on its suspicion that alarm bells must have been ringing as early as October 2006. Rather, it must plead facts that transform this suspicion into a cogent inference that alarm

23

bells were, in fact, ringing at this time. Tellabs, 551 U.S. at 324 ("inference of scienter must be more than merely 'reasonable' or 'permissible'"); Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 706 (7th Cir. 2008) (Makor II) (facts pleaded must create more than "a weak or bare inference of scienter").

In an effort to show that defendants' statements were false and made with scienter, plaintiff argues that the manner in which MGIC reported its delinquency rate suggests that defendants knew that delinquencies among its 2005 and 2006 vintages were mounting as early as October 2006 but were determined to hide this fact from investors. As noted, until the third quarter of 2007, MGIC reported delinquencies on an aggregate basis rather than by vintage year. Plaintiff alleges that by mixing older, more conservatively written vintages with newer, riskier vintages, MGIC was able to mask any alarming trends in the delinquency rate for the recent vintages. Then, in the third quarter of 2007, when the cat was out of the bag, MGIC decided to report its delinquency rate by vintage year and whether the underlying insurance was written through the bulk channel or the flow channel, which revealed higher delinquency rates for the recent-vintage bulk business.

The most serious problem with this argument is that the change in the manner in which MGIC published its delinquency rates was not suspicious. Plaintiff does not allege that MGIC's historical practice was to disclose delinquencies by vintage year and that it abruptly switched to reporting on an aggregate basis in 2006. Rather, as far as the complaint reveals, MGIC reported delinquency rates on an aggregate basis all along and switched to reporting rates by type and vintage year in the third quarter of 2007. This suggests that MGIC made the switch because it realized that a certain segment of its business was responsible for its large losses (i.e., the 2005 and 2006 bulk insurance) and

24

that investors would thus be interested in statistics related to that specific segment. It does not give rise to a strong inference that defendants possessed alarming data prior to the third quarter of 2007 but sought to hide it from investors.[9]

Plaintiff also argues that it is reasonable to infer that, as early as October 2006, defendants were in possession of data suggesting that a high number of loans in MGIC's 2005 and 2006 books were infected with fraud, and that this would have been an indicator that those books were about to experience high delinquency rates. In support of this argument, plaintiff pleads that in the first quarter of 2009 MGIC reported that the rate of fraud in its entire book (not just its 2005 and 2006 books) was 20.4%. Plaintiff argues that it is reasonable to infer from the fraud rate reported in 2009 that MGIC must have suspected that fraud was prevalent in its recent-vintage insurance as early as October 2006. This is so, argues plaintiff, because fraud can be indicated by what are known as "early payment defaults," which are defaults that occur in the first year of the loan. If a borrower defaults on a loan almost immediately, this suggests that he may have

_____

[9]Plaintiff in its brief states that "the Individual Defendants admitted that they were tracking MGIC's delinquencies, trends and losses by vintage year but rebuffed analysts' specific requests for this information." (Pl. Br. in Opp. [Docket #65] at 28.) However, the material cited in support of this statement – an exchange between Culver and a Bear Stearns analyst during MGIC's third quarter 2007 conference call – does not actually support it. The Bear Stearns analyst never made a "specific request" for any information but simply asked Culver why MGIC had experienced quarter-to-quarter average claim size fluctuations. (Chester Decl. [Docket #62] Ex. 5 at 13.) In his response, Culver stated that MGIC "certainly had more claims come in" during the third quarter of 2006, and he finished his sentence by stating that he would not "give that number out." However, his sentence seems to have been mistranscribed because the full sentence is incoherent: "Well, in this quarter, David, we certainly had more claims come in and we've quantified it, but I don't to give that number out from the '04 and '05 vintages than we did on the '03 and priors." Whatever Culver actually said during this exchange, it does not appear as though the analyst asked for delinquency data by vintage year and that Culver rebuffed the request.

25

misrepresented his income on his loan application. However, because MGIC does not investigate specific instances of fraud until after the lender has foreclosed on the mortgage and submitted a claim, MGIC does not formally report the loan as fraudulent until years after the early payment default has occurred. Plaintiff argues that it is reasonable to infer from the high rate of fraud reported in 2009 that MGIC must have been noticing a large number of early payment defaults by late 2006 and early 2007, and that therefore defendants must have known by that time that the 2005 and 2006 books were loaded with fraudulent loans.

There are a number of problems with this argument, but in my view the most serious is that even assuming that MGIC tracked early payment defaults as they were received, MGIC continued to make statements indicating that the rate of fraud in its recent-vintage insurance was not unusually high through the latter half of 2007. By that time, MGIC had already disclosed its alarming losses, and thus it had no reason to continue to lie about its fraud rate. What's more, a high fraud rate at that point in time would have been a somewhat positive development, since MGIC could have rescinded the policies procured by fraud and thereby reduced the number of paid claims. Indeed, during the October 17, 2007 conference call regarding MGIC's third quarter results, an analyst asked Culver whether MGIC saw any opportunity to "mitigate" its substantial losses through fraud detection. Culver responded as follows:

> Well, fraud has been present in the past and still is and more so on the bulk side than the flow side. Our – we're paying more, so the absolute number of fraud cases is probably up a tad, but as a percentage of the flow and the bulk paids, we're not seeing any material change.

26

(Chester Decl. [Docket #62] Ex. 20 at 5.) Had Culver (or any of the other defendants on the call) been in possession of data showing a large increase in the percentage of early payment defaults and interpreted that data as a signal that many of the current delinquencies would not turn into paid claims, he (or they) likely would have disclosed this fact instead of pointing out that the percentage of fraud had not changed. Thus, the only cogent inference is that defendants did not become aware of the high rate of fraud in MGIC's 2005 and 2006 books until after October 2007 – that is, well after defendants made their allegedly fraudulent statements about the performance of those books.

In sum, plaintiff has not pleaded facts giving rise to a strong inference that, during late 2006 and early 2007, MGIC and its executives made statements designed to mislead investors about the severity of the problems in MGIC's 2005 and 2006 books. Rather, the only cogent inference is that no one realized the extent of the problem until the third quarter of 2007. Plaintiff's suspicion that defendants had internal data showing alarming trends prior to this time is pure speculation and does not give rise to a strong inference of scienter.

### 3. Allegations Relating to C-BASS's Liquidity

Plaintiff's remaining allegations concern statements that defendants made about C-BASS. Plaintiff alleges that on July 19, 2007, defendants made several positive statements about C-BASS that were rendered misleading by their failure to disclose that between July 1 and July 18, 2007, C-BASS had paid $145 million in margin calls. Although plaintiff cites several statements in support of this claim (Pl. Br. in Opp. [Docket #65] at 29-30), it focuses on the following statement in MGIC's July 19, 2007 press release:

27

> With respect to liquidity, the substantial majority of C-BASS's on-balance sheet financing for its mortgage and securities portfolio is dependent on the value of the collateral that secures this debt. C-BASS maintains substantial liquidity to cover margin calls in the event of substantial declines in the value of its mortgages and securities. While C-BASS's policies governing the management of capital risk are intended to provide sufficient liquidity to cover an instantaneous and substantial decline in value, such policies cannot guarantee that all liquidity required will in fact be available.

(Chester Decl. [Docket #62] Ex. 13 at 10.) This statement appeared under a heading that read: "Our income from joint ventures could be adversely affected by credit losses, insufficient liquidity or competition affecting those businesses." (Id.) Plaintiff argues that the above statement was misleading because C-BASS did not have "substantial liquidity" when measured against the $145 million in margin calls it received between July 1 and July 18, 2007.

The background to C-BASS's liquidity situation during this time frame is as follows. During the April conference call regarding MGIC's first quarter 2007 results, MGIC noted that one of the major reasons for its disappointing results was the performance of C-BASS. In light of this fact, MGIC asked Bruce Williams (the CEO of C-BASS) to join the call. Williams stated that the developing subprime crisis had "created liquidity issues for all subprime participants" and, among other things, led to "increased margin calls from all lenders." (Chester Decl. [Docket #62] Ex. 12 at 4.) Williams reported that C-BASS began the first quarter with $300 million in cash resources, that it paid $200 million in margin calls during the quarter, and that it had $200 million in cash resources left at the end of the quarter.

Because the situation at C-BASS continued to be of interest to investors during the second quarter of 2007, MGIC asked Williams to participate in MGIC's second quarter

2007 conference call, which was held on July 19, 2007. This time, Williams was joined by John Draghi, C-BASS's Chief Operating Officer. Williams reported that subprime participants such as C-BASS continued to face liquidity issues and increased margin calls from lenders. Draghi then summarized C-BASS's liquidity position and noted that as of "today" – July 19, 2007 – C-BASS had $150 million in cash resources remaining. He added that C-BASS planned to "remain conservative with [its] cash through the rest of the year." (Chester Decl. [Docket #62] Ex. 14 at 4.) Draghi did not mention the amount of margin calls C-BASS paid in the second quarter, but from C-BASS's later filings it appears that it paid $90 million.

In the first eighteen days of the third quarter of 2007 (July 1 to July 18, 2007), however, C-BASS received and paid $145 million in margin calls. No one on the second-quarter conference call mentioned this fact. Moreover, in the days following the conference call, MGIC was flooded with additional margin calls. Between July 19, 2007 and July 26, 2007, C-BASS received and paid $140 million in margin calls. Between July 26, 2007 and August 1, 2007 – that is, in less than one week – C-BASS received an additional $330 million in margin calls.

On July 26, 2007, MGIC determined that in light of the accelerating margin calls at C-BASS, MGIC was required under applicable accounting standards to recognize that nearly its entire investment in C-BASS (approximately $516 million) was materially impaired. On July 30th and 31st, respectively, MGIC and C-BASS issued press releases announcing the unprecedented margin calls. On August 1, 2007, MGIC filed a Form 8-k with the Securities and Exchange Commission reporting that its investment in C-BASS was materially impaired. In this report, MGIC stated that the turmoil caused by the subprime

29

crisis "accelerat[ed] to unprecedented levels beginning in approximately mid-July 2007." (Chester Decl. [Docket #62] Ex. 16 at 2.)

Considering this background, I conclude that defendants' statement that C-BASS maintained "substantial liquidity" to cover margin calls was not false or misleading. As of July 19, 2007, C-BASS had paid $145 million in margin calls and still had $150 million in cash remaining. $150 million in cash is substantial liquidity. Although this proved to be inadequate to cover the ensuing margin calls, MGIC did not say that C-BASS had enough liquidity. To the contrary, MGIC's statement appeared in a section of the press release explaining that "insufficient liquidity" (among other things) could adversely affect C-BASS's performance. Furthermore, the press release qualified its statement about C-BASS's substantial liquidity by adding that, despite C-BASS's substantial cash resources, neither C-BASS nor MGIC could guarantee that those resources would be sufficient to cover all margin calls in the event of "an instantaneous and substantial decline in [the] value" of the securities that C-BASS had used as collateral. (Chester Decl. [Docket #62] Ex. 13 at 10.) In light of the circumstances in which it was made, then, MGIC's statement about "substantial liquidity" could not reasonably have been interpreted as a signal that liquidity was not a concern.[10]

_____

[10]In a related argument, plaintiff argues that the press release contained misleading information because it stated that C-BASS maintained substantial liquidity to cover margin calls "in the event of substantial declines in the value of its mortgages and securities," which implied that such substantial declines had not yet occurred. However, this part of the statement was not meant to be a report on any declines that might have already occurred but a warning that future declines were possible and that C-BASS might not have the liquidity needed to cover the ensuing margin calls. Especially when considered in conjunction with the fact that Williams informed investors on the second-quarter conference call that C-BASS had been subject to increasing margin calls (which implies that, at least from the lender's perspective, the mortgages and securities had substantially

30

Plaintiff argues that even if MGIC's statement in the press release was not technically false MGIC nonetheless had a duty to disclose the $145 million in margin calls that C-BASS received at the beginning of the third quarter because, on the conference call held when the press release was issued, Draghi stated that as of "today" (July 19th, 2007) C-BASS had $150 million in cash available. Plaintiff argues that informing investors that C-BASS had $150 million in cash without also informing them that C-BASS had received $145 million in margin calls over the last eighteen days caused investors to conclude that "C-BASS had ample liquidity and was not experiencing a ruinous assault of margin calls that threatened its viability." (Pl. Br. in Opp. [Docket #65] at 35.) In other words, plaintiff argues that Draghi's statement was a half-truth. However, on the same conference call, Williams noted that C-BASS, along with all subprime participants, had been subject to increasing margin calls and that liquidity was a "primary issue." (Chester Decl. [Docket #62] Ex. 14 at 3-4.) Thus, investors were on notice that liquidity was a concern. Further, the "ruinous assault of margin calls" did not really begin until after the July 19th conference call and press release, when C-BASS received $470 million in margin calls in less than two weeks. Although in hindsight it appears that the $145 million received during the first eighteen days of July was part of this ruinous assault, plaintiff does not plead facts suggesting that defendants knew at the time of the call that additional (and more severe) margin calls were on the way. And once it became clear that the margin calls received in early July were only the beginning and that C-BASS's viability was in jeopardy, both MGIC and C-BASS issued press releases reporting this fact.

declined in value), no reasonable investor could have been misled into thinking that C-BASS's assets had not declined in value.

31

To be sure, investors would have been better informed had Draghi followed up his statement that C-BASS had $150 million in cash by adding that C-BASS had received $145 million in margin calls in the prior eighteen days. However, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." In re Time Warner Inc. Sec. Lit., 9 F.3d 259, 267 (2d Cir. 1993); accord Gallagher v. Abbott Labs., 269 F.3d 806, 808 (7th Cir. 2001) (stating that firms do not have "an absolute duty to disclose all information material to stock prices as soon as news comes into their possession"). And because defendants disclosed that liquidity was a concern, stated that C-BASS had been subject to increasing margin calls, and made truthful statements regarding the amount of cash that remained available, Draghi's failure to also disclose the precise dollar amount of the margin calls that C-BASS had received during the opening days of the third quarter cannot reasonably be considered an omission that rendered his statement about the amount of cash remaining misleading. Accordingly, this claim must be dismissed on the ground that plaintiff has not pleaded facts giving rise to a reasonable belief that defendants made a misleading omission.

Even if Draghi's omission could be considered reasonably misleading, plaintiff has not pleaded facts giving rise to a strong inference of scienter. This is so because it is not at all clear that Draghi was himself aware of these margin calls, or that Williams or MGIC's executives were aware of them. The fact that the margin calls formed a crescendo that peaked at the very end of July suggests that, as of July 19th, much of the $145 million in margin calls had been received only recently. Thus, information concerning these calls may not have made its way up corporate channels or been fully processed by C-BASS's top executives by July 19th. And in fact, plaintiff pleads facts giving rise to a fairly cogent

32

inference that Draghi and Williams did not know about the margin calls. Specifically, one of plaintiff's confidential witnesses states that he "prepared the data and analysis that John Draghi and Bruce Williams presented on the MGIC analyst call in July 2007." (Compl. [Docket #49] ¶ 152.) Tellingly, that witness does not state that he informed Draghi and Williams about the $145 million in margin calls. If this witness was the source of the statements that Williams and Draghi made on the conference call, but that witness left out (or did not know about) the fact that C-BASS had received $145 million in margin calls in the last eighteen days, then this gives rise to a plausible inference that information about the recent margin calls had not made its way to C-BASS's top executives by July 19th. In any event, regardless of whether the confidential witness's allegations actually favor defendants (as opposed to being neutral), the complaint contains no other allegations that give rise to a cogent inference that Draghi, Williams or MGIC's executives omitted reference to the margin calls as part of a scheme to mislead MGIC's investors (or out of recklessness). Therefore, I must conclude that plaintiff has not satisfied its burden to plead facts giving rise to a strong inference of scienter.

## C. Control Person Liability Under Section 20(a)

Plaintiff's second theory of liability is control person liability against all of the individual defendants pursuant to Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). To adequately plead a claim under Section 20(a), a plaintiff must first plead a primary violation of the securities laws. See, e.g., Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. 2008). As explained above, I conclude that plaintiff has not pleaded a viable claim under Section 10(b) and Rule 10b-5, and therefore I also conclude that plaintiff

33

has not pleaded a viable claim under Section 20(a).  Accordingly, this claim will also be dismissed.

### III.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that defendants' motions to dismiss are **GRANTED** to the extent that the consolidated class action complaint is **DISMISSED**.  If plaintiff believes that it can cure the problems identified above with an amended pleading, it may move for leave to file an amended complaint pursuant to Civil L.R. 15 (E.D. Wis. 2010).  In its motion, plaintiff must explain how the amended complaint cures the problems identified above.  In accordance with Civil L.R. 7(b)-(c), defendants will have an opportunity to file a response to any such motion, and plaintiff may file a reply, if it chooses to do so. If plaintiff does not file a motion for leave to file an amended complaint on or before **March 18, 2010**, I will direct the clerk of court to enter final judgment.

**FINALLY, IT IS ORDERED** that plaintiff's motion for leave to file additional authority is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 18 day of February, 2010.

/s_____
LYNN ADELMAN
District Judge

34