UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| Fulton County Employees' Retirement System, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>v.<br><br>MGIC Investment Corporation, Curt S. Culver, J. Michael Lauer, Bruce Williams and John Draghi,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 08-C-0458<br><br>Honorable Lynn S. Adelman |

---

**BRIEF OF DEFENDANTS BRUCE WILLIAMS AND JOHN DRAGHI
IN OPPOSITION TO PLAINTIFF'S MOTION TO AMEND**

---

Jeffrey K. Spoerk (SBN 1005405)
Elizabeth C. Perkins (SBN 105030)
QUARLES & BRADY LLP
411 E. Wisconsin Avenue - Suite 2040
Milwaukee, WI 53202-4497
(414) 277-5763 (telephone)
(414) 978-8704 (facsimile)
eperkins@quarles.com

Edward J. Fuhr
HUNTON & WILLIAMS LLP
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200 (telephone)
804-788-8218 (facsimile)
efuhr@hunton.com

*Counsel for Defendants Bruce Williams and John Draghi*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 3

    A.    The Parties ................................................................................................ 3

    B.    C-BASS's Business ................................................................................... 4

    C.    The Subprime Crisis Begins and MGIC Announces Its Results
            for the First Quarter of 2007 .................................................................... 4

    D.    Following the First Quarter, the Market Enters a Period of
            Relative Calm ........................................................................................... 6

    E.    MGIC Announces Its Results for the Second Quarter of 2007 ............... 6

    F.    C-BASS Receives an Unprecedented Amount of Margin Calls ............... 7

    G.    MGIC and Radian Announce a Material Impairment ............................... 8

    H.    Shareholders Sue MGIC and This Court Dismisses the Action ............... 8

    I.    Plaintiff Moves for Leave to Amend ....................................................... 9

ARGUMENT .......................................................................................................... 11

I.    The Legal Standard on a Motion to Amend ................................................... 11

II.    The Amended Complaint Still Fails to Plead a Misstatement ....................... 12

    A.    Plaintiff Fails To Establish That Defendants Were Clairvoyant
            and Thus Misled Investors About Margin Calls in the Last
            Two Weeks of July 2007 ........................................................................ 13

    B.    Plaintiff Fails To Plead Adequately That C-BASS Overvalued
            Its Portfolio ............................................................................................. 15

            1.    Plaintiff Relies Impermissibly on Fraud by Hindsight ............... 15

            2.    The Amended Complaint Lacks the Requisite Particularity ........ 16

            3.    Plaintiff's Reliance on a Generic Market Index Cannot
                Save Its Claims .......................................................................... 19

            4.    Plaintiff Adduces No Support for Its Claim that C-BASS
                Misled Investors About Returning to Profitability in the Second
                Quarter of 2007 ......................................................................... 20

    C.    Plaintiff Fails to Plead that C-BASS Misstated the Effect of the
            Subprime Crisis on Its Operations .......................................................... 21

III.    The Amended Complaint Still Fails To Plead Scienter ................................. 22

1. The Amended Complaint Fails To Plead that the C-BASS
   Defendants Had a Motive to Defraud MGIC's Investors ..................................22

2. Plaintiff Fails to Plead that the C-BASS Defendants Otherwise
   Intended to Deceive MGIC's Investors ...............................................................24

3. The Most Compelling Inference Remains that of a Swift
   Business Reversal in a Time of Unprecedented Market Stress ...........................25

IV. The Amended Complaint Still Fails To Overcome the Safe Harbor
   for Forward-Looking Statements .......................................................................27

V. This Court Should Dismiss Plaintiff's Section 20(a) Claims for
   "Control Person" Liability Against the C-BASS Defendants.............................28

CONCLUSION...............................................................................................................29

Case 2:08-cv-00458-LA   Filed 04/12/10   Page 3 of 34   Document 82

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

Abrams v. Baker Hughes, Inc., 292 F.3d 424 (5th Cir. 2002)......................................................22

Acito v. IMCERA Group, 47 F.3d 47 (2d Cir. 1995)..................................................................14

In re Alpharma, Inc. Sec. Litig., 372 F.3d 137 (3d Cir. 2004) ...................................................25

Asher v. Baxter Int'l, Inc., 377 F.3d 727 (7th Cir. 2004)......................................................14, 16

Bethany Pharmacal Co. v. QVC, Inc., 241 F.3d 854 (7th Cir. 2001)...........................................11

In re Cerner Corp. Sec. Litig., 425 F.3d 1079 (8th Cir. 2005)......................................................18

Denny v. Barber, 576 F.2d 465 (2d Cir. 1978) ..........................................................................14

Foman v. Davis, 371 U.S. 178 (1962) .......................................................................................11

In re Guidant Corp. Sec. Litig., No. 03-0892, 2004 WL 2538374 (S.D. Ind. 2004) ....................25

In re Harley Davidson, Inc. Sec. Litig., 660 F. Supp. 2d 969 (E.D. Wis. 2009) ...........................18

Iron Workers v. OshKosh Corp., No. 08-797, 2010 U.S. Dist. LEXIS 30693
   (E.D. Wis. Mar. 30, 2010) .............................................................................................. passim

Johnson v. Radian Group, Inc., No. 08-2007, 2009 U.S. Dist. LEXIS 61334 (E.D. Pa.
July 16, 2009)...............................................................................................................................8

Maiden  v. Merge Techs., No. 06-C-349, 2008 U.S. Dist. LEXIS 84083
   (E.D. Wis. Oct. 20, 2008) ............................................................................................. 11-12

Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588 (7th Cir. 2006),
   vacated and remanded on other grounds by, 551 U.S. 308 (2007).........................12, 19, 22

Miller v. Champion Enters., Inc., 346 F.3d 660 (6th Cir. 2003) ................................................11

In re NAHC, Inc. Sec. Litig., 306 F.3d 1314 (3d Cir. 2002) ......................................................11

Nolte v. Capital One Fin. Corp., 390 F.3d 311 (4th Cir. 2004)....................................................25

Perkins v. Silverstein, 939 F.2d 463 (7th Cir. 1991) ...................................................................11

Pugh v. Tribune Co., 521 F.3d 686 (7th Cir. Ill. 2008)...............................................................22

In re Radian Securities Litigation, 612 F. Supp. 2d 594 (E.D. Pa. 2009)..................3, 8, 23, 26, 27

In re Regeneron Pharm., Inc. Sec. Litig., No. 03-3111, 2005 WL 225288
    (S.D.N.Y. Feb. 1, 2005)............................................................................................27

Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246 (N.D. Ill. 1997) ......................................23

Roots Partnership v. Lands' End, Inc., 965 F.2d 1411 (7th Cir. 1992)...........................18

Selbst v. McDonald's Corp., 432 F. Supp. 2d 777 (N.D. Ill. 2006) ................................18

Smith v. Circuit City Stores, Inc., 286 F. Supp. 2d 707 (E.D. Va. 2003).......................12

Stavros v. Exelon Corp., 266 F. Supp. 2d 833 (N.D. Ill. 2004).....................................17

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) .........................3, 23, 26

**FEDERAL STATUTES & RULES**

Private Securities Exchange Litigation Reform Act, 15 U.S.C. § 78 ..................................... passim

Fed. R. Civ. P. 9(b) .......................................................................................................16, 18

Fed. R. Civ. P. 12(b)(6).................................................................................................3, 12

Fed. R. Civ. P. 15(a) .........................................................................................................11

Defendants Bruce Williams and John Draghi (collectively, "C-BASS Defendants") submit this memorandum in opposition to the motion to file an amended complaint ("Amended Complaint") submitted by Fulton County Employees' Retirement System ("Plaintiff").

## PRELIMINARY STATEMENT

On October 28, 2008, Plaintiff filed its first complaint in this matter. This 119-paragraph pleading argued that because C-BASS suffered large losses in late July of 2007, those losses must have been caused by fraud. On June 22, 2009, eight months later, Plaintiff filed a consolidated complaint. This 322-paragraph pleading, like its predecessor, argued once again that because C-BASS suffered dramatic losses, there must have been fraud. Having had eight months to investigate its claims, this pleading should have represented Plaintiff's best shot.

On February 18, 2010, this Court held that Plaintiff's best shot was not good enough and entered an order dismissing the consolidated complaint (the "Dismissal Order"). This Court held that despite having filed a pleading of prodigious length, Plaintiff had failed to clear the first and simplest hurdle raised by the Private Securities Litigation Reform Act, 15 U.S.C. § 78 (the "Reform Act"): pleading a false or misleading statement.

Plaintiff now seeks leave — almost a year-and-a-half after initiating this action — to file a third complaint. In its motion to amend, Plaintiff claims that the Amended Complaint "cures the deficiencies identified by the Court in its February 18th Order" dismissing the initial complaint.

Plaintiff is mistaken for three reasons.

First, the Amended Complaint still fails to plead a misleading statement. Instead of explaining _why_ any particular statements were false, as required by the Reform Act, Plaintiff asserts repeatedly that the C-BASS Defendant's statements were "false" or, similarly, that

C-BASS's reported financial numbers were "too high," because C-BASS ultimately suffered losses.

In the few instances in which the Amended Complaint attempts to explain why a particular statement was false, the results are insufficient and, in some cases, nonsensical. For example, Plaintiff relies on one of its new "confidential witnesses" who purportedly claimed in an odd sentence fragment that C-BASS was, at some unspecified time, "valuing its portfolio higher than it was." Even assuming that this witness meant to state that C-BASS was overvaluing its portfolio, which is far from clear, that statement is contradicted by another one of Plaintiff's confidential witnesses, who stated expressly that C-BASS "posted appropriate reserves." The Amended Complaint never explains which of these dueling confidential witnesses the reader is supposed to find credible, which makes Plaintiff's theory incredible. Nor does the Amended Complaint offer any indication, even generally, of the amount of the purported overvaluation, a lack of particularity that dooms this claim under the Reform Act.

Similarly, Plaintiff cites an internal "stress test" that a confidential witness purportedly conducted at some unspecified time in 2006. According to this witness, this stress test indicated that general market declines would lead to C-BASS receiving "margin calls" in an unspecified amount at an unspecified time. Based solely on this general and unexceptional result, Plaintiff then claims repeatedly that the C-BASS Defendants knew a year later, in early July 2007, that C-BASS was about to be wiped out by an unprecedented wave of margin calls valued in the hundreds of millions of dollars. Plaintiff's allegation is a *non sequitur*.

Second, the Amended Complaint still fails to plead that the C-BASS Defendants acted with scienter. Despite claiming to have interviewed several confidential witnesses on more than one occasion over the course of the past two years, Plaintiff has been unable to get a single one

2

of those witnesses to say that Messrs. Draghi or Williams made a public statement that they either knew to be false or that was contradicted by any internal C-BASS analyses.

Finally, the Amended Complaint still fails to overcome the Reform Act's safe harbor with respect to the numerous forward-looking statements it attacks.

In sum, the words of the court in <u>In re Radian Securities Litigation</u>, 612 F. Supp. 2d 594 (E.D. Pa. 2009), which dismissed a similar suit related to the collapse of C-BASS, are still pertinent to the Amended Complaint:

> Although these allegations, if true, might be sufficient to establish declining conditions in the subprime market and at C-BASS, they are not particularized evidence that the defendants knew or must have known that their statements and omissions presented a danger of misleading buyers or sellers.

<u>Id.</u> at 618. Despite having filed a complaint, a consolidated complaint and now the Amended Complaint, Plaintiff still alleges only declining market conditions. Because amendment would be futile, Plaintiff's motion should be denied and this action should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.    The Parties

Defendant MGIC is a publicly traded corporation with headquarters in Milwaukee, Wisconsin (¶ 18).[1] Through a subsidiary, MGIC is the nation's largest provider of private mortgage insurance (¶¶ 23, 34). During the Class Period, Defendants Culver and Lauer (collectively, "MGIC Defendants") were officers of MGIC (¶¶ 24-25).

Unlike the MGIC Defendants, Messrs. Draghi and Williams are not and have never been officers of MGIC. Rather, during the Class Period, they were officers of Credit-Based Asset

---

[1] The facts in this section are taken from the Amended Complaint and from "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss," including "documents incorporated into the complaint by reference" and "matters of which a court may take judicial notice." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007).

Servicing and Securitization LLC ("C-BASS").  C-BASS was privately owned.  MGIC owned

46% of C-BASS, Radian owned 46%, and C-BASS management owned the rest (¶¶ 2, 35).

### B.    C-BASS's Business

C-BASS was in the business of issuing, servicing and investing in subprime mortgage

assets (¶ 2).  See also ¶¶ 37-38; MGIC Form 10-K, at 29 (Mar. 1, 2007), attached hereto as

Exhibit 1.[2]  As part of this business, C-BASS purchased, among other things, subprime

residential mortgage loans (¶ 35-38).  C-BASS packaged those loans into pools and sold bonds

— known as "mortgage-backed" securities — that were "backed" by those pools.

C-BASS financed its business primarily by borrowing money from various financial

institutions, using its portfolio of mortgage assets as collateral (¶ 41).  See also Dismissal Ord., at

3 n.2 (Feb. 18, 2010); Ex. 1, at 29.  If C-BASS's lenders believed the collateral was insufficient

to secure C-BASS's borrowings, they could demand that C-BASS pledge more collateral, or

simply pay cash, to make up the difference.  Such a demand is known as a "margin call."

### C.    The Subprime Crisis Begins and MGIC Announces Its Results for the First Quarter of 2007

Beginning in February 2007, the subprime mortgage market "experienced significant

turmoil" (¶ 194), showing the first signs of the coming crisis in the United States housing

market.  See also ¶¶ 2 (referring to the "subprime mortgage crisis"); 55-77 (describing "The

Subprime Crisis").  C-BASS was, of course, a participant in the subprime mortgage market (¶ 2).

Indeed, as MGIC disclosed to investors, "C-BASS's mortgage purchases in 2005 and 2006 have

primarily been of subprime mortgages, which bear a higher risk of default."  Ex. 1, at 29; MGIC

Form 10-Q, at 68 (May 10, 2007), Ex. 2.

---

[2] All exhibits to this brief are referred to hereafter as "Ex. __."

4

On April 11, 2007, MGIC announced its financial results for the first quarter of 2007 (¶ 169). With respect to its investment in C-BASS, MGIC stated that its "[i]ncome from joint ventures" had fallen more than fifty percent, "primarily as a result of the operating loss at C-BASS." MGIC Press Release (Apr. 11, 2007), Ex. 3; see also Dismissal Ord., at 28 ("MGIC noted that one of the major reasons for its disappointing results was . . . C-BASS.").

On April 11, 2007, MGIC held an earnings call in which MGIC executives discussed MGIC's first quarter (¶ 169). See also Final Transcript, Q1 2007 MGIC Earnings Conference Call (Apr. 12, 2007), Ex. 4. Mr. Williams of C-BASS also participated. In his remarks, he explained that "[t]his past quarter the subprime market experienced a substantial repricing" (¶ 171). This was "primarily due to the well-publicized issues with subprime loans . . . , to include poor underwriting, increasing delinquencies and foreclosures." Id. Mr. Williams noted that this market crisis "ha[d] created liquidity issues for all subprime [market] participants," causing "increased margin calls from all lenders." Id. (emphasis added). Mr. Williams noted further that C-BASS had "not been immune to these market events" and had in fact paid margin calls in the amount of approximately $200 million in the first quarter of 2007 (¶¶ 87, 171).

As a result of these market conditions, C-BASS reported its first-ever quarterly loss. Ex. 4, at 3 ("events in the first quarter broke C-BASS's string" of positive quarterly results). Mr. Williams disclosed that C-BASS "reported a pre-tax loss of approximately $15 million versus an expected pre-tax profit of approximately $60 million" (¶ 171).

On May 10, 2007, MGIC filed with the SEC its quarterly report for the first quarter of 2007. See Ex. 2. In a section regarding risk factors, MGIC noted that C-BASS maintained "substantial liquidity to cover margin calls." Id. at 68. MGIC cautioned further, however, that "[w]hile C-BASS's policies . . . are intended to provide sufficient liquidity to cover an

instantaneous and substantial decline in value, such policies <u>cannot guaranty that all liquidity</u> <u>required will in fact be available.</u>" <u>Id.</u> (emphasis added).[3]

### D.    <u>Following the First Quarter, the Market Enters a Period of Relative Calm</u>

Beginning in April 2007, the subprime market stabilized and entered a period of relative calm. As Mr. Williams noted on MGIC's earnings call on April 11, "there was a period from the last week of February through basically the first three weeks of March where the market was very unstable, and it seems to have calmed down." Ex. 4, at 18; <u>see also</u> Am. Compl. ¶ 140 (Plaintiff's own confidential witness stating that "in April and May 2007, things looked to be stabilizing and C-BASS had a positive net income").

This relative calm was reflected in sharply decreased margin calls. Whereas C-BASS received and paid margin calls in the amount of $200 million in the first three months of 2007, it received and paid margin calls in the amount of only $90 million in the entire second quarter, a drop of more than fifty percent (¶ 95). <u>See also</u> Dismissal Ord., at 28-29.

### E.    <u>MGIC Announces Its Results for the Second Quarter of 2007</u>

On July 19, 2007, MGIC announced its financial results for the second quarter of 2007, which had ended on June 30, 2007 (¶ 178). <u>See also</u> MGIC Press Release (July 19, 2007), Ex. 5. Later that day, MGIC held an earnings call in which MGIC executives discussed MGIC's performance (¶ 178). <u>See also</u> Final Transcript, Q2 2007 MGIC Earnings Conference Call (July 19, 2007), Ex. 6. Messrs. Draghi and Williams also participated (¶ 179).

Although C-BASS had returned to positive earnings in the second quarter, Mr. Williams still offered a bleak assessment of the subprime market. He noted that "[l]iquidity remains a

---

[3] The SEC filing attached hereto as Exhibit 2 and referenced above does not have sequential page numbers throughout the entire document. The sixty-eighth page cited above is the second-to-last page of this sixty-nine page document.

primary issue for subprime market participants as illustrated by . . . increased margin calls from all lenders" (¶ 180) (emphases added). Mr. Williams noted further that "continued poor performance of the 2006 [subprime] vintage," together with several other factors, had "combined to keep [subprime] market pricing at distressed levels" (¶ 180).

In addition, MGIC's earnings release warned investors again that "[w]hile C-BASS's policies . . . are intended to provide sufficient liquidity to cover a . . . substantial decline in value, such policies cannot guaranty that all liquidity required will in fact be available." Ex. 5, at 9.

### F.    C-BASS Receives an Unprecedented Amount of Margin Calls

In the eighteen days preceding MGIC's earnings call on July 19, C-BASS received and was able to pay to its lenders $145 million in margin calls (¶¶ 193, 197 ). See also Dismissal Ord., at 29. Towards the end of that period, C-BASS's parents, MGIC and Radian, agreed to loan C-BASS $100 million (¶¶ 15, 84), thus bolstering its liquidity position.

In the two weeks following July 19, however, the crisis in the subprime market "accelerat[ed] to unprecedented levels" (¶ 194), and the margin calls from C-BASS's lenders spiraled out of control. In the single week following MGIC's earnings call on July 19, C-BASS paid more than $100 million in margin calls (¶ 196). See also Dismissal Ord., at 29. The following week, C-BASS received more than $300 million in additional margin calls (¶ 197), of which $200 million were received in only two days. See Dismissal Ord., at 29 ("in less than one week . . . C-BASS received an additional $330 million in margin calls"); Radian Form 8-K, at 4 (Aug. 2, 2007), Ex. 7.

In sum, in the two-week period following MGIC's July 19 earnings call, C-BASS received an amount of margin calls equal to the amount it had received in the entire preceding six-and-one-half months, including the first eighteen days of July 2007. As MGIC and Radian would announce shortly, C-BASS was unable to satisfy all of these margin calls.

7

### G. MGIC and Radian Announce a Material Impairment

On July 30, 2007, MGIC announced that the value of its investment in C-BASS had been "materially impaired" (¶ 194). <u>See also</u> MGIC Form 8-K (Aug. 1, 2007), Ex. 8; MGIC Form 10-K, at 110 (Feb. 29, 2008), Ex. 9. MGIC explained that "[b]eginning in February 2007, the market for subprime mortgages ha[d] experienced significant turmoil, with market dislocations accelerating to unprecedented levels beginning in approximately mid-July 2007" (¶ 194). MGIC had not "determined the range of an impairment charge" but noted that "the upper boundary of the range could be MGIC's entire investment [in C-BASS]." <u>Id.</u>

On the same day, Radian issued a similar announcement with respect to its investment in C-BASS (¶ 195). <u>See also</u> Ex. 7; Radian Form 10-Q, at 16-17 (Aug. 9, 2007), Ex. 10.

### H. Shareholders Sue MGIC and This Court Dismisses the Action

Beginning in May 2008, five different plaintiffs filed five different securities class actions against MGIC seeking to take advantage of C-BASS's business reversal.[4] On June 22, 2009, following consolidation, Plaintiff filed a consolidated complaint.

On February 18, 2010, this Court entered an order dismissing the consolidated complaint. In its 34-page opinion, this Court considered and rejected the claims that Plaintiff now raises in the Amended Complaint. Dismissal Ord., at 27-33. With regard to the claims concerning C-BASS, this Court recognized that Plaintiff's claims were based impermissibly on C-BASS's large losses viewed through the prism of "hindsight." <u>Id.</u> at 31.

More specifically, this Court held that the statement that "C-BASS maintained 'substantial liquidity' to cover margin calls was not false or misleading," <u>see</u> Dismissal Ord., at

---

[4] Similar suits were filed against Radian. All such suits were dismissed. <u>See</u> In re Radian Sec. Litig., 612 F. Supp. 2d 594 (dismissing securities fraud suit); Johnson v. Radian Group, Inc., No. 08-2007, 2009 U.S. Dist. LEXIS 61334 (E.D. Pa. July 16, 2009) (dismissing ERISA suit).

30, despite C-BASS's inability to satisfy the wave of margin calls it received in late July 2007. As this Court noted correctly, "C-BASS had paid $145 million in margin calls and still had $150 million in cash remaining." Id. "$150 million is substantial liquidity." Id.

This Court further rejected Plaintiff's claim that Defendants misled MGIC's investors by failing to disclose in MGIC's second quarter earnings call the exact amount of margin calls paid by C-BASS in the first eighteen days of MGIC's third quarter. Rather, "because defendants disclosed that liquidity was a concern, stated that C-BASS had been subject to increasing margin calls, and made truthful statements regarding the amount of cash that remained available, [Mr.] Draghi's failure to also disclose the precise dollar amount of the margin calls that C-BASS had received during the opening days of [MGIC's] third quarter cannot reasonably be considered an omission that rendered his statement about the amount of cash remaining misleading." Id. at 32.

Finally, this Court held that because Mr. Williams "informed investors on the second quarter conference call [on July 19] that C-BASS had been subject to increasing margin calls . . . , no reasonable investor could have been misled into thinking that C-BASS's assets had not declined in value." Dismissal Ord., at 30, n.10 (emphasis added).

## I.    Plaintiff Moves for Leave to Amend

In the Dismissal Order, this Court stated that "[i]f plaintiff believes that it can cure the problems identified above with an amended pleading, it may move for leave to file an amended complaint." Dismissal Ord., at 34. On March 18, 2010, Plaintiff moved for leave to amend.

The Amended Complaint differs from the original complaint in that it involves a shorter class period and focuses more on C-BASS. It is similar to the original complaint, however, in that it attempts to tell the same story; namely, that Defendants knew that C-BASS was doomed weeks and even months before the margin calls in late July 2007 that led to C-BASS's demise.

As with the original complaint, it is not entirely clear which particular statements the Amended Complaint contends were misleading.[5]  It appears to challenge the following:

- margin calls:  the Amended Complaint appears to challenge every statement by Messrs. Draghi and Williams on the April 12 and July 19 calls on the grounds that each such statement omitted information concerning: (i) C-BASS's payment of margin calls in the preceding eighteen days; and (ii) the amount of "inevitable" future margin calls (¶97) that C-BASS would receive following the July 19 call (¶¶ 7, 97, 172(b), 181(e), 183(c));

- value of C-BASS:  the Amended Complaint appears to challenge every statement by Messrs Draghi and Williams on the April 11 and July 19 calls on the grounds that each statement misstated or omitted information concerning the decline in the value of C-BASS's securities portfolio (¶¶ 9, 172(a), 181(a), 183(a)).[6]

- relative superiority of C-BASS:  the Amended Complaint appears to challenge every statement by Messrs. Draghi and Williams on the April 11 and July 19 calls on the grounds that each statement "portray[ed] C-BASS as superior to its subprime peers" (¶ 9) and conveyed the impression that "C-BASS had . . . escaped the subprime collapse" (¶ 177); and,

- earnings expectations:  the Amended Complaint challenges Mr. Draghi's statement on July 19, 2007, that "[f]or the full year, we expect pretax earnings to be between $125 and $175 million" (¶ 182).

---

[5] This is due to the Amended Complaint's impermissible "puzzle-style" approach to pleading; that is, quoting lengthy blocks of text and then alleging that every statement within that block of text was false and misleading.  See, e.g., Am. Compl. ¶¶ 171-72 (quoting twenty-four sentences and then stating, without distinguishing among the various sentences, that "Williams' statements were false and misleading") (emphasis added); ¶¶ 180-81 (quoting eighteen sentences, many of which express multiple propositions, and then stating "Williams' statements were false and misleading"); ¶¶ 182-83 (quoting twenty-one sentences and then stating, without distinguishing among the various sentences, that "Draghi's statements were false and misleading").  The C-BASS Defendants discussed this defect with Plaintiff's pleading style, which alone merits dismissal, in their initial dismissal brief.  See C-BASS Def.'s Dismissal Br., at 14-15 (Docket # 58).

[6] Plaintiff focuses especially on Mr. Williams' statement on April 11 that C-BASS took a "mark-to-market adjustment of $34 million [in the first quarter] . . . to reflect current market conditions" (¶ 171), and Mr. Draghi's statement on July 19 that C-BASS "report[ed] a pretax profit of approximately $50 million" in the second quarter of 2007 (¶ 182).

10

## I.     The Legal Standard on a Motion to Amend

Under Fed. R. Civ. P. 15(a), leave to amend is freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2).  However, justice does not require leave to amend when "amendment would be futile." Bethany Pharmacal Co. v. QVC, Inc., 241 F.3d 854, 861 (7th Cir. 2001) (internal citation omitted).  An amendment would be futile if it "fail[ed] to cure the deficiencies in the original pleading, or could not survive a second motion to dismiss." Perkins v. Silverstein, 939 F.2d 463, 472 (7th Cir. 1991) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

In cases governed by the Reform Act, the inquiry as to what "justice so requires" under Rule 15(a) has an additional nuance.  Specifically, the Reform Act "restrict[s]" a plaintiff's ability to amend. Miller v. Champion Enters., Inc., 346 F.3d 660, 692 (6th Cir. 2003) ("we think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure"); accord In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332-33 (3d Cir. 2002).  The Reform Act "could not achieve [its] purpose" of "prevent[ing] harassing strike suits filed the moment a company's stock price falls" if "plaintiffs were allowed to amend and amend until they got it right." Miller, 346 F.3d at 690, 692 (internal quotations omitted).  Rather, "[o]nly dismissal of insufficient complaints without leave to amend preserves the teeth of the Reform Act." Maiden

---

[7] The Amended Complaint incorporates wholesale many of the claims that this Court rejected in the Dismissal Order.  Rather than repeating each of the arguments they made in their dismissal brief, the C-BASS Defendants incorporate those arguments herein by reference and focus below on Plaintiff's claims that differ, however little, from those in the original complaint.

v. Merge Techs., No. 06-C-349, 2008 U.S. Dist. LEXIS 84083, at *14 (E.D. Wis. Oct. 20, 2008) (quoting Smith v. Circuit City Stores, Inc., 286 F. Supp. 2d 707, 722-23 (E.D. Va. 2003)).[8]

## II.      The Amended Complaint Still Fails to Plead a Misstatement

The Amended Complaint tells the same story as the original complaint with respect to C-BASS, but with a slightly different focus. That focus has shifted to three claims: (i) that the late July 2007 margin calls were "inevitable" and thus should have been disclosed before they occurred; (ii) that C-BASS was overvaluing its portfolio by some unspecified amount; and, (iii) that C-BASS falsely boasted that it was better than its "subprime peers" (¶ 9).

These claims fail for the same reason the claims in the original complaint failed; namely, they do not "plead a false statement of material fact." Dismissal Ord., at 7. As this Court noted in the Dismissal Order, to plead falsity under the Reform Act it does not suffice to point to a challenged statement and say "that statement is false." Nor does it suffice to point to a reported financial result and say "that result is too high." Rather, "a plaintiff must 'specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief.'" Dismissal Ord., at 7 (quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 595 (7th Cir. 2006), vacated and remanded on other grounds by, 551 U.S. 308 (2007)). Moreover, "the facts alleged must be 'sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" Id. Because the Amended Complaint fails to plead a false or misleading statement, amendment would be futile and Plaintiff's motion should be denied.

---

[8] As to what legal standards this Court should apply to determine whether amendment would be futile, the C-BASS Defendants incorporate the discussion in their initial dismissal brief of Fed. R. Civ. P. 12(b)(6) and the Reform Act. See C-BASS Def. Dismissal Brf., at 12-13 (Dckt. # 58); see also Dismissal Ord., at 6-8.

12

**A.** **Plaintiff Fails To Establish That Defendants Were Clairvoyant and Thus Misled Investors About Margin Calls in the Last Two Weeks of July 2007**

In its initial complaint, Plaintiff alleged that Messrs. Draghi and Williams misled investors by failing to disclose on July 19, 2007 that C-BASS had received $145 million in margin calls in the first eighteen days of July. This Court dismissed all claims pertaining to those margin calls, finding that Defendants had no duty to disclose them and that, in any event, "investors were on notice that [C-BASS's] liquidity was a concern." Dismissal Ord., at 31.

The Amended Complaint attempts to plead around this holding by claiming that on July 19, the C-BASS Defendants not only knew about the $145 in margin calls C-BASS had received in the prior three weeks, but also about the crushing wave of margin calls it had yet to receive. Specifically, the Amended Complaint alleges that Confidential Witness No. 6 ("CW6") worked for C-BASS and created "stress scenarios" consisting of "models showing what would happen to the values of C-BASS's bond products if 'certain stresses impacted them'" (¶ 143). According to Plaintiff, these scenarios predicted that a drop in the subprime market generally would lead to "margin calls" at C-BASS. Id.

Plaintiff claims that "as a result of" this stress testing in 2006, "Williams and Draghi were well aware," as early as April 2007, "that these additional margin calls [in the last two weeks of July 2007] were inevitable" (¶ 97) and would "necessarily follow." Pl.'s Br., at 2. As a result of this alleged knowledge, Plaintiff concludes, the C-BASS Defendants misled MGIC's investors by not disclosing these "inevitable" margin calls (¶ 97) that had not yet occurred.

This inference is preposterous. A general prediction at some unspecified time in 2006 that "margin calls" would follow a hypothetical market decline could not have put anyone on notice in early July 2007 that C-BASS would actually receive hundreds of millions of dollars in margin calls in the last two weeks of July 2007. That would require a clairvoyance that the

13

federal securities laws do not demand.  See Iron Workers v. Oshkosh Corp., No. 08-797, 2010 U.S. Dist. LEXIS 30693, at *55 (E.D. Wis. Mar. 30, 2010) ("lack of clairvoyance simply does not constitute securities fraud") (quoting Acito v. IMCERA Group, 47 F.3d 47, 53 (2d Cir. 1995)).

Indeed, the "stress test" from 2006 on which the Amended Complaint relies is not alleged to have quantified, even generally, the dollar amount of the margin calls C-BASS expected in 2007 (¶ 143).  Nor did that "stress test" specify when, even generally, the margin calls would occur.  Id.  Rather, it simply observed that a general market decline would lead to "margin calls."  Far from being inconsistent with C-BASS's disclosures, this conclusion mirrors them; that is, when the subprime market declined in the first quarter of 2007, C-BASS paid margin calls in the amount of $200 million.  Similarly, when the subprime market stabilized but remained stressed in the second quarter of 2007, C-BASS paid margin calls in the amount of $90 million.  Notably, Plaintiff's own confidential witness does not claim that his stress testing predicted the July 2007 margin calls.  Nor does he claim that his stress testing predicted anything that was contrary to management's disclosures.

As it did in the original complaint, Plaintiff attempts to rely on the fact that significant margin calls occurred in late July to impute advance knowledge of those margin calls to the C-BASS Defendants.  But "an unexpected turn of events cannot demonstrate a securities problem at all, as there cannot be 'fraud by hindsight.'"  Asher v. Baxter Int'l, Inc., 377 F.3d 727, 730 (7th Cir. 2004) (quoting Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.)).

In sum, the Amended Complaint fails to explain with particularity why the C-BASS Defendants' statements regarding liquidity and margin calls were false or misleading.  A

14

conclusory reference to a generic stress test in 2006 does not suffice. Accordingly, Plaintiff's proposed amendment would be futile and Plaintiff's motion should be denied.

### B.   <u>Plaintiff Fails To Plead Adequately That C-BASS Overvalued Its Portfolio</u>

The Amended Complaint next attempts to put a new spin on Plaintiff's claim that C-BASS was overvaluing its portfolio and should have taken a greater write-off. Specifically, Plaintiff claims that the C-BASS Defendants fraudulently led MGIC's investors to believe that "C-BASS's portfolio of highly risky subprime assets had not lost significant value" (¶ 9). Related to this claim, Plaintiff alleges that the C-BASS Defendants lied when they said that "C-BASS had been profitable in the second quarter of 2007." <u>Id.</u>

In the Dismissal Order, this Court dismissed similar claims. This Court held that given the disclosures of the C-BASS Defendants, "no reasonable investor could have been misled into thinking that C-BASS's assets had not declined in value." Dismissal Ord., at 30, n.10. The Amended Complaint cites the same public disclosures as the original complaint. Accordingly, this Court's conclusion that no reasonable investor could have been misled stands firm.

In any event, this claim, which the C-BASS Defendants will refer to as the "mark-down" claim, fails for four additional reasons.

#### 1.   <u>Plaintiff Relies Impermissibly on Fraud by Hindsight</u>

First, Plaintiff's "mark-down" claim relies impermissibly on fraud by hindsight. This is clear from Plaintiff's own allegations. Plaintiff states that "C-BASS's mortgage loan portfolio, which had been reported as $4.6 billion at the start of 2007, had begun to perform significantly worse in late 2006 with mounting delinquencies and instances of fraud" (¶ 172(c)). The Amended Complaint then states that "[a]ccordingly, C-BASS was required to mark down its subprime mortgage portfolio more than it reported [in April 2007]." <u>Id.</u> (emphasis added).

15

But poor performance in 2006 does not justify an inference that "accordingly" C-BASS's portfolio should have been marked down "more than [C-BASS] reported" in 2007 (¶ 172(c)); see Asher, 377 F.3d at 730 ("there cannot be 'fraud by hindsight'"); Iron Workers, 2010 U.S. Dist. LEXIS 30693, at *50 (dismissing amended complaint where it "simply cite[d] disappointing figures from the future as though these [we]re evidence of fraud in the past"). This allegation thus fails to plead why the challenged statements were false.

### 2. The Amended Complaint Lacks the Requisite Particularity

Second, Plaintiff's "mark-down" claim fails for lack of particularity. The Reform Act and Fed. R. Civ. P. 9(b) require plaintiffs to "state with particularity" all facts on which they base their allegations that a particular statement was misleading. 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b) ("a party must state with particularity the circumstances constituting fraud").

The Amended Complaint violates this requirement. It alleges that C-BASS should have taken a larger mark-down in the first quarter of 2007. But it never states, even generally, how much of a mark-down C-BASS should have taken. Rather, the Amended Complaint states only that C-BASS should have taken "far greater write downs" (¶ 172(a)), "the necessary markdowns" (¶ 176), "additional material markdowns" (¶ 176), "significantly worse" mark-downs (172(c)), "far more significant[]" markdowns (¶ 175(a)), "significant[]" markdowns (¶ 181(a)), and "more [mark-downs] than it reported" (¶ 172(c)). Plaintiff alleges further that C-BASS valued its portfolio "too high" (¶ 181(a)). But Plaintiff never states by how much the portfolio was overvalued. Rather, Plaintiff claims only that its value was "grossly overstated" (¶ 179) by "significant amounts" (¶ 181(a)).

The Amended Complaint introduces a new "confidential witness" who purportedly said that "C-BASS was 'valuing the portfolio higher than it was.'" Am. Compl. ¶ 158 (referring to CW9). But even assuming that this sentence fragment was intended to mean that C-BASS was

16

overvaluing its portfolio, which is far from clear, neither this witness nor the Amended Complaint explains how large the mark-down should have been.[9]

The decision in <u>Stavros v. Exelon Corp.</u>, 266 F. Supp. 2d 833 (N.D. Ill. 2003), is instructive on this point. The plaintiffs there "allege[d] that the value of [the defendant company] was impaired as early as June 30, 2001 due to [its] investment in the declining telecommunications industry, . . . but [the defendant company] waited until March 31, 2002 to report the charge." <u>Id.</u> at 852. The allegations, however, "largely lack[ed] detail as to which businesses or assets were impaired and by how much . . . , all <u>necessary elements of pleading fraud with particularity</u>." <u>Id.</u> (emphasis added). Accordingly, the court dismissed the complaint.

More recently, in <u>Iron Workers</u>, 2010 U.S. Dist. LEXIS 30693, the plaintiff alleged that a corporate acquisition "was a failure from the get-go" and that the acquiring company "should have admitted this 'at least five years' before it did by recognizing a goodwill impairment." <u>Id.</u>

---

[9] With regard to CW9's+ purported statement that C-BASS was "valuing the portfolio higher than it was" (¶ 10), the C-BASS Defendants note that this statement is suspect for three reasons. First, the statement that C-BASS was "valuing the portfolio higher than it was" is not a complete thought. Rather, it is a sentence fragment. CW9 presumably did not communicate his thoughts to Plaintiff's counsel in sentence fragments, but it is unclear from the Amended Complaint how he completed this thought. He could have said that C-BASS was "valuing the portfolio higher than it was" valued in the opinion of one of C-BASS's many lenders. He could have said that C-BASS was "valuing the portfolio higher than it was" valued through application of a generic index like the ABX. He could have said that C-BASS was "valuing the portfolio higher than it was" valued in his own personal opinion, an opinion he may never have shared with Messrs. Draghi and Williams. The most compelling inference from Plaintiff's decision to quote only this odd sentence fragment suggests that CW9's complete thought was not as favorable to Plaintiff's case as the fragment. In any event, this Court should not have to guess how CW9 would have completed his thought. Second, CW9 is the person who purportedly prepared the Company's valuation reports. Am. Compl. ¶ 10 (CW9 was "the person preparing these reports" that "track[ed] the value of [C-BASS's] portfolio"). Accordingly, if CW9 truly believed that the Company was overstating the value of its portfolio, CW9 was the principal guilty party. It defies common sense to believe that he would have admitted this to Plaintiff's counsel. Finally, CW6 disagrees with CW9. Specifically, CW6 said that "C-BASS posted appropriate reserves" (¶ 139). The Amended Complaint offers no explanation of how to reconcile the purported statements of CW6 with those of CW9.

at *41.  But the plaintiff "fail[ed] to explain how much the goodwill should have been written down, and when, and what specifically about the company's goodwill evaluation was fraudulent."  Id. at 48.  Rather, the plaintiff, similar to the Plaintiff here, simply relied "on the blanket assertion that [the company] was essentially worthless during the entire class period."  Id. at 49.  Relying on this lack of particularity, the court dismissed the complaint.  See also Roots P'ship v. Lands' End, Inc., 965 F.2d 1411, 1419 (7th Cir. 1992) (allegation that company "failed to establish adequate reserves for its excessive and outdated inventory" does not satisfy Rule 9(b) where investor does not allege "what the company's reserves were or suggest how great the reserves should have been"); In re Cerner Corp. Sec. Litig., 425 F.3d 1079, 1084 (8th Cir. 2005) (affirming dismissal of securities action on particularity grounds because although plaintiff alleged significant overstatements of revenue, plaintiff failed "to allege the amount of any overstatements, the extent of any pulling in that took place, or the amount of any revenue that was pulled in from future quarters").[10]

Even if Plaintiff had pleaded its "mark-down" claim with particularity, which it has not, that claim would still fail because it is contradicted by one of Plaintiff's own confidential witnesses.  CW6 stated that "there were several margin calls at C-BASS in February 2007" (¶ 139).  He then stated, however, that the Company "wrote down the assets" and "posted appropriate reserves" (¶ 139) (emphasis added).  Plaintiff cannot have it both ways.

---

[10]  See also In re Harley Davidson, Inc. Sec. Litig., 660 F. Supp. 2d 969, 989 (E.D. Wis. 2009) (to plead with the requisite particularity that "financial results were overstated" in violation of GAAP, a plaintiff "must allege," among other things, "(1) the particular financial transaction which caused the alleged misstatement of earnings; (2) the amount of the overstatement and the effect it had on the company's earnings; [and] (3) the applicable accounting principle(s) applied by the company and why they were improperly applied") (quoting Selbst v. McDonald's Corp., 432 F. Supp. 2d 777, 785 (N.D. Ill. 2006)).

In sum, "[i]t is not enough simply to allege in general that the defendant's statement was false." Makor v. Tellabs, 437 F.3d at 595. With respect to Plaintiff's "mark-down" claim, that is all the Amended Complaint does. Amendment would thus be futile.

### 3. Plaintiff's Reliance on a Generic Market Index Cannot Save Its Claims

Plaintiff attempts to salvage its "mark-down" claim by relying on the movement of a generic market index. Specifically, Plaintiff claims that a particular market index published by a company named "Markit" dropped significantly in 2007 (¶¶ 76-77). According to Plaintiff, this drop in what Plaintiff refers to as the "ABX subprime index" should have caused C-BASS to mark down its portfolio by some unspecified amount (¶ 79).

Even if Plaintiff had pleaded that amount with particularity, which it has not, Plaintiff would still be mistaken. The ABX index cited in the Amended Complaint did not track — and is not alleged to have tracked — the value of the mortgage securities held by C-BASS. Rather, that index tracked "a basket of 20 [particular] subprime mortgage-backed securities" (¶ 76), all of which had been issued "in the second half of 2006." Id.

In contrast to this general index tracking the late 2006 vintage of subprime securities, C-BASS's portfolio contained securities issued in multiple years. As Mr. Williams disclosed on MGIC's earnings call on July 19, 2007, C-BASS's portfolio "ha[d] been built up over a long period of time." Ex. 6, at 28. As a result, "well over 50%" of C-BASS's portfolio consisted of securities issued "prior to 2006." Id. (emphasis added). And as recent participants in the mortgage market have learned all too well, the year in which a security was issued (its "vintage") is vitally important. See, e.g., MGIC Transcript, at 3 (Apr. 12, 2007) (referring to "the well-publicized issues with subprime loans, especially the 2006 vintage").

For this reason, the ABX index cited by Plaintiff, which tracked non-C-BASS securities issued in the last six months of 2006, had little relevance to the value of C-BASS's portfolio.

19

Indeed, relying on the movement of the ABX to value C-BASS's securities is similar to relying on the movement of the Dow Jones Industrial Average to value the securities of a particular company trading on the New York Stock Exchange. There is no necessary correlation between the two.[11]

Finally, as Mr. Williams discussed on April 12, 2007, C-BASS did not see itself as a "generic issuer"; that is, C-BASS believed that its securities generally performed better than the "generic" securities tracked by the ABX "due to the franchise value that people associate with how [C-BASS] look[s] at [its] credit and how [its] credit has performed" (¶ 174). Despite its rhetoric to the contrary, Plaintiff concedes the reasonableness of this belief. Specifically, Plaintiff fails to contest Mr. Williams' statement on April 12 that C-BASS's "early pay defaults," an important measure of credit performance, were "running well below the industry average" (¶ 171). In sum, Mr. Williams stated — and Plaintiff does not dispute — that C-BASS was outperforming the "industry."[12] Naturally, then, C-BASS would not value its portfolio based on a generic basket of twenty securities issued by other market participants in the last part of 2006.

4.  Plaintiff Adduces No Support for Its Claim that C-BASS Misled Investors About Returning to Profitability in the Second Quarter of 2007

Related to its claim that C-BASS overvalued its portfolio, Plaintiff asserts that C-BASS fraudulently led MGIC's investors to believe that C-BASS was profitable in the second quarter

---

[11] Plaintiff attempts to gloss over this difference by referring not to the particular ABX index cited in the Amended Complaint, but to the "subprime market" generally. See, e.g., Pl.'s Br., at 9 (citing to portions of the Amended Complaint referencing the late-2006 vintage ABX index and claiming that "the subprime market fell about 30 percent through April 2007").

[12] For this reason, this Court should reject Plaintiff's claim that C-BASS misled investors into believing that C-BASS was outperforming its "subprime peers" (¶ 9). While Plaintiff disparages C-BASS's performance generally, neither Plaintiff nor its so-called confidential witnesses take issue with the C-BASS Defendants' specific statements about the concrete ways in which C-BASS was outperforming other companies in the subprime market.

of 2007. In fact, Plaintiff claims, C-BASS was not profitable given the downturn in the market generally, the decline in its portfolio and the "inevitable" margin calls it faced (¶ 97).

This claim suffers from all of the flaws described above, in that it relies on hindsight, it fails to plead with particularity just how profitable or unprofitable C-BASS was, and it relies on a generic market index. This claim, however, also suffers from an additional flaw; namely, it is contradicted by one of Plaintiff's own confidential witnesses. Specifically, CW6 stated that C-BASS had a "positive net income" in April and May 2007 (¶ 139). Plaintiff does not explain how this admission comports with Plaintiff's theory — entirely unsupported — that C-BASS generated zero profits in the second quarter of 2007.

### C. Plaintiff Fails to Plead that C-BASS Misstated the Effect of the Subprime Crisis on Its Operations

Plaintiff next alleges that the C-BASS Defendants assured MGIC's investors that "C-BASS's superior credit practices and reputation had allowed it to sidestep the worst of the subprime crisis." Pl.'s Br., at 3; see also id. at 4 (Defendants "falsely represented that C-BASS was largely unscathed by the subprime crisis"). According to Plaintiff, the C-BASS Defendants offered "rosy assurances that C-BASS had largely avoided the subprime fallout." Id. at 5.

This claim fails for many of the reasons discussed above, including that the Amended Complaint fails to point to any specific false statement. More fundamentally, however, this claim is contradicted by the facts as alleged in Plaintiff's own Amended Complaint.

At the outset of 2007, MGIC expected earnings of approximately $290 million for C-BASS. Ex. 1, at 47, 49. Following the unprecedented events of the first quarter, however, C-BASS reported its first-ever quarterly loss. This is not something companies do when they are "largely unscathed," Pl.'s Br., at 4, by a market crisis. Moreover, although C-BASS returned to profitability in the second quarter of 2007, it drastically reduced its earnings expectations for the

year, from approximately $290 million to a range of $125 million to $175 million. Even the top of this range was a drop of more than $100 million from what C-BASS expected earlier. Once again, this is not something that companies do when they have "largely avoided," Pl.'s Br., at 5, a market crisis.

In sum, Plaintiff's claim that C-BASS misled investors into believing that C-BASS had sailed through the subprime crisis fails given C-BASS's disclosed losses and reduced forecasts.

## III. The Amended Complaint Still Fails To Plead Scienter

In addition to the Amended Complaint's failure to allege that Messrs. Draghi or Williams made a misstatement, it fails to plead facts giving rise to the requisite strong inference that either did so with an intent to deceive investors. See Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. Ill. 2008) ("plaintiffs must create a strong inference of scienter with respect to each individual defendant"). For this additional reason, amendment would be futile and Plaintiff's motion should be denied.

### 1. The Amended Complaint Fails To Plead that the C-BASS Defendants Had a Motive to Defraud MGIC's Investors

The Amended Complaint, like its predecessor, fails for three reasons to plead scienter by alleging that Messrs. Draghi and Williams had a motive to defraud MGIC's investors.

First, as a general matter, the Seventh Circuit has held that while "[m]otive and opportunity may be useful indicators" of scienter, "nowhere in the [Reform Act] does it say that they are either necessary or sufficient." Makor v. Tellabs, 437 F.3d at 601 (emphasis added); accord Abrams v. Baker Hughes, Inc., 292 F.3d 424, 430 (5th Cir. 2002) (under the Reform Act, "[a]llegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter"). Accordingly, the Amended Complaint's allegations of motive, standing alone, cannot clear the Reform Act's scienter hurdle.

22

Second, Plaintiff's allegations of motive are speculative. With respect to Mr. Draghi, for example, Plaintiff claims only that "as a member of C-Bass's senior management, [Mr. Draghi] likely held restricted equity options in C-Bass" (¶ 297) (emphasis added). With respect to Messrs. Draghi and Williams, Plaintiff then claims that the anticipated merger between MGIC and Radian would "potentially provide a means for Williams and Draghi to monetize their investment in C-Bass" (¶ 298) (emphasis added).

"[P]laintiff[s] must do more than speculate as to defendants' motives or make conclusory allegations of scienter; plaintiff[s] must allege specific facts." Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246, 1255 (N.D. Ill. 1997). Plaintiff's admittedly speculative foundation of "potential[]" motives (¶ 298) cannot support a "cogent" and "compelling" inference that the C-BASS Defendants intended to deceive MGIC's investors. Tellabs, 551 U.S. at 314.

Finally, even if Plaintiff's motive allegations were not so speculative, they would still fail because they involve the type of generic corporate motives that courts have repeatedly rejected. The "desire to complete a merger and realize the attendant gains on company stock" is "among the motives that have been found to be generally possessed by most corporate directors." Radian, 612 F. Supp. 2d at 609. Accordingly, allegations that Defendants wanted to effectuate the "planned merger between MGIC and Radian" (¶¶ 13, 50-54), cannot give rise to a strong inference of fraudulent intent. Id. at 608-09 (citing cases).[13]

---

[13] With respect to motive, the C-BASS Defendants note further that the Complaint does not allege that either Mr. Draghi or Mr. Williams owned stock in MGIC. This is significant, as the goal of the alleged fraud, according to Plaintiff, was to inflate the value of MGIC's stock. Am. Compl. ¶ 310 ("As a result of the . . . materially false and misleading information . . . set forth above, the market price of MGIC's securities was artificially inflated during the Class Period.").

2. <u>Plaintiff Fails to Plead that the C-BASS Defendants Otherwise Intended to Deceive MGIC's Investors</u>

Plaintiff attempts to plead the C-BASS Defendants' knowledge or recklessness by claiming that Messrs. Draghi and Williams were aware on July 19 that C-BASS had received and paid $145 million in margin calls in the first eighteen days of July (¶ 183(e)). Plaintiff relies on CW6, who purportedly said that Mr. Draghi "knew about every margin call that came in" (¶ 141), as well as CW1, who speculated that "[Mark] Rosenthal [at C-BASS] likely kept [Messrs.] Draghi and Williams up to speed on incoming margin calls" (¶ 108).

Even if this were true, however, it is irrelevant to the C-BASS Defendants' scienter. As this Court held in the Dismissal Order, the failure to disclose on July 19, 2007, the margin calls paid by C-BASS in the prior eighteen days was in no way misleading. Dismissal Ord., at 30. Accordingly, regardless of whether Messrs. Draghi or Williams knew about those margin calls or not, their silence could not have been intentionally misleading.

With regard to Plaintiff's claims concerning the valuation of C-BASS's portfolio, the Amended Complaint fails to plead even generally, much less with the requisite particularity, <u>when</u> Messrs. Draghi and Williams learned these alleged facts about the portfolio's value, <u>how</u> they learned about them, and even <u>if</u> they knew about all of them prior to the two earnings calls. Only two of the nine  confidential witnesses, CW6 (¶¶ 133-44) and CW9 (¶¶152-62), are alleged ever to have been in the same room as Messrs. Draghi and Williams, and these witnesses say nothing to indicate that Messrs. Draghi or Williams were aware of information or internal reports that contradicted their public statements concerning C-BASS's profits or the value of its portfolio. <u>Cf. Iron Workers</u>, 2010 U.S. Dist. LEXIS, at *57 (dismissing complaint where "[n]one of the confidential witnesses stated that any of the Defendants knew X was true while they said Y, or that internal projections showed something different from what was publicly disclosed").

24

With respect to CW9 in particular, the Amended Complaint attempts to portray him as believing that "C-BASS was 'valuing the portfolio higher than it was,'" whatever that may mean. But even if CW9 believed that C-BASS was overvaluing its entire portfolio at some unspecified time, there is no allegation that CW9 shared this belief with Messrs. Draghi or Williams, much less that they agreed with it. Accordingly, the statement by CW9 cannot give rise to a strong inference of scienter on the part of the C-BASS Defendants. See In re Alpharma, Inc. Sec. Litig., 372 F.3d 137, 150 (3d Cir. 2004) ("allegations that . . . [a] subordinate [of an individual defendant], knew of the irregularities occurring in Brazil provide an insufficient basis upon which to impute knowledge to [that individual defendant]"); Nolte v. Capital One Fin. Corp., 390 F.3d 311, 316 (4th Cir. 2004) (affirming dismissal where plaintiffs failed to plead that the speaking defendants "adopted [an employee's] opinion [that Capital One was undercapitalized] but then publicly declared that Capital One was maintaining sufficient capital"); see generally 15 U.S.C. § 78u-4(b)(2) (plaintiffs must plead facts giving rise to a "strong inference" that "the defendant," not some other individual, "acted with the required state of mind").

In sum, with respect to Plaintiff's valuation claims, "it is impossible to determine from the facts as alleged in the Complaint exactly what information Defendants learned" and "when they learned it." In re Guidant Corp. Sec. Litig., No. 03-0892, 2004 WL 2538374, at *8 (S.D. Ind. 2004). Accordingly, amendment would be futile.

### 3. The Most Compelling Inference Remains that of a Swift Business Reversal in a Time of Unprecedented Market Stress

In their dismissal brief, the C-BASS Defendants explained that the inference urged by Plaintiff — that Messrs. Draghi and Williams intended to deceive investors in their corporate parent MGIC by withholding information about C-BASS's margin calls and underwriting standards — is simply not plausible. C-BASS Def.'s Dismissal Brf., at 25-26 (Dckt. #58).

And it is certainly not "cogent and at least as compelling as [the] opposing inference of nonfraudulent intent," as it must be to survive this motion to dismiss. <u>Tellabs</u>, 551 U.S. at 314. Rather, the most compelling inference on the facts alleged is that of a swift business reversal in the midst of unprecedented market stress.

The Amended Complaint adds nothing that alters this analysis. Like its predecessor, it offers no facts, no reasons, why an inference of fraud by Messrs. Draghi and Williams is necessary to tell the story of C-BASS's demise. Indeed, the Amended Complaint quotes approvingly from an analyst who believed that a deteriorating market — not fraud — was the culprit. <u>See</u> ¶ 199 ("a proliferation of margin calls by nervous lenders is causing a real liquidity crunch for companies that . . . package low-grade loans. The latest victim is C-BASS . . . .").

The approval by MGIC's independent auditor of MGIC's financial statements for 2007 adds further credence to this explanation. <u>See</u> <u>Iron Workers</u>, 2010 U.S. Dist. LEXIS, at *57 ("the fact that one of the Big Four accounting firms evidently agreed with [defendants'] approach weakens the inference that the need to recognize an impairment was so manifest that the failure to do so was fraudulent"); Ex. 9, at 137 (report of PwC). Indeed, as Plaintiff concedes, MGIC's auditor PricewaterhouseCoopers was not the only "Big Four" auditor to approve the timing of C-BASS's impairment. Deloitte & Touche, the independent auditor of Radian, Inc., one of the owners of C-BASS, "did not require Radian to restate for C-BASS" (¶ 186 n.2); that is, Deloitte found Radian's end-of-July impairment of its investment in C-BASS to be appropriate. <u>Cf.</u> <u>In re Radian</u>, 612 F. Supp. 2d at 622 (dismissing similar claims involving C-BASS and noting that "even after taking additional time to investigate the timing of the C-BASS impairment charge, Deloitte did not require Radian to file an amended 10-Q"). Similar circumstances led the <u>Radian</u> court to conclude that the fraud alleged there was improbable because it would have required the

participation of, among others, Radian, "C-BASS, MGIC, Deloitte and [PwC]." Id. at 623 n.29; see also Iron Workers, at *69-70 ("the number of defendants involved in the alleged fraud stretches credibility").

Finally, the agreement by MGIC and Radian to provide $100 million to C-BASS shortly before July 19 (¶¶ 15, 84) affirmatively defeats any inference of scienter. "[I]f Radian and MGIC had . . . known the size of the losses they had already sustained as a result of their respective investments in C-BASS, it makes little sense to suggest that they would have further provided additional funds, particularly in the form of an unsecured credit facility." Radian, 612 F. Supp. 2d at 621; cf. In re Regeneron Pharm., Inc. Sec. Litig., No. 03-3111, 2005 WL 225288, at *22 (S.D.N.Y. Feb. 1, 2005) (it is "well settled that . . . the purchase of additional company shares during the class period [] is inconsistent with an intent to commit fraud") (citing cases).

In sum, the "competing inferences" discussed above and in C-BASS's dismissal brief "far outweigh any inference that the [C-BASS] Defendants intended to commit fraud." Iron Workers, 2010 U.S. Dist. LEXIS, at * 65. Plaintiff's proposed amendment would be futile.

## IV. The Amended Complaint Still Fails To Overcome the Safe Harbor for Forward-Looking Statements

Even if the Amended Complaint could overcome the hurdles of the misstatement and scienter elements, its claims against Messrs. Draghi and Williams would still require dismissal because many of their challenged statements were either forward-looking or immaterial. The C-BASS Defendants addressed this point in their dismissal brief. See C-BASS Def.'s Dismissal Brf., at 26-29 (Dckt. #58). Because the Amended Complaint challenges the same statements as the initial complaint, the C-BASS Defendants incorporate their prior arguments by reference.

**V.** **This Court Should Dismiss Plaintiff's Section 20(a) Claims for "Control Person" Liability Against the C-BASS Defendants**

In addition to its claims under Section 10(b), the Amended Complaint accuses Messrs. Draghi and Williams of violating Section 20(a) of the Reform Act (¶¶ 314-17). Section 20(a) imposes liability on persons who control those who are primarily liable under Section 10(b).

The Section 20(a) claims raised in the Amended Complaint are identical to those raised in Plaintiff's initial complaint. Accordingly, they should be dismissed for the same reasons this Court dismissed those in the initial complaint. See Dismissal Ord., at 33-44; see also C-BASS Def.'s Dismissal Brf., at 29-30 (Dckt. #58).

## CONCLUSION

The Amended Complaint fails to cure the problems identified in this Court's Dismissal Order. For this reason, the C-BASS Defendants respectfully request that this Court deny Plaintiff's motion to file an amended complaint and dismiss this action with prejudice.

Dated: April 12, 2010

/s/ Elizabeth C. Perkins
_____
Jeffrey K. Spoerk (SBN 1005405)
Elizabeth C. Perkins (SBN 105030)
QUARLES & BRADY LLP
411 E. Wisconsin Avenue - Suite 2040
Milwaukee, WI 53202-4497
(414) 277-5763 (telephone)
(414) 978-8704 (facsimile)
eperkins@quarles.com

Edward J. Fuhr
HUNTON & WILLIAMS LLP
951 E. Byrd Street
Riverfront Plaza, East Tower
Richmond, Virginia 23219
804-788-8200 (phone)
804-788-8218 (facsimile)
efuhr@hunton.com

*Counsel for Defendants Bruce Williams and John Draghi*