UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

FULTON COUNTY EMPLOYEES'
RETIREMENT SYSTEM, on behalf of itself and
all others similarly situated,

       Plaintiffs,

vs.

MGIC INVESTMENT CORPORATION, CURT
S. CULVER, J. MICHAEL LAUER BRUCE
WILLIAMS AND JOHN DRAGHI.

       Defendants.

Honorable Lynn S. Adelman

Case No. 08-C-0458

---

**BRIEF OF MGIC INVESTMENT CORPORATION, CURT S. CULVER AND J. MICHAEL LAUER IN OPPOSITION TO MOTION TO AMEND CONSOLIDATED CLASS ACTION COMPLAINT**

---

Bryan B. House
Max B. Chester
William J. (Bill) Katt, Jr.
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
414.297.5554 (BBH)
414.297.5573 (MAXC)
414.319.7035 (WJK)
414.297.4900 (facsimile)

Jay N. Varon
FOLEY & LARDNER LLP
3000 K Street, N.W.
Washington, D.C. 20007
202.672.5380 (JNV)
202.672.5399 (facsimile)

Attorneys for Defendants MGIC
INVESTMENT CORPORATION, CURT S.
CULVER and J. MICHAEL LAUER

## TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

ARGUMENT .................................................................................................................... 7

I.      THE PROPOSED AMENDED COMPLAINT'S SCIENTER ALLEGATIONS
DO NOT SATISFY THE PSLRA OR RULE 9(b). ............................................. 7

     A.    Plaintiff Does Not Raise A Strong Inference of Scienter Regarding the
Valuation of C-BASS's Portfolio. ............................................................ 7

         1.    C-BASS's Margin Calls Do Not Raise A Strong Inference of
Scienter. ...................................................................................... 12

         2.    The Performance of the ABX Index Does Not Raise A Strong
Inference of Scienter. ................................................................... 14

     B.    The Timing of MGIC's Impairment Of Its Investment In C-BASS Does
Not Raise A Strong Inference of Scienter............................................. 16

     C.    Plaintiff Has Not Pleaded Recklessness As To Culver and Lauer...................... 19

     D.    Plaintiff's Fraud Theory Is Implausible and Culver and Lauer Had No
Motivation To Commit Fraud ................................................................. 20

II.     PLAINTIFF FAILS TO SUFFICIENTLY ALLEGE FALSITY OF THE
ALLEGED STATEMENTS DESCRIBED IN THE PAC. ................................ 21

     A.    Plaintiff Does Not Allege That Culver Or Lauer Made The Challenged
Statements .............................................................................................. 22

     B.    The Alleged Misrepresentation That C-BASS's Portfolio Had Not Lost
Significant Value .................................................................................... 23

     C.    The Alleged Misrepresentation That C-BASS Marked Its Subprime Assets
Using Market Prices................................................................................ 25

     D.    The Alleged Misrepresentation That C-BASS Was Profitable In The
Second Quarter Of 2007 And Expected To Be Profitable For The Full
Year 2007 ............................................................................................... 27

     E.    The Alleged Misrepresentation That C-BASS Had Ample Liquidity ................. 28

III.    PLAINTIFF'S ALLEGATIONS ARE INSUFFICIENT TO STATE A SECTION
20(a) CLAIM AGAINST CULVER OR LAUER............................................. 30

CONCLUSION............................................................................................................... 30

MILW_9978394.4

# TABLE OF AUTHORITIES

CASES

*Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653 (5th Cir. 2005).........................................23

*Billhofer v. Flamel Techs., SA,* 663 F. Supp. 2d 288 (S.D.N.Y. 2009) .........................................28

*Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007).........................................18

*Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).........................................23

*Chill v. Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) .........................................19

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd. Co.*, 655 F. Supp. 2d 262 (S.D.N.Y. 2009).........................................18

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990).........................................18

*Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753 (7th Cir. 2007).........................................8

*In re Allied Capital Corp. Securities Litigation,* 02 Civ. 3812 (GEL) 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003).........................................9-10

*In re Ambac Financial Group, Inc. Securities Litigation*, No. 08 Civ 411, 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010) .........................................12

*In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d. 969 (E.D. Wis. 2009) .........................................8-9

*In re Loral Space & Communications Ltd. Sec. Litig.,* No. Civ. 4388 (JGK), 2004 WL 376422 (S.D.N.Y. February 27, 2004)) .........................................18

*In re Radian Sec. Litig.,* 612 F. Supp. 2d 594 (E.D. Pa. 2009).........................................*Passim*

*In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334 (D. Md. 2004) .........................................22

*In re Sears Roebuck & Co. Secs. Litig.*, 291 F. Supp. 2d 722 (N.D. Ill. 2003) .........................................30

*In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007) .........................................18

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, Case No. 08-C-797 (E.D. Wis. March 30, 2010).........................................17-18, 28

*Israeli v. Team Telecom Intern., Ltd.,* No. Civ. A. 04-CV-4305 (PGS)*, 2006 WL 2883237.........................................22

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588 (7th Cir. 2006).........................................22

ii

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ...........................................................................19

*Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.,* No. Civ. A. 06-2204 (WJM), 2009 WL
    4250061...........................................................................................................................22

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
    Commerce*, 08 Civ. 8143 (WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) .............10, 20

*Pugh v. Tribune Co.,* 521 F.3d 686 (7th Cir. 2008).....................................................................30

*Roots P'ship v. Lands End, Inc.*, 965 F.2d 1411 (7th Cir. 1992)..................................................27

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977)..................................................................10

*Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777 (N.D. Ill. 2006)................................................9

*Slayton v. Am. Express Co.* No. 085-442-CV (2d Cir. Jan. 22, 2010)....................................27, 29

*South Cherry St., L.L.C. v. Hennessee Group L.L.C.*, 573 F.3d 98 (2d Cir. 2009) ......................19

*Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033 (7th Cir. 1977)........................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .............................................21

*United States v. Schiff*, Nos. 08-1903 and 08-1909, 2010 WL 1338141 (3d Cir. Apr. 7,
    2010) ......................................................................................................................... 22-23


**STATUTES**

15 U.S.C. § 78u-4(b)(2) ................................................................................................................7


**OTHER AUTHORITIES**

17 C.F.R. § 240.12b-2(3)(iv)(2) (2009).......................................................................................30

APB 18: The Equity Method of Accounting for Investments in Common Stock ..........4, 6, 17, 18

Brad Logan, *The ABX Index: A Pricing Conundrum*, Credit, at 48 (May 1, 2008).....................15

FASB Staff Position FAS 157-3, *Determining the Fair Value of a Financial Asset When
    the Market for That Asset Is Not Active* (Oct. 10, 2008)..........................................................5

iii

MILW_9978394.4

FASB Staff Position FAS 157-4, *Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly* (Apr. 9, 2009) ...................................................................5

Gretchen Morgenson and Louise Story, "*Testy Conflict With Goldman Helped Push A.I.G. To The Edge*," N.Y. Times, Feb. 2010 ...........................................................13

Kate Kelly, "*How Goldman Won Big on Mortgage Meltdown*," Wall Str. J., Dec. 14, 2007 at A1 ................................................................................................... 12-13

Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008:  Study on Mark-to-Market Accounting (December 30, 2008) .......................................................................................................9

*SEC Office of the Chief Accountant and FASB Staff Clarifications on Fair Value Accounting*, Release 2008-234 (Sept. 30, 2008) ............................................5

SEC Sample Letter Sent to Public Companies on MD&A Disclosure Regarding the Application of SFAS 157 (Fair Value Measurements) (March 2008) ......................16

SEC Sample Letter Sent to Public Companies on MD&A Disclosure Regarding the Application of SFAS 157 (Fair Value Measurements) (September 2008) ...............16

Statement of Financial Accounting Standards No. 157: Fair Value Measurements ................ 4-5

iv

MILW_9978394.4

## INTRODUCTION

Plaintiff's proposed Amended Complaint ("PAC") is futile. It suffers from the same infirmities as the Consolidated Class Action Complaint ("CCAC") dismissed in this Court's February 18, 2010 Decision and Order (the "Opinion"). Again, Plaintiff has not pleaded false statements or scienter for MGIC, Curt Culver or Michael Lauer ("the MGIC Defendants")[1] with the particularity the PSLRA and Rule 9(b) require. Because the PAC cannot satisfy the applicable pleading standards, the motion to amend should be denied, and final judgment should be entered.

Abandoning its fraud theory involving MGIC's business, Plaintiff now focuses on C-BASS alone. By changing the theory of its case to one based on C-BASS's portfolio valuation and margin calls, Plaintiff puts insurmountable distance between the alleged misconduct and the MGIC Defendants. Quite simply, Plaintiff has not pleaded with particularity that Culver or Lauer knew (or were reckless in not knowing) any of the allegedly false information relating to C-BASS's portfolio valuation, its write-downs or the margin calls it received. As before, Plaintiff makes only conclusory allegations that Culver and Lauer had "access to" certain information or that they "necessarily" knew something was amiss. Such allegations do not satisfy the PSLRA pleading standards or Rule 9(b).

Also, by relying on two complex standards under generally accepted accounting principles ("GAAP")—"fair value" and "other than temporary impairment"—the application of which necessarily is laden with considerable judgment, Plaintiff's failure to allege scienter becomes even more pronounced. First, Plaintiff does not sufficiently plead that C-BASS did not value its securities portfolio at "fair value," much less that the MGIC Defendants knew this to be

---

[1] In light of the briefs relating to the defendants' motions to dismiss the CCAC, the MGIC Defendants presume familiarity with all defendants and other background information regarding MGIC, C-BASS and their respective businesses. Where helpful, we refer the Court to the MGIC Defendants' earlier briefs for additional information. In support, we cite to the Exhibits to the Declaration of Max B. Chester filed with the MGIC Defendants' Motion to Dismiss the CCAC. *See* Dkt. Entry 62.

the case. Second, Plaintiff does not sufficiently plead that MGIC fraudulently failed to take an "other than temporary impairment" earlier than it did. Plaintiff ignores the complexities of the accounting principles on which it bases its fraud theory. Instead, Plaintiff cites the subsequent impairment of MGIC's investment in C-BASS as evidence that C-BASS's portfolio was overvalued even before the class period began and that the MGIC Defendants must have known this to be the case, even though MGIC's further investment in C-BASS belies this supposed "knowledge." Like the allegations in the CCAC, this is classic "fraud by hindsight."

In addition, no new allegations suggest that Culver or Lauer actually made any false or misleading statements or that MGIC's disclosures were misleading. As the Opinion noted, MGIC repeatedly disclosed that C-BASS's securities portfolio contained illiquid securities that could fall in value and that there was no guarantee that C-BASS would be able to maintain sufficient liquidity. Even if any statements made by the C-BASS officers were regarded as misleading, such statements cannot be attributed to the MGIC Defendants, and no allegations suggest that the MGIC Defendants knew, or were reckless in not knowing, that any information provided by C-BASS during the earnings conference calls was false.

## BACKGROUND

**The February 18, 2010 Opinion**: In its Opinion, the Court dismissed all claims against the MGIC Defendants. The CCAC claims had been based largely on MGIC's alleged misstatements and omissions regarding the performance of its mortgage insurance business. The CCAC also included a theory regarding misstatements and omissions with respect to C-BASS's liquidity as of July 19, 2007, the date of MGIC's second quarter earnings press release and earnings conference call. Plaintiff argued that press release's "risk factor" regarding C-BASS was misleading because it said that "C-BASS maintains substantial liquidity to cover margin calls in the event of declines in the value of its mortgages and securities." The Court concluded that the statement was neither false nor misleading. Opinion ("Op.") at 30. Even assuming C-BASS had paid $145 million of margin calls from July 1 through July 18, the Court noted that C-

2

BASS "still had $150 million" and "$150 million is substantial liquidity." Op. at 30. The Court noted that MGIC had not said that C-BASS had enough liquidity and, to the contrary, the Court observed that the press release stated that "neither C-BASS nor MGIC could guarantee that its resources would be sufficient to cover all margin calls." Op. at 30.

The Court also rejected Plaintiff's contention that there was a duty to disclose the purported $145 million in margin calls C-BASS received prior to July 19. Op. at 32. In any event, the Court noted that this purported omission was not, in fact, misleading because Williams had disclosed that liquidity remained a "primary issue." *Id.* at 31. In light of the many disclosures regarding C-BASS's margin calls and liquidity issues, the Court said, "Draghi's failure to also disclose the precise dollar amount of the margin calls that C-BASS had received during the opening days of the third quarter cannot reasonably be considered an omission that rendered his statement about the amount of cash remaining misleading." *Id.* at 32. Even if the failure to disclose the $145 million of margin calls was an omission, the Court held Plaintiff had not pleaded sufficiently that the MGIC executives had been aware of the margin calls. *Id.* at 32.

**The Proposed Amended Complaint**: The PAC's new overarching assertion is that C-BASS's portfolio was overvalued. Plaintiff's new confidential witness ("CW") allegations, however, do not implicate the MGIC Defendants with respect to this critical element of Plaintiff's case. The most significant allegations are those made by CW9, who purports to have performed work with respect to C-BASS's portfolio valuations. Notably, CW9 mentions nothing about MGIC or any MGIC employees. The only other materially different CW allegation regarding valuation is that CW6 (also CW6 in the CCAC) now contends that in 2006 he ran certain "stress scenarios" suggesting that, "if the market dropped 35%," C-BASS would experience a "nasty hit" to the balance sheet and "margin calls." PAC ¶ 143.

Other new CW allegations relate to lender margin calls C-BASS received. CW6 provides some background regarding margin calls, stating that they came by email and were received by C-BASS's employees Marc Rosenthal and John Draghi. PAC ¶¶ 134, 141. CW1

3

also provides information regarding margin calls, stating that Williams and Draghi were "likely" kept up to speed on margin calls C-BASS received. *Id.* ¶ 108. Neither CW1 nor CW6, however, assert *any* MGIC personnel received *any* information regarding margin calls.

Other relevant additions to the PAC include conclusory allegations regarding GAAP violations relating to "fair value" accounting and impairment of assets. Plaintiff now contends that C-BASS's securities portfolio was overvalued under GAAP in the first and second quarters of 2007 due to C-BASS's failure to take proper write-downs. As a result, C-BASS's net income was overstated, causing a purported overstatement of MGIC's quarterly results. PAC ¶¶ 90 and 92.[2] Further, plaintiff contends, again in conclusory fashion, that MGIC should have impaired its investment in C-BASS prior to doing so on July 30, 2007. *Id.* ¶ 163.

**Relevant Accounting Guidance and MGIC Disclosures**

"Fair Value" Accounting: "Fair value" is "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." FAS 157 ¶ 5. In September 2006, the Financial Accounting Standards Board ("FASB") issued Statement No. 157: Fair Value Measurements ("FAS 157")[3] to provide additional guidance regarding the determination of fair value estimates for financial reporting purposes because: "Differences in guidance created inconsistencies that added to the complexity

---

[2] MGIC "picked up" its share of income (or loss) from the results of C-BASS (and its other primary investment, Sherman Financial Group, LLC) in accordance with the equity method of accounting described in APB 18: The Equity Method of Accounting for Investments in Common Stock ("APB 18"). *See* Ex. 2, 2006 Form 10-K at 48 ("Our equity in the earnings from the C-BASS and Sherman joint ventures with Radian and certain other joint ventures and investments, accounted for in accordance with the equity method of accounting, is shown separately, net of tax, on our consolidated statement of operations.").

[3] While FAS 157 became effective for fiscal years beginning on or after November 15, 2007, the definition of "fair value" in FAS 157 was not new. Rather, FAS 157 retained the earlier "exchange price" definition of "fair value," that is, the price in an orderly transaction between market participants to sell the asset or transfer the liability. FAS 157 summary. *See* FAS 157, Summary at 1.

4

in applying GAAP."  FAS No. 157, Summary at 1, *available at*

http://www.fasb.org/pdf/fas157.pdf (last visited April 12, 2010).  The SEC and the FASB have

since issued numerous clarifications to help entities comply with "fair value" accounting.[4]

> MGIC explained that C-BASS carried its mortgages and securities at "fair value":
>
>> Mortgages and other securities are classified by C-BASS as trading securities and are carried at fair value, as estimated by C-BASS. Changes in fair value between period ends (a "mark-to-market") are reflected in C-BASS's statement of operations as unrealized gains or losses . . . Mortgage loans are not marked-to-market and are carried at the lower of cost or fair value on a portfolio basis, as estimated by C-BASS.

Ex. 2, 2006 Form 10-K at 39.

> C-BASS informed MGIC investors on the July 19, 2007 earnings conference call

that it verified fair value "by a three-way comparison of observed market prices, financing marks

from our lenders and our internal calculations during our ongoing securities review."  Ex. 14 at

4.  MGIC's disclosure to investors regarding C-BASS's methodology was consistent:

>> Virtually all of C-BASS's assets do not have readily ascertainable market values, and as a result, their value for financial statement purposes is estimated by the management of C-BASS based on, among other things, valuations provided by financing counterparties.  The ultimate value of these assets is the net present value of their future cash flows which depends on, among other things, the level of losses on the underlying mortgages and prepayment activity by the mortgage borrowers.

Ex. 2, 2006 Form 10-K at 79.

---

[4] *See, e.g.,* FASB Staff Position FAS 157-3, *Determining the Fair Value of a Financial Asset When the Market for That Asset Is Not Active* (Oct. 10, 2008) *available at* http://www.fasb.org/pdf/fsp-fas_157-3.pdf (last visited April 12, 2010);  FASB Staff Position FAS 157-4, *Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly*, (Apr. 9, 2009) *available at* http://www.fasb.org/project/fasb 157-active-inactive-distressed.shtmlp (last visited April 12, 2010); *SEC Office of the Chief Accountant and FASB Staff Clarifications on Fair Value Accounting*, Release 2008-234 (Sept. 30, 2008) *available at* http://www.sec.gov/news/press/2008/2008-234.htm (last visited April 12, 2010).

MILW_9978394.4

<u>Impairment and APB 18</u>:  APB 18(h) provides guidance regarding when an equity method investor should recognize an "other than temporary" impairment ("OTTI"):

> A loss in value of an investment which is other than a temporary decline should be recognized.  Evidence of a loss in value might include, but would not necessarily be limited to, absence of an ability to recover the carrying amount of the investment or inability of the investee to sustain an earnings capacity which would justify the carrying amount of the investment.  A current fair value of an investment that is less than its carrying amount may indicate a loss in value of the investment.  However, a decline in the quoted market price below the carrying amount or the existence of operating losses is not necessarily indicative of a loss in value that is other than temporary.  All are factors to be evaluated.

MGIC noted in its annual filings that it reviewed C-BASS for impairment pursuant to the equity method of accounting: "The Company reviews its investments in joint ventures for evidence of 'other than temporary' impairments, such as an inability of the investee to sustain an earnings capacity which would justify the carrying value of the investment."  Ex. 2, 2006 Form 10-K at 63.  On July 30, 2007, MGIC announced in a press release that it had determined its investment in C-BASS was impaired.  PAC, ¶ 194.  MGIC noted it had not determined the range of the impairment, but that it could be the entirety of MGIC's investment in C-BASS.  Ex. 15 at 1.  After assessing the market for its equity interest in C-BASS, as well as C-BASS's expected future cash flows, MGIC recorded the C-BASS impairment in its financial statements in the third quarter of 2007, concluding as follows:

> The Company believes there is a high degree of uncertainty surrounding the amounts and timing of the cash flows in the scenarios and its analysis of them involved significant management judgment based upon currently available facts and circumstances, which are subject to change. The market analysis as well as the Company's analysis of the cash flow projections reflected little or no value for the Company's equity interest in C-BASS.  Based on these analyses the Company's entire equity interest in C-BASS was written down through an impairment charge under the guidance of APB 18 – Equity Method of Accounting.

Ex. 67, 3Q 2007 Form 10-Q at 12.

6

MILW_9978394.4

**ARGUMENT**

I. **THE PROPOSED AMENDED COMPLAINT'S SCIENTER ALLEGATIONS DO NOT SATISFY THE PSLRA OR RULE 9(b).**

With respect to the MGIC Defendants, the cornerstone of the PAC is that Culver and Lauer supposedly knew that C-BASS's securities portfolio was overvalued. Because C-BASS's portfolio allegedly was overvalued, Plaintiff contends that (1) MGIC's financial statements for the first and second quarters of 2007 were incorrect because MGIC's net income, which reflected an equity method "pick-up" of C-BASS's results, was overstated in each period; and (2) MGIC concealed that its investment in C-BASS was impaired. Pl. Br. 14. The premise of Plaintiff's case against the MGIC Defendants—that Culver and Lauer knew C-BASS's portfolio was overvalued—is wholly conclusory.[5] Plaintiff's allegations regarding Culver and Lauer do not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., scienter. 15 U.S.C. § 78u-4(b)(2).

A. **Plaintiff Does Not Raise A Strong Inference of Scienter Regarding the Valuation of C-BASS's Portfolio.**

Plaintiff contends that Culver and Lauer knew C-BASS's portfolio was overvalued because, by virtue of their positions at MGIC, they "had access to quarterly and monthly reports concerning the state of C-BASS's business." PAC ¶¶ 24-25. In addition, CW6 alleges that Lauer attended meetings at which "the quarter's financial information and its comparison to the same quarter in the prior year" were presented. *Id.* ¶ 137.[6] Plaintiff does not

_____

[5] The PAC's only allegations that suggested that Culver knew anything about C-BASS's valuation and write-downs were based on "Exhibit A," an inaccurate Bloomberg transcription of MGIC's April 12, 2007 earnings conference call. *See* PAC ¶¶ 83, 174 (attributing to Culver statements regarding C-BASS's portfolio and write-downs). After listening to the audio recording, Plaintiff withdrew these allegations, as well as the allegation in Paragraph 88 of the PAC that Lauer said "no big write-offs at C-BASS were expected" and the allegation in Paragraph 176 that Culver made the same comment. *See* Dkt Entry 80. Plaintiff now concedes that C-BASS CEO Bruce Williams made the above-described statements.

[6] Contrary to Plaintiff's allegation, Lauer was not on C-BASS's Board, nor did he attend any C-BASS Board meetings. Even if the allegation were true, it does not support a strong inference of

MILW_9978394.4

allege what was in these unspecified "reports" and "financial information," much less that the information suggested that C-BASS had overvalued its portfolio. Plaintiff's allegations fail because neither defendants' titles, nor their purported "access" to unspecified reports, supports a strong inference of scienter. *See Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) ("there is a big difference between knowing about the reports … and knowing that the reports are false"). *See also In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d. 969, 999 (E.D. Wis. 2009) ("[N]ot only is mere receipt of reports insufficient to establish scienter, the inferential leap required to tie these alleged facts to the conclusion that defendants acted knowingly or recklessly when presenting relevant information to the market is untenable given the heightened pleading standards.").

Moreover, there is no indication that the "financial information" and "reports" referenced in the PAC would allow one to detect an overvalued portfolio. Quarterly or monthly statements of operations, for example, could identify net income (or loss) for the period without any analysis regarding how portfolio values were computed. Likewise, balance sheets could reflect an aggregate portfolio value without allowing the reader insight into how that value was calculated. Plaintiff's key confidential witness, CW9, asserts that he prepared something entirely different—reports that relied on "computer programs" and "models" to value C-BASS's subprime mortgages and its MBS. PAC ¶ 154. CW9 identified only Williams and Draghi as recipients of these valuation reports. PAC ¶ 155. The PAC does not suggest that Culver or Lauer (or anyone at MGIC) received reports regarding the valuation of C-BASS's securities portfolio, let alone reports showing that the portfolio was overvalued. *See Radian,* 612 F. Supp. 2d at 616) ("Although the plaintiffs allege that Radian maintained an 'active involvement in

---

scienter. In *In re Radian Sec. Litig.*, 612 F.Supp. 2d 594, 600 (E.D. Pa. 2009), the plaintiff also alleged that one of Radian's senior executives was on C-BASS's Board, yet the Court recognized that this did not suggest he was aware of any improprieties. *Id.* at 616.

MILW_9978394.4

strategic activities at C-BASS,' the plaintiffs have not alleged, specifically, that the defendants knew of any accounting irregularities at C-BASS…").

Plaintiff tries to bolster its claims by asserting that C-BASS failed to write down its portfolio "as required by GAAP," PAC ¶ 179, but general allegations that a defendant has violated GAAP are insufficient to establish a strong inference of scienter.  *See In re Harley-Davidson*, 660 F. Supp. 2d at 989.  The court in *Harley-Davidson* explained that GAAP violations must be pleaded with particularity:

> [P]laintiffs must allege: (1) the particular financial transaction which caused the alleged overstatement of earnings; (2) the amount of the overstatement and the effect it had on the company's earnings; (3) the applicable accounting principle(s) applied by the company and why they were improperly applied; and (4) the defendant was responsible for calculating and/or disseminating the allegedly incorrect financial information.

*Id*. (quoting *Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777, 785 (N.D. Ill. 2006)).  Plaintiff fails this test miserably, never identifying the amount of the overvaluation of C-BASS's portfolio or the applicable GAAP accounting principle.  Of course, Plaintiff also fails to allege that the MGIC Defendants were responsible for the valuation calculations.

Valuing illiquid assets under GAAP is complicated.[7]  Due to the complexity and considerable management judgment involved, many courts have dismissed fraud claims similar to those here.  In *In re Allied Capital Corp. Securities Litigation*, 02 Civ. 3812 (GEL) 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003), the defendant, Allied, used the "fair value" methodology for

---

[7] Given the concern that "fair value" accounting played a role in the general instability in the financial markets that began in late 2007 and continued through the Spring of 2009, the October 2008 Emergency Economic Stabilization Act mandated that the SEC, in consultation with the Federal Reserve and the Secretary of the Treasury, conduct a study on FAS 157's mark-to-market accounting standards.  That study resulted in a 209-page report issued on December 30, 2008 that articulated eight recommendations for action and improvement of FAS 157 and related mark-to-market requirements.  *See* Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008:  Study on Mark-to-Market Accounting, *available at* www.sec.gov/news/studies/marktomarket123008.pdf

9

valuing its investments composed of illiquid securities for which no market existed. The plaintiffs alleged that Allied's valuation policy violated GAAP because it did not account for market conditions and changes in the investments' circumstances, thereby resulting in the overvaluation of Allied's investments. *Id.* at \*2. The court noted that "there is no one authoritative method of determining fair value, since valuing securities for which no current market exists involves the exercise of judgment, and is inherently imprecise." *Id.* at \*1. With this in mind, the court held that the plaintiffs' complaint "fails to allege what plaintiffs contend was the true valuation, or to plead specific facts indicating that Allied's values were incorrect, or how Allied's accounting policy caused any overstatement." *Id.* at \*4. The court rejected plaintiffs' attempt to contrast Allied's valuations to that of a competitor because "[t]hat some other company reached a different valuation provides no reason to believe that its valuation was correct and Allied's wrong." *Id.*

   *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 08 Civ. 8143 (WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ("*CIBC*"), is particularly instructive. There the plaintiffs, like the Plaintiff here, alleged the defendants failed to take timely write-downs on MBS that eventually suffered dramatic write-downs in late 2007 and early 2008. *Id.* at \*1-2. The plaintiff argued that the impairment in the value of the securities was widely known because the decline was tracked by the ABX Index and was reported in the press. *Id.* at \*2. The court granted defendants' motion to dismiss, finding that "the Complaint is bereft of factual allegations from which a reader could infer Defendants intentionally or recklessly failed to take write-downs on [MBS] . . . Plaintiff's repeated allegation concerning the magnitude of the write-downs is insufficient to plead scienter." *Id.* at \*12. The court said the plaintiffs' allegations regarding CIBC's write-downs "amount to fundamental disagreements with Defendants' business judgments in a tumultuous economic downturn--claims that are not actionable under Section 10(b) and Rule 10b-5." *Id.* at \*13 (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977)).

10

As in *Allied Capital* and *CIBC*, Plaintiff here fails to plead GAAP violations as required by the PSLRA.  Among other things, Plaintiff fails to allege the "true" value of C-BASS's portfolio or why C-BASS's valuation was incorrect.  CW9 provides no insight regarding how C-BASS's valuation methodology worked, but simply says that C-BASS was "valuing the portfolio higher than it was."  PAC ¶ 158.  CW9 suggests his point of comparison was the "drop in the ABX Index in 2007," but he does not identify the difference between C-BASS's values and the ABX, nor does he say the difference was material.[8]  CW9's assertion that "the valuation of C-BASS's portfolio was on the decline from the third quarter of 2006 through the second quarter of 2007," PAC ¶ 156, is similarly unhelpful to Plaintiff.  Again, CW9 does not say that the decline was material.[9]

CW6, Plaintiff's other key witness, does not support the assertion that C-BASS's portfolio was overvalued.  CW6 says that, in February 2007, C-BASS "marked to market and wrote down the assets," PAC ¶ 139, never suggesting the portfolio was overvalued.  To the contrary, he says C-BASS "posted appropriate reserves" during this period.  *Id.*  He then says "things looked to be stabilizing and C-BASS had positive net income" in April and May 2007, *id.* ¶ 140, and he alleges no problems with portfolio valuations during this period.  While CW6

---

[8] The ABX and its flaws as a valuation tool are discussed below.  *See infra* at 15-17.  In any event, CW9 does not specify when the ABX "drop" he refers to occurred or even which of the many ABX indicies he references.  The ABX.BBB 06-2 graph in paragraph 76 of the PAC hardly reflects a "drop" throughout the relevant period.  Rather, it shows a dip in February, but the index rises in March and then remains at that higher level through April and May, only declining below the February low in what appears to be late June.

[9] MGIC's financial statements confirm that C-BASS's portfolio values, in fact, declined throughout the class period from $7 billion as of December 31, 2006 to $5.4 billion as of March 31, 2007 to $5.0 billion as of June 30, 2007.  *See* Ex. 2, 2006 Form 10-K at 79; Ex. 30, Q1 2007 Form 10-Q at 32, and Ex. 31, Q2 2007 Form 10-Q at 36.  Most of this "decline" in value was caused by C-BASS having a smaller portfolio, *i.e.*, fewer assets.  CW9's allegations ignore these changes in the size of the portfolio that would cause the portfolio value to be "on the decline" during the class period.

11

MILW_9978394.4

says that there were "some issues" regarding the valuation of C-BASS's securities in June 2007, *id.* ¶ 140, he does not describe the "issues," much less assert that the portfolio was overvalued.

*In re Ambac Financial Group, Inc. Securities Litigation*, No. 08 Civ 411, 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010), relied on by Plaintiff, is easily distinguished. The *Ambac* plaintiff had a team of "independent consultants, including mortgage industry specialists and a former trader of RMBS and CDOs." *Id.* at *6. The consultants' "expert analysis" computed a required $2.1 billion, $2.7 billion and $8.9 billion mark to market adjustment for the first quarter, second quarter and third quarter of 2007, respectively, versus Ambac's mark to market adjustments of only $5 million, $57 million and $743 million for those same periods. *Id.* at *10. For the full year 2007, the "expert analysis" determined a mark to market adjustment of $17 billion versus Ambac's actual adjustment of $6.1 billion. *Id.* The court found that the "expert analysis" specifically contradicted Ambac's statements that it was not suffering the same performance issues experienced by others in the marketplace. *Id.* at *23-24 . In contrast, Plaintiff here has no experts, no consultants, no analysis, and no allegations regarding the amount or specific timing of the purported overvaluation. It has only CW9's vague observations that unspecified valuation reports indicated that "things were not good," PAC ¶ 156, and the portfolio was being valued "higher than it was." *Id.* ¶ 158.

1.        **C-BASS's Margin Calls Do Not Raise A Strong Inference of Scienter.**

Plaintiff suggests that margin calls provided "objective" evidence of deterioration of the C-BASS portfolio's value, PAC ¶ 181(e), but Plaintiff never says what the lender valuations were or why they were correct. Margin calls can be driven by any number of lender motivations; they do not necessarily say anything about "fair value" of the underlying collateral.[10] The Court said as much in its recent Opinion. Op. at 30 n.10 (receipt of increasing

---

[10] For example, while unknown during the class period, Goldman Sach's effort to reduce its exposure to mortgage-backed securities and other subprime-related assets is now Wall Street lore. According to reports, in December 2006 and early 2007, Goldman's management demanded that its subprime risk be cut by as much as 50 percent. *See* Kate Kelly, "*How*

12

margin calls "implies that, *at least from the lender's perspective*, the mortgages and securities had substantially declined in value…") (emphasis added). Even if a lender's margin call, in fact, was driven by that lender's honest perception of the collateral securing the loan, that reflects only one view of "fair value." Nothing suggests that the lender's view was the "correct" view, much less that C-BASS's estimates regarding "fair value" were so incorrect that they were fraudulent.

Plaintiff's CWs confirm that margin calls were made at the whim of the lender. CW1 states that "a firm providing financing might decide that the bond's value had declined and was now worth only 40 cents on the dollar." PAC ¶ 105. CW1 says C-BASS personnel "would then run analyses in a attempt to 'rebut' the margin calls and refute the valuation provided by the Wall Street firm that was making the call," without saying if C-BASS's efforts were successful. *Id.* ¶ 105-06. CW6 asserts that a margin call is made "when a broker/lender determines that the borrower's account value has declined to a value that is not satisfactory to the lender." *Id.* ¶ 133. By Plaintiff's own allegations, margin calls were not necessarily based on any objective view of fair value, but rather lenders' reluctance to loan money secured with subprime MBS collateral they viewed as risky.

In any event, with respect to MGIC's July 19, 2007 earnings conference call, the Court previously held that Plaintiff had not pleaded that the MGIC Defendants were aware of the purported $145 million in margin calls C-BASS received from July 1-July 18. Op. at 32. Nothing has changed. While Plaintiff added allegations identifying C-BASS personnel who received information regarding margin calls, *see* PAC ¶¶ 134 and 141, Plaintiff makes no

---

*Goldman Won Big on Mortgage Meltdown*," Wall Str. J., Dec. 14, 2007 at A1. Goldman's resulting margin calls on MBS collateral had little to do with underlying collateral, but rather Goldman's attempt to reduce subprime risk by calling for more margin on loans backed by subprime collateral. *See* Gretchen Morgenson and Louise Story, "*Testy Conflict With Goldman Helped Push A.I.G. To The Edge*," N.Y. Times, Feb. 2010 at A1 (reporting that Goldman's aggressive margin calls and refusal to allow a third-party valuation of AIG's portfolio accelerated AIG's collapse).

allegations regarding Culver's or Lauer's knowledge of the margin calls. Rather, Plaintiff asks the Court to accept unreasonable inferences, including that, given an infusion of cash MGIC provided to C-BASS, "it may be strongly inferred that Culver and Lauer knew about the $145 million of undisclosed margin calls at the time of the July 19, 2007 MGIC earnings call…" PAC ¶ 12. Plaintiff provides no explanation, however, why providing a line of credit would lead to the conclusion that Culver and Lauer knew that C-BASS had experienced $145 million in margin calls from July 1 through July 18.[11]

More importantly, there is no factual support for the assertion that the MGIC Defendants were "on notice by July 19, 2007 that C-BASS was rapidly succumbing to margin calls… ." Pl. Br. 26. Plaintiff contends that C-BASS's portfolio values left it "vulnerable to a wave of margin calls from lenders," Pl. Br. 13, but the argument presumes the MGIC Defendants knew that C-BASS's portfolio was overvalued — a demonstrably incorrect presumption. The fact that C-BASS had received (and paid) margin calls in the past gave the MGIC Defendants no inkling of what was to come. As the MGIC Defendants described previously, they, along with the Chairman of the Federal Reserve and the Secretary of the Treasury, did not foresee what would happen in the days, weeks and months after July 19, 2007. MGIC Defs. Br. in Supp. of MTD at 45-46. Plaintiff has offered nothing to disturb this Court's prior conclusion that: "plaintiff does not plead facts suggesting that defendants knew at the time of the [July 19] call that additional (and more severe) margin calls were on the way." Op. at 31.

### 2. The Performance of the ABX Index Does Not Raise A Strong Inference of Scienter.

Plaintiff suggests that the ABX Index put all defendants on notice that C-BASS's portfolio was overvalued, *see* Pl. Br. 21, but Plaintiff's premise—that the ABX Index was a proxy for the value of C-BASS's assets—is flawed. Relying on "media accounts," Plaintiff calls

---

[11] Given C-BASS's July 17, 2007 purchase of Fieldstone, which Plaintiff says required C-BASS to pay Fieldstone $184 million, PAC ¶ 4, MGIC's line of credit to C-BASS is unremarkable.

MILW_9978394.4

the ABX Index "the benchmark for the performance of subprime RMBS." PAC ¶ 76.[12]  In reality, there are multiple ABX indices and they do *not* track RMBS; they track the average prices of credit-default swap ("CDS") contracts written on twenty separate RMBS issued within a six-month period.  *See* Brad Logan, *The ABX Index:  A Pricing Conundrum*, Credit, at 48 (May 1, 2008).[13]  In addition, there are no short sale restrictions, so traders could short the ABX indices with impunity, driving the prices down even further with their bets against subprime-related assets.  *See id.* ("Since it is easier to short a derivatives index than it is to short a cash instrument, it is the index that will be most likely to reflect bearish sentiment.").[14]

Moreover, the ABX Index price never purported to be a proxy for valuing individual RMBS.  Brad Logan of Markit succinctly summarized the issue as follows:

> The ABX may be a standardized and liquid tradable index, but it was not designed to be uncritically extrapolated to the broader [asset-backed securities] market and was certainly not designed as a valuation tool for individual securities. . . .Compare the ABX to equity indicies. … [T]he Dow Jones Industrial Average . . . will not give an equity investor information on the performance or value of a specific stock.  You would not mark Vodafone stock using the Dow Jones, of which it is not even a member . . . .

Brad Logan, *supra*.[15]

Plaintiff cites no authority for the proposition that a drop in any ABX Index or the subprime market generally requires a company to take a corresponding write-down on its

---

[12] "Residential mortgage-backed securities" ("RMBS") and "mortgage-backed securities" ("MBS") are the same and these terms are used interchangeably here.

[13] Brad Logan is Managing Director of Structured Finance at Markit, the firm that created and maintains the ABX Index.

[14] According to reports, Goldman Sachs maintained massive short positions on the ABX indices netting several hundred million in profits during the subprime market dislocation in the first quarter of 2007.  *See* Kelly, *supra* note 10.

[15] To Logan's point regarding Vodafone and the Dow Jones, Plaintiff does not allege that C-BASS bonds were among the securities against which CDS in the ABX indicies were written.

securities portfolio in order to comply with GAAP.[16]  But there is contrary authority.  *See, e.g.,*

*CIBC*, 2010 WL 961596 at \*10 (ABX Index and press reports were not sufficient to establish a

strong inference of scienter for failure to record write-downs and stating "knowledge of a general

economic trend does not equate to harboring a mental state to deceive, manipulate or defraud.");

*Radian*, 612 F. Supp. 2d at 616 (rejecting argument that Radian officers must have known their

statements were misleading due to adverse trends in the subprime industry because "generalized

allegations do not support a charge of conscious misbehavior or recklessness").  Even if the ABX

Index provided relevant information regarding C-BASS's securities portfolio, Plaintiff does not

allege that Culver or Lauer (or anyone at MGIC) tracked any ABX Index and believed it to be a

reliable valuation tool.

> **B.**    **The Timing of MGIC's Impairment Of Its Investment In C-BASS Does Not Raise A Strong Inference of Scienter.**

Because Plaintiff's theory that MGIC concealed an other than temporary

impairment in its investment in C-BASS depends entirely on its argument that C-BASS's

portfolio was overvalued, it can be rejected for the reasons stated above.  Plaintiff's impairment

theory is even more deficient because it charges, with no factual support, that MGIC misapplied

APB 18, another accounting rule requiring the use of considerable management judgment.

---

[16] SEC guidance regarding "fair value" has evolved a great deal since 2007, but even today, there is no suggestion that "fair value" must correspond with the ABX or other market indices. Rather, the SEC's Division of Corporate Finance said in a March 2008 "Dear CFO Letter" that companies should "consider" providing information in their disclosures regarding the extent to which the company considered relevant market indices, such as the ABX, in applying its valuation techniques or models.  *See* SEC Sample Letter Sent to Public Companies on MD&A Disclosure Regarding the Application of SFAS 157 (Fair Value Measurements) (March 2008) *available at* http://www.sec.gov/divisions/corpfin/guidance/fairvalueltr0308.htm (last visited April 12, 2010).  The SEC provided further guidance in September of 2008.  *See* SEC Sample Letter Sent to Public Companies on MD&A Disclosure Regarding the Application of SFAS 157 (Fair Value Measurements) (Sept. 2008) *available at* http://www.sec.gov/divisions/corpfin/guidance/fairvalueltr0908.htm (last visited April 12, 2010).

MILW_9978394.4

Paragraph 19(h) of APB 18 establishes a two-part test when considering OTTI. First, one must determine if there has been a loss in value. APB 18 provides that factors to be considered may include "absence of an ability to recover the carrying value of the investment" and "inability of the investee to sustain an earnings capacity which would justify the carrying amount of the investment." Second, if there is a loss in value, one must consider whether that loss is indicative of a loss that is other than temporary.[17] Again, there is little guidance in this regard. While APB 18 states: "A *series of operating losses* of an investee or other factors may indicate that a decrease in value of the investment has occurred which is other than temporary," *see* ABP 18, ¶ 6(b) (emphasis added), it also cautions that "[a]ll are factors to be evaluated" in determining whether an OTTI exists. ABP 18, ¶ 19(h).

Recently, this Court, in *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, Case No. 08-C-797 (E.D. Wis. March 30, 2010), dismissed a securities class action complaint focused on Oshkosh's failure to take an impairment of goodwill it had paid for a Dutch company in 2001. Although Oshkosh ultimately took a $175 million goodwill impairment in 2008, the court rejected plaintiff's contention that Oshkosh fraudulently failed to take the impairment earlier. The Court concluded that the complaint "fails to explain how much the goodwill should have been written down, and when, and what specifically about the company's goodwill evaluation was fraudulent." Slip Op. at 26. The court rejected any inference of scienter, stating "[t]here are no allegations that there were any internal reports that suggested that the failure to take an impairment charge earlier was an incorrect application of accounting principles, much less an error so grievous that it exceeded differences over accounting principles

---

[17] This second step is significant because a loss in value of an investment is not presumed to be "other than temporary." As a result, even if C-BASS's securities portfolio had been overvalued *and* that overvaluation had affected MGIC's ability to recover the carrying value of its investment in C-BASS, this situation could have been temporary and would not have required impairment of the investment.

MILW_9978394.4

and rose to the level of fraud." *Id.* at 32 (quoting *In re Loral Space & Communications Ltd. Sec. Litig.*, No. Civ. 4388 (JGK), 2004 WL 376422, at *17 (S.D.N.Y. February 27, 2004));[18] *see also Radian*, 612 F. Supp. 2d at 614 ("[A]part from the plaintiffs' bald assertions that the value of Radian's investment in C-BASS was impaired at an earlier date, and that a write-down should have been made no later than March 31, 2007, the CCAC fails to allege any such impairment with sufficient particularity.").

        Here, Plaintiff does not explain what APB 18 requires, what the amount of the impairment should have been or when it should have been recorded. To try would be futile. Plaintiff does not challenge any of C-BASS's financial results prior to the first quarter of 2007, and, far from a *series of operating losses*, C-BASS had substantial profits in 2004, 2005 and 2006. *See* Ex. 2, 2006 Form 10-K at 80. One small loss in the first quarter of 2007, Ex. 30, Q1 2007 Form 10-Q at 32, does not a "series" make, particularly in light of the fact that C-BASS reported a profit in the second quarter of 2007. Ex. 31, 2Q 2007 Form 10-Q at 37. Plaintiff's repeated references to C-BASS's ultimate losses (reported in MGIC's 2007 Form 10-K) and MGIC's ultimate impairment conclusion (reported in MGIC's third quarter 2007 Form 10-Q) are beside the point. Also working against Plaintiff is the absence of any allegation that MGIC restated its financial statements or that MGIC's auditor, PricewaterhouseCoopers, disagreed with MGIC's assessment that the impairment should be reflected in MGIC's results for the third quarter. *See e.g., Oshkosh* at 32 ("the fact that one of the Big Four accounting firms evidently agreed with their approach weakens the inference that the need to recognize an impairment was

---

[18] This Court in *Oshkosh* conducted a thorough analysis regarding the judgments involved in assessing impairment and cited a host of analogous cases in addition to *In re Loral Space & Communications Ltd. Sec. Litig.* dismissing claims similar to those here. *See* Slip Op at 23-26 (discussing *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd. Co.*, 655 F. Supp. 2d 262 (S.D.N.Y. 2009); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1160-62 (C.D. Cal. 2007), and *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

MILW_9978394.4

so manifest that the failure to do so was fraudulent."); *Radian*, 612 F. Supp. 2d at 622 (noting with respect to Radian's third quarter 2007 C-BASS impairment change that "even after taking additional time to investigate the timing of the C-BASS impairment change, Deloitte did not require Radian to file an amended 10-Q.").

### C. Plaintiff Has Not Pleaded Recklessness As To Culver and Lauer.

Relying on C-BASS's 2007 loss of $1.75 billion, Plaintiff argues that Culver and Lauer were "at least reckless."  Pl. Br. at 2.  "Recklessness" is "a highly unreasonable omission, involving not merely simple or even excusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977).  In fact, *South Cherry St., L.L.C. v. Hennessee Group L.L.C.*, 573 F.3d 98, 110 (2d Cir. 2009), cited by Plaintiff, is instructive in that the Second Circuit affirmed the dismissal of the complaint, in which the plaintiff alleged that the defendant recklessly recommended an investment that turned out to be part of a Ponzi scheme, noting "there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others."  *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).  The court found no allegation in the complaint that "there were obvious signs of fraud, or that the danger of fraud was so obvious that [the defendant] must have been aware of it.  *Id.* at 112.  *See also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) ("[f]raud cannot be inferred simply because [a company] might have been more curious or concerned about the activity at [a subsidiary].").

Far from suggesting recklessness, what Culver and Lauer knew would have given them comfort that C-BASS was responding to the subprime dislocation appropriately.

- MGIC's March 1, 2007 filing described how the subprime dislocation affected C-BASS's securities portfolio and noted an approximately $30 million write-down for the period February 1 through February 23.  Ex. 2, 2006 Form 10-K at 48.

19

- In the first quarter, C-BASS lost money and took approximately $100 million in adjustments caused by the subprime dislocation. Ex. 12 at 4-5.

- In the July 19, 2007 earnings conference call, C-BASS again described in detail the effect of the subprime dislocation, noting that it had reacted by taking write-downs in certain parts of its portfolio to reflect changes in its loss projections and prepayment assumptions. Ex. 14 at 3-4.

- In the earnings call, Williams further reported that Deloitte "performed a review of our valuation methodology as of 6/30 and no adjustments were made." Ex. 14 at 19.

Given these facts, Lauer and Culver had reason to believe that C-BASS was monitoring the subprime market and reacting appropriately with significant write-downs. *See CIBC*, 2010 WL 961596, at *12 (defendants' write-downs in the class period contradicted an inference of scienter). Plaintiff's relies on no facts, but merely unfounded suspicion. As the Court said previously, however, "plaintiff cannot simply rest on its suspicion that alarm bells must have been ringing… Rather, it must plead facts that transform this suspicion into a cogent inference that alarm bells were, in fact, ringing at the time." Op. at 23-24.

### D. Plaintiff's Fraud Theory Is Implausible and Culver and Lauer Had No Motivation To Commit Fraud

Plaintiff's contention that the MGIC Defendants committed the fraud to "promote a healthy appearance for the C-BASS sinking ship—so that the Defendants could foist MGIC's interest in C-BASS onto unsuspecting private investors" in order to close the Radian merger, Pl. Br. at 2, is fraught with inconsistencies Plaintiff cannot explain. First, if MGIC and C-BASS understood that the subprime crisis "hit in late 2006" as alleged, Pl. Br. at 3, why would C-BASS in February 2007 agree to buy Fieldstone, a subprime mortgage originator that Plaintiff says was a "deeply troubled company"?[19] Second, if the MGIC Defendants knew that C-BASS was

---

[19] It would also make little sense for C-BASS to agree to purchase more that *$1 billion* of Fieldstone's subprime mortgage loans and MBS, PAC ¶ 47, "[r]ather than jettison the merger agreement with Fieldstone which was struggling to survive." PAC ¶ 78. And if the first margin calls in February 2007 caused a "panic" at C-BASS, as CW9 alleges, *id.* ¶ 161, it defies logic and business sense for C-BASS to agree to do this rather than walk away.

MILW_9978394.4

"essentially defunct" on July 19, 2007, Pl. Br. 4, why would MGIC have provided C-BASS with an unsecured $50 million loan in connection with the purchase of Fieldstone only two days earlier? *See Radian*, 612 F. Supp 2d at 621 ("if Radian and MGIC had indeed known the size of the losses they had already sustained as a result of their respective investment in C-BASS, it makes little sense to suggest that they would have further provided additional funds, particularly in the form of an unsecured credit facility"). Finally, if the analysts, commentators and market participants knew that the subprime market had collapsed and were discussing it throughout the first six months of 2007 as Plaintiff suggests, PAC ¶¶ 55-77, how could MGIC believe on July 19, 2007 that it would be able to "foist" its approximately $450 million interest in C-BASS on "unsuspecting" investors?

These questions quickly illustrate that Plaintiff's inference of scienter is implausible and neither cogent nor compelling as required by *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.* 551 U.S. 308 (2007). The far stronger inference is that, given its long history with C-BASS, MGIC believed in C-BASS's capabilites and thought C-BASS would withstand what MGIC (and almost everyone else) believed was a temporary subprime market dislocation. Further, as explained in the motion to dismiss the CCAC, the absence of any stock sales by Culver or Lauer and the increase in their equity holdings during the period at issue, *see* Defs. Br. in Supp. of MTD 32-34, 35-36, are so inherently inconsistent with Plaintiff's fraud theory that they render Plaintiff's scienter allegations neither "cogent" nor "compelling."

## II.    PLAINTIFF FAILS TO SUFFICIENTLY ALLEGE FALSITY OF THE ALLEGED STATEMENTS DESCRIBED IN THE PAC.

Plaintiff contends that C-BASS and MGIC made four categories of misleading statements: (1) C-BASS's portfolio of subprime assets had not lost significant value; (2) C-BASS marked its subprime assets to market; (3) C-BASS had ample liquidity to address its lender margin calls; and (4) C-BASS had been profitable in the second quarter of 2007 and expected to be profitable for the full year 2007. Pl. Br. 14. To plead a false statement of

21

material fact under the PSLRA, a plaintiff "must specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." Op. at 6 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 595 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007)). Plaintiff fails to meet this standard as to all defendants.

A.     **Plaintiff Does Not Allege That Culver Or Lauer Made The Challenged Statements**

We note that, given Plaintiff's Motion to Correct the PAC, *see* Dkt Entry 80, only one of the purported misstatements Plaintiff alleges was actually made by MGIC—the statement that C-BASS had "substantial" liquidity—and that statement was made in MGIC's July 19, 2007 press release, not by Culver or Lauer. Undeterred, Plaintiff argues in various ways that the MGIC Defendants are "responsible for" statements made by Williams and Draghi. *See, e.g.,* PAC ¶ 23. As the MGIC Defendants explained previously, the statements Draghi and Williams made on the earnings conference calls cannot be attributed to the MGIC Defendants. *See* MGIC Defs. Reply Br. 17-18.[20]

The Third Circuit Court of Appeals in *United States v. Schiff*, Nos. 08-1903 and 08-1909, 2010 WL 1338141 (3d Cir. Apr. 7, 2010), recently rejected an attempt to hold Bristol Myers Squibb's CFO, Schiff, liable for the statements of another officer on the company's earnings conference calls. The court said the "the plain language of § 10(b) and corresponding Rule 10b-5 do not contemplate the general failure to rectify misstatements of others." 2010 WL

---

[20] In the parent/subsidiary context, the statements of employees of a subsidiary may not be attributed to the parent company and vice versa. *See, e.g.*, *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 381 (D. Md. 2004) (attempt to attribute false statements of parent company senior executives to CEO of subsidiary "fails to satisfy the requirements of the PSLRA and Rule 9(b)"); *Israeli v. Team Telecom Intern., Ltd.,* No. Civ. A. 04-CV-4305 (PGS), 2006 WL 2883237, * 9 (D.N.J. Oct. 10, 2006) (PSLRA did not allow plaintiff to impute statements of subsidiary employees to its parent company); *Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.,* No. Civ. A. 06-2204 (WJM), 2009 WL 4250061, at * 9 (D.N.J. Nov. 25, 2009) (same). Because C-BASS is an equity investee, not a subsidiary, this principle applies here with even more force.

MILW_9978394.4

1338141, at *10. The court observed that imposing an obligation to rectify others' misstatements "would be illogical" in light of the Supreme Court's holding in *Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994), that § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Schiff*, 2010 WL 1338141, at *10. The Third Circuit also rejected the government's theory that Schiff had a "fiduciary duty" to the company's shareholders to correct the other officer's misstatements. The court called the government's primary legal support, *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005), which Plaintiff relies on here, "weak" in that *Barrie* "never mentioned how or when such a duty to disclose based on statements of another arises, or whether Rule 10b-5 contemplates a duty to speak in such a circumstance based on fiduciary obligations…" *Schiff*, 2010 WL 1338141, at *7.

Even if *Barrie* were authoritative, it applies only "[w]here it is pled that one defendant knowingly uttered a false statement and the other defendant *knowingly* failed to correct it…" 409 F.3d at 656 (emphasis added). *Barrie* and cases like it are inapplicable here because Plaintiff has not pleaded with particularity the predicate to its argument —that Culver or Lauer knew Draghi or Williams made false statements.

In any event, we address below the deficiencies with respect to each of the four categories of purported misstatements alleged by Plaintiff.

**B.    The Alleged Misrepresentation That C-BASS's Portfolio Had Not Lost Significant Value**

Plaintiff contends that Williams falsely represented that the first quarter write-down of C-BASS's securities portfolio was only $34 million, asserting that C-BASS "needed to take far greater write-downs in light of the 30% plunge in the subprime market to report these assets at fair value in accordance with GAAP." Pl. Br. at 19. The falsity of the write-down obviously turns on the valuation of the portfolio. As explained above, Plaintiff has not pleaded sufficiently that a different valuation was right and C-BASS's was wrong.

23

MILW_9978394.4

In support of its contention that the first quarter 2007 write-down should have been greater, Plaintiff relies on an analyst's unsubstantiated comment about the state of the subprime market. The analyst actually said "*BBB paper* is down 30% for the year-to-date." Ex. 12 at 22 (emphasis added). Plaintiff provides no insight regarding what "BBB paper" the analyst was talking about, and there is no allegation that it is the same BBB paper that C-BASS had in its securities portfolio. Moreover, even if the analyst was right, as Williams explained, BBB securities made up only 18% of the C-BASS portfolio. *Id.* Because the $34 million write-down could have been primarily related to C-BASS's BBB securities, there is no reason to think C-BASS did not take significant write-downs on those securities, as the analyst seems to have expected would be the case.

According to CW6, stress scenarios, which "showed what would happen if the market dropped 35%," predicted a "nasty hit to the balance sheet" and "margin calls." Pl. Br. 19. This allegation only raises more questions. First, the "stress scenario" models purportedly were created in 2006, PAC ¶ 143; Plaintiff ignores changes in the portfolio over time and never states what the stress scenario predicted for the portfolio as it existed during the class period. Second, what "market" was used for the 35% drop in the stress scenario? Was it one of the ABX indicies? An index of financial company stocks? The Dow Jones Industrial Average? Third, was the "stress scenario" described by CW6 even reached in 2007 and, if so, when?

Even if we knew the answers to these questions, Plaintiff cannot show falsity because C-BASS and MGIC disclosed that the subprime dislocation was having a serious impact on C-BASS. On March 1, MGIC reported that C-BASS had experienced a $30 million write-down to its securities portfolio in February. Ex. 2, 2006 Form 10-K at 48. On April 12, C-BASS reported that it had experienced margin calls of approximately $200 million in the first quarter of 2007 and that it was taking a "hit" of approximately $100 million due to write-downs in the securities and whole loan portfolios, losses due to wider securitization spreads and losses on

24

claims to certain impaired counterparties. Ex. 12 at 4-5. Thus, the disclosed impact of the first quarter market dislocation on C-BASS was "nasty" by any measure.

### C. The Alleged Misrepresentation That C-BASS Marked Its Subprime Assets Using Market Prices

As described above, MGIC had disclosed in its public filings that, because C-BASS's securities portfolio consisted of illiquid securities, C-BASS used a cash flow model as part of the process by which it estimated the fair value of the portfolio. Plaintiff ignores this disclosure and contends that C-BASS instead falsely said that it "valued its portfolio using market prices." Pl. Br. at 20.

Plaintiff's contention is based on a misinterpretation of Williams' comments on the April 12, 2007 conference call. Analyst Wayne Smith questioned Williams on the call regarding the size of C-BASS's write-downs "given what the market has done." Ex. 12 at 22. Williams responded that C-BASS was different from other securitizers, noting C-BASS's "very good standard in terms of the spread we executed at…" *Id.* Stressing that C-BASS did not mark securities where they would be marked if C-BASS was a "generic issuer," Williams said C-BASS MBS was "pricing and trading well inside of [how a generic issuer would price and trade] due to the franchise value that people associate with how we look at our credit and how our credit has performed." *Id.* What Williams was explaining, perhaps inartfully, was that C-BASS was *not* using generic market prices. Rather, given that C-BASS "priced $3 billion worth of issuance" in the first quarter of 2007, C-BASS was marking its BBB securities where it "executed at" and, for MBS below BBB, for which there was no trading and hence no market, it priced based on its own credit models reflecting how it believed the underlying collateral would perform.[21] Williams' Q&A with Smith makes little sense if, as Plaintiff contends, Williams was

---

[21] According to Plaintiff, "MBS … rated 'BBB' was the riskiest MBS tracked by most market participants; … MBS … rated 'BB' of 'B' … were so risky that they were not even tracked by market participants; and [the rest of] C-BASS's portfolio was too risky to receive a credit rating…" PAC ¶ 38.

MILW_9978394.4

saying C-BASS valued its assets "in accordance with market prices." Pl Br. at 19.  In fact, Williams was saying exactly the opposite.[22]

Williams made this explicitly clear in the second quarter of 2007 when he explained that "we continue to update our credit and prepayment models to insure that we are comfortable with the valuation of our portfolio…  We verify [book value] by three-way comparison of observed market prices, financing marks from our lenders and our internal calculations during our ongoing securities review.  We evaluate all significant differences between book value and market value among these three valuation methods and take appropriate action as warranted."  Ex. 14 at 4.  When an analyst asked whether C-BASS's methodology involved a "market mark" or a "model mark," Williams explained "the reality of it is that there [are] very few things trading in the market" and "it's very difficult to tell you what the market is."  *Id.* at 19.  Confirming that C-BASS's expectations were based on its cash flow models, Williams said "we have no intention of selling our portfolio and we expect it's going to realize what we expect in terms of the yield where we have it marked."  *Id.* at 19.

Draghi further noted that C-BASS took write-downs in the second quarter due to changes in loss projections for second lien collateral and changes in prepayment assumptions for "alt-A" collateral.  *Id.* at 4.  Later, an analyst asked if C-BASS had a "range of lifetime loss assumptions" for modeling the residual securities in its portfolio.  Draghi said that the loss assumptions were "pretty granular" and varied by "deal and by vintage" and "whether it's a first lien or a second lien transaction."  He also noted that C-BASS's loss assumptions for the 2006 vintage first lien deals had been noticeably higher than the 2004 and 2005 vintages.  *Id.* at 26.

---

[22] Williams' comment that C-BASS considered rating agencies' views "irrelevant" to its valuation decisions confirmed that C-BASS marked based on its view of the securities in its portfolio, not the views of market observers.

MILW_9978394.4

### D. The Alleged Misrepresentation That C-BASS Was Profitable In The Second Quarter Of 2007 And Expected To Be Profitable For The Full Year 2007

Plaintiff contends that statements regarding C-BASS's expected earnings were materially false because "Defendants knew that C-BASS had suffered such severe unrecognized losses that positive earning projections for C-BASS were impossible." Pl. Br. at 20. This theory, of course, also depends entirely on Plaintiff's premise that C-BASS was concealing, and planned to continue concealing, massive unrecognized losses by failing to take greater write-downs in its portfolio. There is simply no factual support for the assertion that the profit in Q2 was not "real" or that there was no reasonable basis for the projections for the full year 2007. *See Roots P'ship v. Lands End, Inc.*, 965 F.2d 1411, 1417-18 (7th Cir. 1992) (projections of future performance are actionable if made "without a reasonable basis").

From CW9's observation that the first wave of margin calls in February of 2007 had sent C-BASS into "panic," Pl. Br. at 20, Plaintiff draws the baseless conclusion that "[T]herefore, defendants had no truthful basis or expectation for the $150 - $200 million earnings forecast for 2007 and, therefore, these projections were materially false." *Id.* CW6's allegations, however, bolster C-BASS's second quarter results and C-BASS's expression of optimism for the rest of the year. *See* PAC ¶ 140 (noting that things looked to be stabilizing and C-BASS had a positive net income in April and May 2007) and PAC ¶ 142 (noting it was not until July 2007 that "C-BASS ran into problems"). Plaintiff's reliance on the SEC's recent *amicus* brief in *Slayton v. Am. Express Co.*, No. 085-442-CV (2d Cir. Jan. 22, 2010), *see* Dkt. Entry 78, also is unavailing. The SEC's *amicus* does not articulate a novel proposition – warning of a *potential* problem is insufficient if the speaker knows the problem *presently exists* and is material. The SEC's view makes sense in *Slayton*, where the plaintiff alleged that the defendant received a document advising of additional losses in the subject investments and that defendant had estimated additional write-downs, but the defendant's disclosure merely warned of "potential" deterioration in the subject investments.

27

Here, Plaintiff asserts that Culver and Lauer "knew" that C-BASS had masked losses by not writing down its portfolio further than it did. No witness, however, says one of the MGIC defendants had a document in hand that contradicted C-BASS's statements that it had recorded a profit in the second quarter or expected that it would be profitable in 2007. *See Oshkosh* Slip Op. at 31-32 ("None of the confidential witnesses stated that any of the Defendants knew X was true while they said Y, or that internal projections showed something different from what was publicly disclosed."). Thus, the cautionary language in MGIC's disclosures regarding C-BASS's prospects is subject to the safe harbor for forward-looking statements. *See* Defs. Br. in Supp. of MTD at 62-65.

### E. The Alleged Misrepresentation That C-BASS Had Ample Liquidity

Plaintiff again challenges the statement in MGIC's press release that C-BASS had "substantial liquidity" and Draghi's statement that C-BASS had "today on the order of $150 million in cash resources." PAC ¶ 188. Plaintiff now contends that these statements were misleading because $100 million of the $150 million referenced in Draghi's statements had been provided as an unsecured line of credit from MGIC and Radian. Pl. Br. 22. Plaintiff argues that caselaw prohibits one from making a positive statement about a subject while not disclosing "negative facts contradicting that statement." *Id.* at 22 (citing *Billhofer v. Flamel Techs., SA,* 663 F. Supp. 2d 288, 298 (S.D.N.Y. 2009)). We agree. But what are the "negative facts contradicting" Draghi's statement? The CWs do not say, for example, that C-BASS did *not* have approximately $150 million in cash resources on hand, or that C-BASS otherwise misrepresented its liquidity position on the morning of July 19. Moreover, none of the sources of the $150 million were ever discussed, so not describing *one* of those sources does not contradict anything said.

Again focusing on what happened *after* July 19, Plaintiff argues that "Draghi's statement materially misled the market by suggesting to the market that C-BASS was able to maintain a certain level of liquidity when, in fact, the opposite was true…" Pl. Br. 22. As this

MILW_9978394.4

Court determined previously, however, the defendants suggested no such thing. There had been no guarantee (or even a suggestion) that C-BASS would be able to maintain a certain level of liquidity. *See* Op. at 30. Rather, C-BASS had stressed that "liquidity *remains a primary issue* for subprime market participants as illustrated by … increased margin calls from all lenders…" Ex. 14 at 3-4 (emphasis added).[23] MGIC, of course, expressly stated that C-BASS policies "cannot guarantee that all liquidity required will, in fact, be available." Op. at 28 (quoting Ex. 13 at 10). The Court thoroughly examined this issue and disposed of Plaintiff's claims that MGIC and C-BASS misrepresented C-BASS's liquidity.

As the Court noted, "[T]he 'ruinous assault of margin calls' did not really begin until after the July 19th conference call and press release … [P]laintiff does not plead facts suggesting that defendants knew at the time of the call that additional (and more severe) margin calls were on the way. Op. at 31. As to knowledge of margin calls, CW6 can only state that "in July 2007" C-BASS received large margin calls and he was told C-BASS might file bankruptcy. *See* PAC ¶ 142. In a case like this one, where a difference of several days, perhaps even one, is paramount, the reference to "July 2007" obviously is insufficient. For all the reasons explained above, nothing alleged in the PAC disturbs this Court's well-reasoned conclusion.[24]

---

[23] Plaintiff's argument that Williams did not disclose on the July 19 earnings call that C-BASS had received additional margin calls is meritless. *See* Pl. Br. n.3. Williams' statement regarding the challenges faced by "subprime market participants" including liquidity remaining "a primary issue," cannot be construed fairly as excluding C-BASS. While C-BASS certainly said it was taking steps to weather the storm, it never suggested it was immune to margin calls or other effects of the subprime dislocation. *See* Ex. 12 at 4 (Williams stating on the April 12, 2007 earnings conference call that "we … have not been immune to these market events…").

[24] The theory behind the SEC *amicus* in *Slayton* similarly is inapplicable with respect to Plaintiff's liquidity argument. Plaintiff does not allege with any particularity that the MGIC Defendants knew C-BASS would be unable to meet its liquidity needs when MGIC said that C-BASS policies could not guarantee that all liquidity required would be available. Thus, the safe harbor applies to MGIC's forward-looking statements regarding C-BASS's liquidity.

MILW_9978394.4

## III. PLAINTIFF'S ALLEGATIONS ARE INSUFFICIENT TO STATE A SECTION 20(A) CLAIM AGAINST CULVER OR LAUER.

The PAC does not sufficiently allege a Section 20(a) claim against Culver or Lauer. In order to state a claim under Section 20(a), a plaintiff must plead (1) an underlying securities violation; (2) that "the defendant actually exercised general control over the operations of the entity;" and (3) that "the defendant had the power or ability to control the specific acts constituting the primary violation." *In re Sears Roebuck & Co. Secs. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003). In the first instance, because Plaintiff's PAC does not state an underlying violation, there is no viable Section 20(a) claim. *See, e.g., Pugh v. Tribune Co.,* 521 F.3d 686, 693 (7th Cir. 2008).

In addition, the PAC makes only conclusory, boilerplate allegations regarding "control" as to Lauer and Culver. PAC, ¶¶ 315-317. There are no factual allegations that they controlled Draghi and Williams, nor could there be given the record before the Court. Plaintiff's contention that "MGIC controlled 46% of C-BASS," Pl. Br. 29, on its face, refutes any suggestion that Culver and Lauer had the power to "direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *See* 17 C.F.R. § 240.12b-2(3)(iv)(2) (2009) (defining "control").

## CONCLUSION

Because the proposed claims against Defendants MGIC Investment Corporation, Curt S. Culver and J. Michael Lauer are futile, Plaintiff's Motion to Amend its Consolidated Class Action Complaint against should be denied.

MILW_9978394.4

FOLEY & LARDNER LLP


s/ Bryan B.  House_____
Bryan B. House
Max B. Chester
William J. (Bill) Katt, Jr.
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
414.297.5554 (BBH)
414.297.5573 (MAXC)
414.319.7035 (WJK)
414.297.4900 (facsimile)

Attorneys for Defendants MGIC
INVESTMENT CORPORATION, CURT
S. CULVER and J. MICHAEL LAUER

31

MILW_9978394.4