UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| FULTON COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Civil No. 08-cv-00458-LA<br>**Consolidated** |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **PLAINTIFF'S MEMORANDUM OF LAW IN REPLY TO THE OPPOSITION BRIEF OF DEFENDANTS BRUCE WILLIAMS AND** |
| MGIC INVESTMENT CORPORATION, CURT S. CULVER, LARRY PIERZCHALSKI, J. MICHAEL LAUER, BRUCE WILLIAMS AND JOHN DRAGHI, | ) ) ) ) ) ) | **JOHN DRAGHI AND IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO FILE AN AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| Defendants. | ) | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 3

    **I.**    **The Amended Complaint Pleads that Williams and Draghi Made Materially False Statements and Omissions** ........................................... 3

        A.    False Statements Regarding Liquidity ....................................................... 3

        B.    False Statements Regarding C-BASS's Expected 2007 Profit ................... 5

        C.    False Statements Regarding C-BASS's 2Q07 Earnings ............................. 7

        D.    False Statements Regarding C-BASS's 1Q07 Earnings ............................. 7

        E.    False Statements Regarding Portfolio Valuation ........................................ 9

        F.    Williams and Draghi Hid the Fact that the Value of C-BASS's Portfolio Was Plummeting, and the Fact that C-BASS Received $145 Million in Margin Calls in the First Eighteen Days of July 2007 .... 10

    **II.**    **The Amended Complaint Pleads a Strong Inference of Scienter** .................... 11

        A.    Draghi ....................................................................................................... 11

        B.    Williams ................................................................................................... 13

        C.    The Most Compelling Inference Is that Williams and Draghi Hid the Massive Damage to C-BASS in a Vain Attempt to Stave Off the Inevitable .............................................................................. 14

    **III.**    **Conclusion** .......................................................................................................... 155

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ackerman v. Schwartz*,
   947 F.2d 841 (7th Cir. 1991) ..................................................................................1, 3

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)..........................................................................................13

*Billhofer v. Flamel Tech., SA*,
   663 F. Supp. 2d 288 (S.D.N.Y. 2009)..........................................................................4

*Florida State Bd. of Admin. v. Green Tree Fin. Corp*,
   270 F.3d 645 (8th Cir. 2001) ................................................................................12, 13

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
   No. 08-411, 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010)..........................8, 9, 10, 15

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)........................................................................................8

*In re Harley-Davidson, Inc. Sec. Litig.*,
   660 F. Supp. 2d 969 (E.D. Wis. 2009).........................................................................8

*In re RAIT Fin. Trust Sec. Litig.*,
   No. 07-3148, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)........................................8

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)..........................................................................................13

*In re Sears, Roebuck & Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003) ....................................................................12, 14

*In re Wash. Mut. Inc. Sec. Deriv. & ERISA Litig.*,
   No. 08-1919, 2009 WL 3517630 (W.D. Wash. 2009)...............................................14

*Makor Issues & Rights, Ltd. v. Tellabs, Inc. ("Tellabs I")*,
   437 F.3d 588 (7th Cir. 2006) .....................................................................................4, 5

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*")..........................................................13, 14

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .......................................................................................12

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)..................................................................................................4

*Roots P'ship v. Lands' End, Inc.*,
    965 F.2d 1411 (7th Cir. 1992) ............................................................................................5

*South Ferry LP #2 v. Killinger*,
    No. 04-1599, 2009 WL 3153067 (W.D. Wash. 2009)........................................................14

**INTRODUCTION**

Bruce Williams and John Draghi argue in their opposition brief that Plaintiff has failed to show that they made false statements during the MGIC Investment Corporation ("MGIC") 2Q07 earnings conference call on July 19, 2007. There is one statement, however, for which Williams and Draghi simply have no response. On the July 19, 2007 call, Draghi told investors that C-BASS had "on the order of $150 million in cash resources" to cover margin calls, but did not tell investors that $100 million of the $150 million in cash resources had been pumped into the Company on July 17, 2007 – a mere two days before the investor conference call – by MGIC and the Radian Group, Inc. ("Radian") in the form of an emergency loan. The federal securities laws make it clear that when a person begins speaking on a particular topic, they have a duty to tell the full and complete truth, and they cannot omit material facts that are necessary to keep their other statements from misleading investors. *Ackerman v. Schwartz*, 947 F.2d 841, 846 (7th Cir. 1991). Here, telling investors that C-BASS had $150 million in liquidity to cover margin calls, without also telling them that two-thirds of that available liquidity had come from an emergency loan made two days before the conference call, was securities fraud.

This failure to disclose the emergency loan was particularly egregious because C-BASS's ability to continue as a going concern depended upon its having sufficient liquidity to cover margin calls. Indeed, investors and analysts recognized that, if C-BASS ran out of liquidity, it would then have to begin liquidating its portfolio at fire sale prices and would quickly go out of business. One need only look at the questions that analysts asked during the various conference calls to see that C-BASS's liquidity was the key issue for investors. *See, e.g.*, AC ¶191[1] ("Q. Is there a need for additional liquidity? A. We said last week [C-BASS's] cash resources are fine at

---

[1] Amended Complaint ("AC"), filed as Exhibit A to Plaintiff's Motion to Amend (Doc. No. 75). References to ¶__ and ¶¶__ mean this Amended Complaint.

the moment."); ¶192 ("[C-BASS's] basic assumption is that they don't sell the bonds. And to the extent they are forced to, to cover margin cost, that obviously poses a big risk."); ¶192 ("[T]o the extent they [C-BASS] are forced to liquidate that could, I guess, dramatically shift the market values in their portfolio."). Investors needed to know about the $100 million emergency loan made two days before the investor conference call to understand the truth about C-BASS's $150 million in liquidity to cover margin calls. The failure to disclose the emergency loan was also misleading because it led investors to believe that C-BASS's cash resources had dropped from $200 million in 1Q07 to $150 million in 2Q07, when in fact these cash resources had dropped from $200 million in 1Q07 to $50 million in 2Q07, with an additional $100 million being pumped back into the Company by MGIC and Radian two days before the investor call.

There is also ample evidence in the Amended Complaint to give rise to a cogent inference that Draghi and Williams knew about or were reckless in not knowing about the $100 million emergency loan. Several of the confidential witnesses testified that both Draghi and Williams were made aware of the margin calls as they came in, and were intimately involved in securing funding to pay off the margin calls. ¶¶104, 108, 134, 160, 162. Moreover, it simply is not believable that C-BASS would have been able to secure $100 million in emergency funding from MGIC and Radian without the knowledge and involvement of its two top ranking officers. The timing of the emergency loan is also highly suspicious: it was made a mere two days before MGIC's 2Q07 conference call, as Draghi and Williams were about to face investors and report C-BASS's liquidity position. The stronger inference here is that the $100 million loan was deliberately made so that Draghi and Williams could report to investors on the conference call that C-BASS had "$150 million in available cash." This further supports an inference that Draghi and Williams knew about the emergency loan.

2

Finally, Williams and Draghi have not rebutted the allegations that they materially overstated C-BASS's earnings and portfolio performance by failing to properly account for the massive portfolio losses C-BASS suffered from 1Q07 through July 19, 2007. The confidential witness allegations in the Amended Complaint show that Williams and Draghi received margin call and portfolio valuation data informing them of these losses, establishing a cogent inference that they were at least reckless in making their false statements.

## ARGUMENT

I. **The Amended Complaint Pleads that Williams and Draghi Made Materially False Statements and Omissions**

A. <u>False Statements Regarding Liquidity</u>

During the 2Q07 earnings call, Draghi made a misleading misrepresentation regarding C-BASS's liquidity position, reassuring the market that the company had "on the order of $150 million in cash resources." ¶182. By discussing C-BASS's liquidity, Draghi incurred a duty to speak the whole truth about the subject. *Ackerman*, 947 F.2d at 846 ("Federal law requires persons to tell the truth about material facts once they commence speaking"). But Draghi failed to inform investors that $100 million of the $150 million in "cash resources" came from emergency loans made available by MGIC and Radian on July 17, 2007 to support C-BASS's liquidity position. ¶102. This omission rendered Draghi's statement materially misleading because by representing that C-BASS was able to maintain $150 million in liquidity, down only $50 from the $200 million in liquidity reported for 1Q07, without disclosing the role played by emergency loans, Draghi misled investors into believing that C-BASS's liquidity position had not been significantly impacted by the subprime crisis when the exact opposite was true. C-BASS's ability to maintain liquidity to cover margin calls was critical to understanding its health as a business and was closely tracked by the market because if C-BASS did not have

3

funds sufficient to cover margin calls, it would have to sell its portfolio at distressed prices to raise cash, which could quickly put it out of business. *See* ¶¶191-92. By July 19, 2007, as the subprime crisis continued, C-BASS's liquidity had deteriorated to the point where emergency aid was necessary. Thus, C-BASS was in a materially weaker financial position than Draghi's statement indicated. *Makor Issues & Rights, Ltd. v. Tellabs, Inc. ("Tellabs I")*, 437 F.3d 588, 596 (7th Cir. 2006) ("materiality exists when 'there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information'") (*overruled on other grounds*); *see also Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("[A] statement which is literally true, if susceptible to quite another interpretation by the reasonable investor . . . may properly . . . be considered a material misrepresentation.").

Additionally, Draghi failed to disclose that C-BASS's lenders had eroded C-BASS's liquidity position by making $145 million in margin calls in the first eighteen days of July. ¶183(c). Again, by discussing the subject of C-BASS's liquidity in a positive manner without disclosing negative contrary facts, such as the fact that margin calls had eroded most of C-BASS's liquidity, Draghi misled investors into believing that such facts did not exist. *See Billhofer v. Flamel Tech., SA*, 663 F. Supp. 2d 288, 298 (S.D.N.Y. 2009) (defendant's "omission of any contrary statements *does* necessarily imply an opposite conclusion: that [defendant] *and* its partner [] were not in possession of material information . . . that would detract from the 'success' of [defendant's product]"). Had Draghi truthfully disclosed the existence of the $145 million in margin calls, which he had a duty to do in light of his false representation regarding C-BASS's liquidity, the market would have realized that there was a significant risk of C-BASS's imminent collapse due to insufficient liquidity driven by rising margin calls.

4

Therefore, Draghi's omission of the $145 million in margin calls rendered his statement regarding C-BASS's liquidity materially misleading. *Tellabs I*, 437 F.3d at 596.

Tellingly, Williams and Draghi do not appear to specifically contest the falsity of Draghi's statement that C-BASS had $150 million in cash resources as of July 19, 2007. *See* C-BASS Opp. at 12-22.

      B.      <u>False Statements Regarding C-BASS's Expected 2007 Profit</u>

At the 2Q07 earnings call, Draghi falsely represented that C-BASS expected to earn "between $125 and $175 million" for 2007. ¶182. Draghi had no reasonable basis to expect that C-BASS could earn this amount for 2007 because C-BASS's portfolio suffered approximately ***$726 million*** in losses in the first eighteen days of July 2007, making Draghi's profit projection entirely unrealistic. *See Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1417-18 (7th Cir. 1992) (indicating that earnings projection "made or reaffirmed without a reasonable basis" is actionable). The basis for this alleged loss is as follows:

- On July 31, 2007, C-BASS stated in a press release that "[d]uring the first 24 days of July alone, C-BASS met an additional $260 million of margin calls, representing greater than a 20% decline in the lender's value." ¶196.

- But it is known that $145 million of these $260 million in margin calls, or approximately 56%, was paid during the first eighteen days of July. ¶197.

- Therefore, 56% of the 20+% decline in the value of C-BASS's portfolio, or approximately 11%, occurred by July 19, 2007.

- Since C-BASS had $6.6 billion in assets on June 30, 2007, it can be inferred that, according to C-BASS's lenders, the value of C-BASS's portfolio dropped by more than $726 million (11% of $6.6 billion) by July 19, 2007. ¶¶182, 196.

Because C-BASS purported to value its portfolio for financial statement purposes "based on, among other things, valuations provided by financing counterparties," the fact that C-BASS's lenders determined that C-BASS's portfolio had dropped by $726 million meant that, under its

5

own accounting method, C-BASS would have to account for this massive drop in its portfolio valuation.[2] *See* Exhibit 2 to the Declaration of Max Chester, dated August 14, 2009, ("Chester Decl."), at 39, 79 (describing C-BASS's reliance on valuations provided by financing counterparties.) C-BASS recognized portfolio value losses as "losses" for financial statement purposes so that adjusting C-BASS's portfolio valuation to reflect a $726 million drop in value would cause C-BASS to recognize about the same amount in losses. *See* ¶171.[3] Such a loss would be enormous in relationship to the size of C-BASS's business, which had total revenue of only $746.7 million and pre-tax earnings of $290.5 million in 2006. Chester Decl., Ex. 2 at 80. Thus, contrary to Draghi's statement, C-BASS could not possibly expect to earn a profit for 2007, let alone a profit ranging from $125 to $175 million. *See* ¶171 (demonstrating how even the relatively small, 1.5%, markdown of C-BASS's portfolio that Williams reported on April 11, 2007 rendered C-BASS unprofitable). In fact, C-BASS would report a $1.75 billion loss for the year. ¶9.[4]

---

[2] The reason that an 11% portfolio decline inflicted such massive damage was the fact that C-BASS was "leveraged out in excess," having borrowed approximately seven dollars for every one dollar of capital that belonged to it. ¶159. Thus, although C-BASS had only about $900 million in equity, it had assets of approximately $6.6 billion. *See*, *e.g.*, ¶40. For this reason, even small portfolio declines caused enormous losses and left C-BASS owing its lenders billions of dollars that it could no longer afford to repay. *See* ¶¶42, 161. This explains why, as Confidential Witness 9 ("CW9") observed, the margin calls C-BASS received in 1Q07 caused a "panic," they represented portfolio losses of $1.035 billion, far more than C-BASS could afford to absorb. *See* ¶161.

[3] During the 2Q07 call, Williams indicated that C-BASS examined "observed market prices, financing marks from our lenders" and its own "internal calculations" in valuing securities. Neither "observed market prices" nor C-BASS's "internal calculations" justified a finding that C-BASS had not suffered massive losses. Subprime market prices had plummeted 50% through July 18, 2007 (¶3) and, as described by CW9, a former C-BASS employee whose job was to value C-BASS's subprime assets, C-BASS's own internal valuations had shown "extreme risk" and declines in portfolio value since 3Q06. ¶¶156-57.

[4] Moreover as stated in the amicus brief of the United States Securities and Exchange Commission ("SEC"), filed as Exhibit A to Plaintiff's Motion For Leave to Submit Additional Authority, Draghi's statement was not accompanied by meaningful cautionary language because

6

C.  False Statements Regarding C-BASS's 2Q07 Earnings

Draghi overstated C-BASS's earnings for 2Q07 by failing to acknowledge losses in C-BASS's portfolio. Draghi represented on July 19, 2007 that C-BASS earned "a pretax profit of approximately $50 million" for 2Q07. ¶182. But during that quarter, C-BASS received $90 million in margin calls from its lenders. ¶94. Based on C-BASS's admission that margin calls totaling $260 million represented a 20+% loss in the value of its portfolio, it can be inferred that the $90 million in margin calls during 2Q07 represented a portfolio decline of approximately 7%, or **$462 million** (since C-BASS's portfolio was $6.6 billion as of June 30, 2007). *See* ¶¶182, 196. Thus, far from earning a $50 million profit, C-BASS had suffered hundreds of millions of dollars in losses under its own fair value accounting principles. *See* Chester Decl., Ex. 2 at 39, 79.

D.  False Statements Regarding C-BASS's 1Q07 Earnings

On April 11, 2007, Williams reported that C-BASS would take markdowns of approximately $100 million on its $6.9 billion portfolio, or about 1.5%, for 1Q07. ¶¶171, 174. However, the $200 million in margin calls received by C-BASS during this quarter indicates that the value of C-BASS's $6.9 billion portfolio had declined by approximately 15%, or **$1.035 billion**. ¶¶171, 196. Thus, Instead of reporting a pretax loss of $15 million, C-BASS should have reported hundreds of millions of dollars in losses. ¶171. CW9 confirms that C-BASS's portfolio value began declining in 3Q06 and C-BASS "was valuing [its] portfolio higher than it

---

the loss to C-BASS's portfolio had already occurred by the time he made his statement. (Doc. No. 78-1 at 2) (stating that cautionary language is not "meaningful" under the safe harbor for forward-looking statements because "[i]t is misleading and therefore insufficient for a company to warn of a *potentiality* that it is aware currently exists.") (italics in original).

was" in light of the plunging subprime market as measured by the ABX subprime index, which fell by approximately 30% in the first quarter of 2007. ¶¶156, 174.[5]

Williams and Draghi argue that Plaintiff's so-called "markdown" claims are insufficiently particular. *See* C-BASS Opp. 16-19; *id.* 18 n.10 (citing *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 989 (E.D. Wis. 2009). But Plaintiff has pled that Williams and Draghi overstated C-BASS's performance by failing to account for $1.035 billion and $462 million in portfolio losses for 1Q07 and 2Q07, respectively. In so doing, Williams and Draghi misapplied C-BASS's fair value accounting policy by ignoring massive downward price indicia from C-BASS's lenders in violation of C-BASS's own stated reliance on "valuations provided by financing counterparties." Thus, in the light most favorable to Plaintiff, the Amended Complaint alleges that Williams and Draghi seriously overstated C-BASS's earnings, which is sufficient at the pleading stage. "'[I]t is a factual question whether [a company's] accounting practices were consistent with GAAP,' and thus, we cannot determine this issue on a motion to dismiss." *In re RAIT Fin. Trust Sec. Litig.*, No. 07-3148, 2008 WL 5378164, at *7 (E.D. Pa. Dec. 22, 2008) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997)); *In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08-411, 2010 WL 727227, at *25 (S.D.N.Y. Feb. 22, 2010) ("The parties' disagreements over GAAP compliance also raise issues of fact that cannot be resolved on a motion to dismiss.").

---

[5] The dramatic drops in the subprime market as measured by the ABX index are relevant to understanding the decline in the value of C-BASS's portfolio because CW9 specifically referenced the ABX index in describing how C-BASS was "valuing the portfolio higher than it was." *See* ¶158. The ABX index also highlights the huge gap between what was going on in the subprime market and what Williams and Draghi were representing about the value of C-BASS's portfolio. For example, for the 1Q07, the ABX index registered declines of approximately 30% while C-BASS, despite owning a mortgage-backed securities portfolio that was mostly less creditworthy than the securities tracked by the ABX, reported portfolio declines of approximately 1.5%. *See* ¶174.

8

E. False Statements Regarding Portfolio Valuation

During the 1Q07 earnings call, Williams affirmatively misrepresented the performance of C-BASS's portfolio in the face of a pointed question from an analyst asking why C-BASS had reported such tiny markdowns even though the subprime crisis had caused the subprime market, as tracked by the ABX index of mortgage-backed securities ("MBS"), to plummet by approximately 30% and even though 77% of C-BASS's MBS portfolio had lower credit ratings than the MBS tracked by the ABX Index. ¶174. According to Williams,[6] C-BASS did not have to take larger markdowns because C-BASS was "not a generic issuer" and could achieve higher value for its assets because of "the franchise value that people associate with how we look at our credit and how our credit has performed." *Id.* These representations were half-truths at best because the 1.5% markdown taken by C-BASS was far less than the 15% markdown that C-BASS should have taken given its lenders' valuation determinations. This drastic overstatement of the performance of C-BASS's portfolio was a material misstatement. *See In re Ambac*, 2010 WL 727227, at *23-*24.[7]

---

[6] The Amended Complaint initially attributed the colloquy in paragraph 174 to MGIC's CEO, Curt Culver, in reliance on the Bloomberg Transcript of the April 11, 2007 earnings call, which was filed by Williams and Draghi as Doc. No. 58-5. Subsequently, the MGIC Defendants supplied Plaintiff with an audio recording of the call clarifying that, in fact, Williams was the individual who made these false statements. (*See* Doc. No. 80).

[7] Williams and Draghi try to suggest that there is a conflict between the observations of Confidential Witness 6 ("CW6"), a former employee of C-BASS who worked in "financial analysis," and the observation by CW9 that C-BASS was "valuing the portfolio higher than it was." *See* C-BASS Opp. at 18. CW6 made the rather unremarkable observation that in February 2007, "there were several margin calls" and "C-BASS marked to market and wrote down the assets and C-BASS posted appropriate reserves." ¶139. But CW6 was not alleged to have performed valuations of C-BASS's portfolio or received margin call emails from lenders. *See* ¶¶132-44. Thus, as someone who worked in the finance department, CW6 was simply acknowledging the publicly known fact that C-BASS took a mark-to-market markdown for 1Q07 and posted reserves that were appropriate in light of the size of the reported markdown. CW6 should not be read as opining on the validity of the decision to mark down C-BASS portfolio by only 1.5% as CW6's job responsibilities did not provide him with reason to evaluate this

F.   <u>Williams and Draghi Hid the Fact that the Value of C-BASS's Portfolio Was Plummeting, and the Fact that C-BASS Received $145 Million in Margin Calls in the First Eighteen Days of July 2007</u>

Williams and Draghi did not tell the market that the value of C-BASS's portfolio was plummeting and obscured the fact that C-BASS had received $145 million in margin calls in the first 18 days of July 2007 by seeking $100 million in emergency loans from MGIC and Radian and then presenting that $100 million as part of C-BASS's liquidity without disclosing its source or the fact that the loans were necessary to support C-BASS's liquidity.

On July 19, 2007, Williams did make a general observation that "[l]iquidity remains a primary issue for subprime market participants as illustrated by . . . increased margin calls from all lenders." ¶180. But this statement did not alert investors to the magnitude of portfolio declines and margin calls at C-BASS for several reasons. First, on its face, the statement is about the market in general, not C-BASS in particular. Moreover, Williams distinguished C-BASS from the general subprime turmoil in the same statement, asserting that "[o]ur disciplined buying practices during the course of 2006 and 2007 have been effective and the delinquency performance of our 2006 paper is well below the industry average." *Id.*

Second the rest of Williams' and Draghi's statements regarding C-BASS's performance were inconsistent with a truthful disclosure regarding the value of C-BASS's portfolio. For example, the $462 million in markdowns that C-BASS should have taken for 2Q07 was massive compared to the size of C-BASS's business, which only had revenue of $746.7 million and profits of $290.5 million for 2006. *See* Chester Decl., Ex 2 at 80. For 1Q07, Williams reported a tiny 1.5% markdown and expressly represented that a larger markdown was not required in light

---

decision. Therefore, contrary to Williams' and Draghi's contention, there is no conflict. Moreover, to the extent the Court finds that there is a conflict, CW6 confined his observation to February 2007 but Plaintiff alleges extensive misrepresentations about the value of C-BASS's portfolio on July 19, 2007.

10

of C-BASS's superior franchise value. ¶¶171-74. Analyst reports covering MGIC's July 19, 2007 earnings call confirm that Williams and Draghi misled the market. ¶189 (stating C-BASS was "notably better" and that "more stable C-BASS results are encouraging"); *id* (reporting that "[joint venture] income rebounded following the weakness in 1Q07 owing to improved results at C-BASS"); *id.* (stating "[w]e were a bit concerned that it could be a lot worse than reported, so we believe that this bodes well for the proposed sale of a majority interest in C-BASS, a critical piece of the merger with [Radian]").

**II.     The Amended Complaint Pleads a Strong Inference of Scienter**

     A.     <u>Draghi</u>

The Amended Complaint establishes that Draghi acted with scienter. CW6 confirms that Draghi knew about the $145 million in margin calls paid by C-BASS between July 1, 2007 and July 18, 2007 because Draghi received emails from C-BASS's lenders when such margin calls occurred. ¶134. As Confidential Witness #1 ("CW1")[8] observed, the margin calls were accompanied by valuations from the lenders justifying the calls. ¶106. Moreover, CW9, CW6 and CW1 all stated that Draghi, because of his position and heavy involvement in C-BASS's day-to-day affairs, likely knew the details of C-BASS's relationship with its lenders. ¶¶104, 108, 134, 160, 162. Thus, there is no question that Draghi knew about the margin calls and knew that C-BASS's receipt of margin calls meant C-BASS's lenders had determined that the value of C-BASS's portfolio had fallen and, accordingly, that C-BASS had likely suffered a loss.[9]

CW9 stated that Draghi received monthly portfolio valuation reports showing declining portfolio value and "extreme risk" starting in 3Q06. ¶¶156-59. Draghi also supervised the

---

[8]    CW1 was senior executive in investor relations at C-BASS for ten years. ¶103.

[9]    That C-BASS valued its portfolio using "valuations provided by financing counterparties" was common knowledge reported in MGIC's public filings. *See, e.g.*, Chester Decl., Ex. 2 at 39, 79.

creation of the "stress scenarios" prepared by CW6 and so was aware that the 50+% drop in the subprime market through July 18, 2007 would significantly damage C-BASS. ¶143. Thus, Draghi knew that C-BASS was "valuing the portfolio higher than it was." ¶158.

In light of his involvement with the lenders in paying off the margin calls as they came in and the detailed information he received regarding C-BASS's liquidity, there is also strong inference that Draghi knew that MGIC and Radian had to support C-BASS's liquidity position with an emergency $100 million in credit on July 17, 2007.[10] *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (holding that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance'"). The timing of the $100 million emergency loan is also highly suspicious: it occurred on July 17, a mere two days before Draghi and Williams were to face investors and report C-BASS' liquidity position. The close proximity in time between the emergency loan and conference call raises a strong inference that the loan was made with an eye towards the conference call. This further supports a cogent inference that Draghi and Williams knew about the $100 million loan.

Accordingly, the Amended Complaint alleges that Draghi was aware of vast amounts of information contradicting his false statements at the time that he was making them, which establishes scienter. "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Florida State Bd. of Admin. v. Green Tree Fin. Corp*, 270 F.3d 645, 665 (8th Cir. 2001) (citing *Novak v. Kasaks*, 216 F.3d

---

[10] It is not believable that C-BASS would have been able to secure the $100 million emergency loan from MGIC and Radian without the knowledge of the Company's two top officers.

12
Case 2:08-cv-00458-LA   Filed 04/29/10   Page 16 of 20   Document 88

300, 311 (2d Cir. 2000) and *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001));
*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (same).[11]

  B. <u>Williams</u>

  The Amended Complaint establishes "classic" evidence of Williams' scienter: he knew the facts rendering his statements false when he made his statements. *Florida State*, 270 F.3d at 665; *Aldridge*, 284 F.3d at 83. Williams knew about the margin calls. CW1 stated that Mark Rosenthal, the head of C-BASS's trading desk, likely updated Williams on incoming margin calls and that Williams likely had to sign off on the payment of the large margin calls of the sort that were occurring in the first eighteen days of July 2007. ¶108. The inference that Williams knew about the margin calls is further strengthened by the fact that Draghi knew about the margins calls and by the fact that the margin calls were critical to C-BASS's liquidity position and portfolio valuation. ¶¶181, 196. *See Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 711 (7th Cir. 2008) ("*Tellabs II*") ("at the top of the corporate pyramid sat [] the CEO. . . . Is it conceivable that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely."). CW9 confirmed that Williams received the monthly portfolio valuation reports that showed the decline in the value of C-BASS's portfolio and the "extreme risk" contained therein, demonstrating that Williams knew that C-BASS was "valuing the portfolio higher than it was." ¶¶156-59. And in light of his knowledge of the margin calls and

---

[11]  Williams and Draghi argue that the fact that MGIC and Radian loaned C-BASS $100 million on July 17, 2007 "affirmatively defeats any inference of scienter." C-BASS Opp. at 27. This argument does not make sense because the fact that a loan was made does not change the fact that Draghi knew about facts rendering his statements false at the time they were made. Also, the $100 million loan on July 17, 2007, two days before Draghi misleadingly represented to the market that C-BASS had $150 million in cash resources, is entirely consistent with Plaintiff's allegations that Defendants were trying to prop up C-BASS in order to sell a portion of the company to an outside party. ¶13.

the importance of the liquidity issue to the company's survival, there is a strong inference that Williams also knew that MGIC and Radian had to support C-BASS's liquidity position with an emergency $100 million in credit on July 17, 2007, which was a crucial issue for C-BASS's survival. *In re Sears*, 291 F. Supp. 2d at 727; *Tellabs II*, 513 F.3d at 711.

Williams' own detailed statements and assurances regarding the state of C-BASS's business provide an additional, independent basis for inferring scienter. On the April 11, 2007 conference call, Williams demonstrated that he knew exactly how much MBS C-BASS held and the creditworthiness of those MBS. ¶174. Also on April 11, 2007, Williams spoke in detail about the portfolio valuation adjustments that C-BASS would take for 1Q07. ¶171. On both calls, Williams evinced a detailed knowledge of how C-BASS valued its portfolio. ¶¶171, 180 (describing how C-BASS purportedly valued its portfolio). The Court may infer Williams' scienter based on this detailed knowledge and his representations about C-BASS's performance alone. *In re Wash. Mut. Inc. Sec. Deriv. & ERISA Litig.*, No. 08-1919, 2009 WL 3517630, at *6 (W.D. Wash. 2009) (Defendant's "own statements about risk management show his detailed knowledge about the processes. These allegations show his actual knowledge of the risk management problems of which Plaintiffs complain."); *South Ferry LP #2 v. Killinger*, No. 04-1599, 2009 WL 3153067, at *9 (W.D. Wash. 2009).

> C.  The Most Compelling Inference Is that Williams and Draghi Hid the Massive Damage to C-BASS in a Vain Attempt to Stave Off the Inevitable

The most compelling inference to be drawn from the allegations of the Amended Complaint is that Williams and Draghi realized in the first quarter of 2007 that C-BASS had suffered massive damage in the midst of the unfolding subprime crisis but chose to conceal that damage in an attempt to buy time while Defendants tried to recapitalize C-BASS through a partial sale to an outside buyer. *See Tellabs II*, 513 F.3d at 710 ("The fact that a gamble . . . fails

14

is not inconsistent with its having been a considered, though because of the risk a reckless, gamble."). This inference is compelled by the fact that Williams and Draghi repeatedly made statements designed to convince the market that all was well at C-BASS even though they knew that things were not well at all. It does not make sense that, two days after C-BASS received access to $100 in emergency loans on July 17, 2009, Draghi would represent to the market that C-BASS had $150 in liquidity but think it immaterial that $100 million of this liquidity were loans necessary because C-BASS had almost run out of money. Similarly, it does not make sense that Draghi would receive margin call emails showing that the value of C-BASS's portfolio had fallen by $726 million the first eighteen days of July but believe this did not undermine his rosy prediction that C-BASS would earn between $125 and $175 million for the year. Reasonable people do not omit these kinds of facts when they are trying to accurately describe the health of a business.

Williams and Draghi try to brush off their false statements as the effects of a "swift business reversal in a time of unprecedented market stress." C-BASS Opp. at 25. But the Amended Complaint eliminates this possibility by demonstrating that Williams and Draghi misrepresented the information they had at the time. *See In re Ambac*, 2010 WL 727227, at *22 ("taking the facts in the light most favorable to the plaintiffs . . . there is a vast gap between the picture that [the company] presented to investors . . . and the alleged practices within the company.").

### III. Conclusion

For the foregoing reasons, the Amended Complaint adequately pleads securities fraud violations against Williams and Draghi. Accordingly, amendment would not be futile and the Court should grant Plaintiff's motion to file an amended pleading.

Dated: April 29, 2010

Respectfully submitted,

SCOTT+SCOTT LLP

s/ Beth A. Kaswan
Beth A. Kaswan
Thomas Laughlin
500 Fifth Avenue, 40th Floor
New York, NY 10110
Tel: 212/223-6444
Fax: 212/223-6334
Email: bkaswan@scott-scott.com
       tlaughlin@scott-scott.com

SCOTT+SCOTT LLP
Arthur L. Shingler III
600 B Street, Suite 1500
San Diego, CA 92101
Tel: 619/233-4565
Fax: 619/233-0508
Email: ashingler@scott-scott.com
 -and-
Geoffrey M. Johnson
12434 Cedar Road
Cleveland Heights, OH 44106
Tel: 216/229-6088
Fax: 216/229-6092
Email: gjohnson@scott-scott.com

PREVIANT, GOLDBERG, UELMEN,
GRATZ, MILLER & BRUEGGEMAN, S.C.
Jason R. Oldenburg
1555 North RiverCenter Drive, Suite 202
P.O. Box 12993
Milwaukee, WI 53212
Telephone: 414-271-4500 or 800-841-5232
Facsimile: 414-271-6308

*Attorneys for Plaintiff Fulton County
Employees' Retirement System*

16
Case 2:08-cv-00458-LA   Filed 04/29/10   Page 20 of 20   Document 88