UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| FULTON COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Civil No. 08-cv-00458-LA **Consolidated** |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **PLAINTIFF'S MEMORANDUM OF LAW IN REPLY TO THE OPPOSITION BRIEF OF DEFENDANTS MGIC INVESTMENT** |
| MGIC INVESTMENT CORPORATION, CURT S. CULVER, LARRY PIERZCHALSKI, J. MICHAEL LAUER, BRUCE WILLIAMS AND JOHN DRAGHI, | ) ) ) ) ) ) ) | **CORPORATION, CURT CULVER AND J. MICHAEL LAUER AND IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO FILE AN AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL** |
| Defendants. | ) | **SECURITIES LAWS** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

    I.      The Amended Complaint Pleads that the MGIC Defendants Made Materially False Statements and Omissions ........................................................ 2

          A.      Culver and Lauer Knowingly Failed to Correct Williams' and Draghi's False Statements ......................................................... 2

          B.      MGIC is Liable for Williams' and Draghi's False Statements .................... 5

          C.      MGIC's July 19, 2007 Press Release ........................................................... 6

          D.      MGIC's SEC Form 10-Q for 1Q07 ............................................................... 8

          E.      Defendants Hid the Fact That the Value of C-BASS's Portfolio Was Plummeting and the Fact That C-BASS Received $145 Million in Margin Calls in the First Eighteen Days of July 2007 .............. 10

    II.     The Amended Complaint Pleads a Strong Inference of Scienter ..................... 12

          A.      Culver ......................................................................................................... 12

          B.      Lauer .......................................................................................................... 14

          C.      MGIC .......................................................................................................... 14

    III.    **Plaintiff Has Stated a Section 20(a) Claim** .......................................................... 14

    IV.    **Conclusion** ........................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ackerman v. Schwartz*,
   947 F.2d 841 (7th Cir. 1991) ...................................................................................................6

*Barrie v. Intervoice-Brite, Inc.*,
   409 F.3d 653 (5th Cir. 2005) ................................................................................................1, 4

*Billhofer v. Flamel Tech., SA*,
   663 F.Supp.2d 288 (S.D.N.Y. 2009) .......................................................................................7

*Custom Steel, Inc. v. John Wanta Builders, Inc.*,
   779 N.W.2d 724 (Wis. App. 2009) .........................................................................................6

*Harrison v. Dean Witter Reynolds, Inc.*,
   974 F.2d 873 (7th Cir. 1992) .................................................................................................15

*In re Allied Capital Corp. Sec. Litig.*,
   2003 WL 1964184 (S.D.N.Y. April 25, 2003) ......................................................................10

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
   2010 WL 727227 (S.D.N.Y. Feb. 22, 2010) ...........................................................................9

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ..................................................................................................9

*In re Parmalat Sec. Litig.*,
   594 F. Supp. 2d 444 (S.D.N.Y. 2009) .....................................................................................5

*In re Radian Sec. Litig.*,
   612 F. Supp. 2d 594 (E.D. Pa. 2009) ....................................................................................10

*In re RAIT Fin. Trust Sec. Litig.*,
   2008 WL 5378164 (E.D.Pa. Dec. 22, 2008) ...........................................................................9

*In re Sears, Roebuck & Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003) ...............................................................................13, 14

*In re Shopko Sec. Litig.*,
   2002 WL 32003318 (E.D. Wis. Nov. 5, 2002) .....................................................................12

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
   124 F.Supp.2d 527 (S.D. Ohio 2000) .....................................................................................4

*In re Williams Sec. Litig.*,
   339 F.Supp.2d 1206 (N.D. Okla. 2003) ..............................................................15

*Institutional Investors Group v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)...............................................................................13

*Kirsch Co. v. Bliss and Laughlin Ind., Inc.*,
   495 F. Supp. 488 (W.D. Mich. 1980) .................................................................15

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ................................................................................7

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .....................................................................5, 6, 14

*McGuire v. Dendreon Corp.*,
   2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) ...................................................4

*Noll v. Dimiceli's, Inc.*,
   115 Wis.2d 641 (Wis. App. 1983) .......................................................................6

*Pamperin v. Trinity Mem'l Hosp.*,
   144 Wis.2d 188 (1988) ........................................................................................6

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
   2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) .....................................................10

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
   2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ....................................................4

*Selbst v. McDonald's Corp.*,
   2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) ....................................................14

*Sloane Overseas Fund, Ltd. v. Sapiens Intern. Corp., N.V.*,
   941 F. Supp. 1369 (S.D.N.Y. 1996) ..................................................................15

*South Cherry Street, LLC v. Hennessee Group LLC*,
   573 F.3d 98 (2d Cir. 2009) ................................................................................12

*State v. Timblin,*
   259 Wis.2d 299 (Wis. App. 2002) .......................................................................6

*United States v. Schiff,*
   2010 WL 1338141 (3d Cir. April 7, 2010) ......................................................4, 5

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) .................................................................................4

## INTRODUCTION

MGIC Defendants Curt Culver and J. Michael Lauer have not adequately rebutted Plaintiff's claim that John Draghi's statement on the July 19, 2007 MGIC Investment Corporation ("MGIC") conference call that C-BASS had "in the order of $150 million in cash resources" to cover margin calls was materially misleading. The statement itself was materially misleading given that MGIC and the Radian Group, Inc. ("Radian") had pumped $100 million of the $150 million in cash resources into C-BASS a mere two days before the investor call in the form of an emergency loan. Moreover, Culver and Lauer are equally liable for the failure to disclose that $100 million of the $150 million in cash resources had been pumped into C-BASS two days before the investor call because they knew about the emergency loan. *See, e.g., Barrie v. Intervoice-Brite, Inc.,* 409 F.3d 653, 656 (5th Cir. 2005) ("Where it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it . . . the fraud is sufficiently pled as to each defendant."). The Amended Complaint[1] alleges numerous facts giving rise to a cogent inference that Culver and Lauer knew about the emergency loan, including:

- the highly suspicious timing of the $100 million emergency loan -- i.e., the loan itself was made a mere two days before the July 19 investor call, giving rise to a strong inference that the loan was made with an eye towards the investor call and that Culver and Lauer knew about it;

- the size of the emergency loan -- i.e., it simply is not believable that MGIC and Radian would have both signed off on infusing $50 million in unsecured liquidity into C-BASS, accounting for two thirds of C-BASS's cash resources, without the knowledge of MGIC's top two executives; and

- Lauer's intimate involvement with C-BASS -- e.g., one confidential witness stated that Lauer attended presentations to the C-BASS Board. ¶¶136-37.

---

[1] Amended Complaint ("AC"), filed as Exhibit A to Plaintiff's Motion to Amend (Doc. No. 75). References to ¶ and ¶¶ mean the Amended Complaint

Thus, Culver and Lauer are just as liable as Williams and Draghi for failing to correct Draghi's statement about C-BASS's $150 million in liquidity without also disclosing the $100 million emergency loan. In addition, the MGIC Defendants falsely represented that C-BASS would remain profitable for 2007 and that billions of dollars of low-grade subprime securities in C-BASS's portfolio had not lost significant value. By failing to appropriately recognize the collapse of C-BASS's portfolio with timely markdowns, the MGIC Defendants materially overstated MGIC's financial performance in its 1Q07 SEC Form 10-Q.

## ARGUMENT

I.  **The Amended Complaint Pleads that the MGIC Defendants Made Materially False Statements and Omissions**

    A.    <u>Culver and Lauer Knowingly Failed to Correct Williams' and Draghi's False Statements</u>

Williams and Draghi made numerous false statements at MGIC's 1Q07 and 2Q07 earnings calls.[2] Culver and Lauer are liable for these statements because they had reason to know that Williams' and Draghi's statements were false, but failed to correct those statements, artificially inflating the value of MGIC stock.

The false statements made by Williams and Draghi included:

− Draghi's representation during the 2Q07 earnings call that C-BASS had "on the order of $150 million in cash resources," a statement that misleadingly failed to disclose that $100 million of the $150 million was emergency loans and that $145 million in margin calls had seriously eroded C-BASS's liquidity. ¶182.

− Draghi's representation during the 2Q07 earnings call that C-BASS expected to earn "between $125 and $175 million" for 2007. *Id.* This statement was false because the $145 million in margin calls received by C-BASS in the first eighteen days of July indicated that C-BASS's lenders, whose valuations C-BASS relied upon in determining the value of its portfolio, had determined that C-BASS's portfolio had lost ***$726 million*** in value, a crushing loss that eliminated any chance of a 2007 profit.

---

[2] Plaintiff incorporates its discussion of the false and misleading statements made by Williams and Draghi in its brief in reply to the opposition brief of Williams and Draghi. (Doc. No. 88)

¶¶182, 196-97. Exhibit 2 to the Declaration of Max Chester, dated August 14, 2009 ("Chester Decl.") at 39, 79 (describing C-BASS's reliance on valuations provided by financing counterparties).

– Draghi's statement during the 2Q07 earnings call that C-BASS earned "a pretax profit of approximately $50 million" for 2Q07. ¶182. This statement was false because the $90 million in margin calls received by C-BASS during 2Q07 represented a portfolio decline of approximately 7 percent, or *$462 million* (since C-BASS's portfolio was $6.6 billion as of June 30, 2007). ¶¶182, 196. Thus, far from earning a $50 million profit, C-BASS had suffered hundreds of millions of dollars in losses under its own fair value accounting principles. *See* Chester Decl., Ex. 2 at 39, 79.

– Williams' statement during the 1Q07 earnings calls that C-BASS would take markdowns of approximately $100 million on its portfolio of $6.9 billion in subprime assets, or about 1.5 percent, for 1Q07. ¶171. This statement was false because the $200 million in margin calls received by C-BASS during this quarter indicated that C-BASS's portfolio had declined by approximately 15 percent, or *$1.035 billion*. ¶¶171, 196. Instead of reporting a pretax loss of $15 million, C-BASS should have reported hundreds of millions of dollars in losses. ¶171.

– Williams' representation during the 1Q07 earnings call that C-BASS did not have to take larger markdowns despite the plummeting subprime market because C-BASS was "not a generic issuer" and could achieve higher value for its assets because of "the franchise value that people associate with how we look at our credit and how our credit has performed." ¶174.[3] These representations were half-truths at best because the 1.5 percent markdown taken by C-BASS was far less than the 15 percent markdown that C-BASS should have taken, given its lenders' valuation determinations.[4]

---

[3] The Amended Complaint initially attributed the colloquy in paragraph 174 to MGIC's CEO, Curt Culver, in reliance on the Bloomberg Transcript of the April 11, 2007 earnings call, which was filed by Williams and Draghi as Doc. No. 58-5. Subsequently, the MGIC Defendants supplied Plaintiff with an audio recording of the call clarifying that, in fact, Williams was the individual who made these false statements. (*See* Doc. No. 80).

[4] In addition to Defendants' own admissions, the Amended Complaint relies on statements from C-BASS's former employees, who confirm that C-BASS had suffered huge losses that it falsely refused to acknowledge. For example, Confidential Witness #9 ("CW9"), who worked as a risk manager at C-BASS for six years and whose job responsibilities included valuing C-BASS's portfolio, observed that C-BASS's portfolio began to decline in value starting in 3Q06 and that C-BASS was "valuing the portfolio higher than it was." ¶¶152, 156, 158. CW9 further observed that C-BASS's model valuations showed "extreme risk" starting in the middle of 2006 and that some types of loans in C-BASS's portfolio began to decline at a "very fast rate" in late 2006 and 2007. ¶¶156-57. The MGIC Defendants suggest that there is a conflict between these observations and the observations of Confidential Witness 6 ("CW6"), who worked in "financial analysis." *See* MGIC Opp. at 11. CW6 made the rather unremarkable observation that in February 2007, "there were several margin calls" and "C-BASS marked to market and wrote

3

Culver and Lauer were present when Williams and Draghi made these false statements (¶¶169, 178) and, as explained in Plaintiff's papers, knew or had reason to know of C-BASS's collapse. Therefore, Culver and Lauer knowingly failed to correct Williams and Draghi and are liable for their false statements. "Where it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it . . . the fraud is sufficiently pleaded as to each defendant." *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005); *see e.g., In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F.Supp.2d 527, 543 (S.D. Ohio 2000); *see, also Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, No. 07-1952, 2009 WL 3853592, at *6 (M. D. Fla. Mar. 30, 2009); *McGuire v. Dendreon Corp.*, No. 07-800, 2008 WL 5130042, at *8 (W.D. Wash. Dec. 5, 2008) (describing authority holding that "a high-ranking company official cannot knowingly fail to correct a false oral statement made by another official at a conference with analysts or similar setting"); *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) ("[the company] cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties.")

The decision cited to by the MGIC Defendants, *United States v. Schiff*, Nos. 08-1903 and 08-1909, 2010 WL 1338141 (3d Cir. April 7, 2010), does not disturb the holding of *Barrie* that an individual may be liable for knowingly failing to correct statements made in his/her presence.

---

down the assets and C-BASS posted appropriate reserves." ¶139. But CW6 was not alleged to have performed valuations of C-BASS's portfolio or received margin call emails from lenders. *See* ¶¶132-44. Thus, as someone who worked in the finance department, CW6 was simply acknowledging the publicly known fact that C-BASS took a mark-to-market markdown for 1Q07 and posted reserves that were appropriate in light of the size of the reported markdown. CW6 should not be read as opining on the validity of the decision to mark down C-BASS portfolio by only 1.5 percent as CW6's job responsibilities did not provide him with reason to evaluate this decision. Therefore, contrary to Williams' and Draghi's contention, there is no conflict. Moreover, to the extent the Court finds that there is a conflict, CW6 confined his observation to February 2007 but Plaintiff alleges extensive misrepresentations about the value of C-BASS's portfolio on July 19, 2007.

4

Rather, in *Schiff*, the Third Circuit considered a different point of law. The government asked the Third Circuit to find that "high corporate executives" have a general fiduciary duty to correct false statements of others. *See Schiff*, 2010 WL 1338141, at *7 ("The Government argues that [defendant's] duty to disclose in the SEC filings derives from a general fiduciary obligation of 'high corporate executives' to the company's shareholders"). In this case, Plaintiff seeks to apply the central holding of *Barrie*, not the broad fiduciary duty theory sought by the government in *Schiff*. For this reason, the Third Circuit's opinion in *Schiff* is largely irrelevant.

> B. <u>MGIC is Liable for Williams' and Draghi's False Statements</u>

MGIC is liable for Williams' and Draghi's false statements for three independent reasons. First, as explained in the preceding paragraph, Culver and Lauer are liable for their failure to correct Williams and Draghi during MGIC's 1Q07 and 2Q07 earnings conference calls. Since Culver and Lauer were acting in the scope of their employment, MGIC is also liable for their failure to correct. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*").

Second, Williams and Draghi were acting as MGIC's agents and had actual authority to bind MGIC. "At the most basic level, the common law principle of *respondeat superior - i.e.,* that a principal is liable for the acts of its agent within the scope of the agent's authority - is centuries old. The Second Circuit - and nearly every other circuit to have considered the question - expressly has permitted the application of the common law principle of *respondeat superior* to hold principals liable for Section 10(b) violations by their agents." *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 450 (S.D.N.Y. 2009). Under Wisconsin law,[5] "[w]hether an actual principal-agent relationship exists usually turns on facts concerning the understanding

---

[5] "The law of the forum state governs where …no party alleges that the law of a different state controls and differs from that of the forum." *In re Parmalat*, 594 F. Supp. 2d at 451 n. 43.

between the alleged principal and agent. The relationship exists 'only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act.'" *State v. Timblin,* 259 Wis.2d 299, 312 (Wis. App. 2002); *Noll v. Dimiceli's, Inc.*, 115 Wis.2d 641, 643 (Wis. App. 1983) ("the determination of whether a principal-agent relationship exists is a question of fact for the trier-of-fact.") Here, MGIC manifested its intent that Williams and Draghi act as its agent when MGIC's CEO, Culver, brought Williams and Lauer to MGIC's 1Q07 and 2Q07 earnings conference calls to speak to MGIC's investors about the status of C-BASS. ¶¶170, 179.

Third, Williams and Draghi had apparent authority to bind MGIC. "[T]he doctrines of respondeat superior and apparent authority remain applicable to suits for securities fraud." *Tellabs II*, 513 F.3d at 708. "The doctrine of apparent authority binds a principal to the acts of another who reasonably appears to a third person to be authorized to act as the principal's agent, because of acts of the principal or agent, if the principal had knowledge of the acts and acquiesced to them." *Custom Steel, Inc. v. John Wanta Builders, Inc.*, 779 N.W.2d 724, *1 (Wis. App. 2009) (citing *Pamperin v. Trinity Mem'l Hosp.,* 144 Wis.2d 188, 203, 423 N.W.2d 848 (1988)). Largely for the same reasons that they had actual authority, Williams and Draghi had apparent authority. Reasonable investors and analysts at MGIC's earnings calls would have perceived Williams and Draghi as having authority to speak on MGIC's behalf about C-BASS.

C. MGIC's July 19, 2007 Press Release

In its July 19, 2007 press release, MGIC stated "C-BASS maintains substantial liquidity to cover margin calls in the event of substantial declines in the value of its mortgages and securities." This statement was a "half-truth" because by discussing C-BASS's liquidity, MGIC incurred a duty to speak the whole truth about the subject. *Ackerman v. Schwartz*, 947 F.2d 841,

6

846 (7th Cir. 1991) ("Federal law requires persons to tell the truth about material facts once they commence speaking"). But MGIC failed to inform investors that, during the first eighteen days of July, C-BASS had paid $145 million in margin calls, eroding its liquidity position to the point where it had to seek an emergency $100 million in loans on July 17, 2007 from MGIC and Radian to support its liquidity position. ¶102. This omission rendered MGIC's representation materially misleading because by stating that C-BASS maintained "substantial liquidity" without disclosing the significant deterioration in C-BASS's liquidity position, MGIC's misled investors into believing that this deterioration was not occurring. *See Billhofer v. Flamel Tech., SA*, 663 F.Supp.2d 288, 298 (S.D.N.Y. 2009) (defendant's "omission of any contrary statements *does* necessarily imply an opposite conclusion: that [defendant] *and* its partner [] were not in possession of material information . . . that would detract from the 'success' of [defendant's product]"). The deterioration in C-BASS's liquidity position was material because it indicated that C-BASS was being significantly damaged by the subprime crisis and that its liquidity position had already reached critical conditions. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("*Tellabs I*") ("materiality exists when 'there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information'") *(overruled on other grounds)*. C-BASS's ability to maintain liquidity to cover margin calls was critical to understanding its health as a business and was closely tracked by the market because if C-BASS did not have funds sufficient to cover margin calls, it would have to sell its portfolio at distressed prices to raise cash, which could quickly put it out of business. See ¶102 (describing analyst observation that if C-BASS had to sell assets to cover margin calls, it would "obviously pose[] a big risk."). Thus, MGIC misled investors into believing that a critical measure of C-BASS's business, liquidity,

7

was far healthier than was actually the case.[6]

D. MGIC's SEC Form 10-Q for 1Q07

MGIC's SEC Form 10-Q for 1Q07, dated May 10, 2007, stated that the total equity in C-BASS was $912 million, of which 46 percent belonged to MGIC. *See* ¶90. This statement was false because in the first quarter of 2007, C-BASS had suffered approximately $1.035 billion in unacknowledged losses, which required MGIC to write down the value of its equity interest in C-BASS under generally accepted accounting principles ("GAAP"). The basis for MGIC's alleged loss is as follows:

- On July 31, 2007, C-BASS described how a certain percentage decline in the value of C-BASS's portfolio corresponded with a certain volume of margin calls, stating "[d]uring the first 24 days of July alone, C-BASS met an additional $260 million of margin calls, representing greater than a 20% decline in the lender's value." ¶196.

- Since margin calls totaling $260 million represented "greater than a 20% decline in the lender's value," the $200 million in margin calls received in 1Q07 showed that, according to its lenders, C-BASS's portfolio had declined by approximately 15 percent.

- C-BASS's portfolio was $6.9 billion in 1Q07, so a 15 percent decline in value was approximately $1.035 billion. ¶¶171, 196.

Because C-BASS purported to value its portfolio for financial statement purposes "based on, among other things, valuations provided by financing counterparties," the fact that C-BASS's lenders determined that C-BASS's portfolio had dropped by $1.035 billion meant that, by its own terms, C-BASS suffered this loss and it should have been counted against C-BASS's

---

[6] In its February 18, 2010 Order dismissing Plaintiff's claims, the Court relied in part on a finding that Defendants "made truthful statements regarding the amount of cash that remained available." (*See* Doc. No. 74 at 32). The Amended Complaint clarifies that Defendants did not make truthful statements about C-BASS's cash resources, because Draghi misleadingly stated that C-BASS had $150 million in cash resources without disclosing that $100 million of those resources were emergency loans injected into C-BASS on July 17, 2007 to support its liquidity position. ¶102. Draghi's false statement underscores the misleading nature of MGIC's statement regarding C-BASS's "substantial liquidity." In both statements, Defendants attempted to create a false impression of C-BASS's continued strength by hiding the severe deterioration in C-BASS's liquidity from the market.

8

earnings. *See* Chester Decl., Ex. 2 at 39, 79 (describing C-BASS's reliance on valuations provided by financing counterparties). Thus, as CW9 confirmed, C-BASS was "valuing the portfolio higher than it was." ¶158.[7]

The failure to writedown the value of MGIC's investment in the face of this massive $1.035 billion loss violated APB 18(h), which states that "[a] loss in value of an investment which is other than a temporary decline should be recognized" and that "[a] current fair value of an investment that is less than its carrying amount may indicate a loss in value of the investment." *See* MGIC Opp. at 6. Here, the fair value of C-BASS declined $1.035 billion, which indicates a loss that is other than temporary and should be recognized under APB 18(h). The fact that the loss was other than temporary is further supported by the size of the decline, which rivaled C-BASS's total equity, and by the fact that the decline occurred during an ongoing subprime crisis, which made a quick rebound in value unlikely. In the light most favorable to Plaintiff, these allegations show that MGIC violated GAAP by failing to recognize a large, other than temporary loss. Accordingly, these allegations sufficiently plead the 1Q07 10-Q's falsity. "'[I]t is a factual question whether [a company's] accounting practices were consistent with GAAP,' and thus, we cannot determine this issue on a motion to dismiss.'" *In re RAIT Fin. Trust Sec. Litig.*, No. 07-3148, 2008 WL 5378164, at *7 (E.D.Pa. Dec. 22, 2008) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997)); *In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08-411, 2010 WL 727227, at *25 (S.D.N.Y. Feb. 22, 2010) ("The

---

[7] The Court should reject the MGIC Defendants' quixotic argument that C-BASS's margin calls did not "necessarily say anything about 'fair value' of the underlying collateral." *See* MGIC Opp. at 12-14. C-BASS admitted that the margin calls "represent[ed]" a determination by its lenders that C-BASS's portfolio had lost value and MGIC's own public statements represented that C-BASS relied on the "valuations provided by financing counterparties" to value its portfolio. Contrary to the MGIC Defendants' strained characterizations, the confidential witnesses quoted by the MGIC Defendants further evidence the fact that the margin calls reflected value determinations by C-BASS's lenders. *See* MGIC Opp. at 13.

9

parties' disagreements over GAAP compliance also raise issues of fact that cannot be resolved on a motion to dismiss.").

Because the Amended Complaint points to specific facts demonstrating that MGIC's accounting treatment for C-BASS was an "extreme departure from the range of reasonable treatments under GAAP," this case is distinguishable from *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 614 (E.D. Pa. 2009). In the *Radian* case, plaintiffs alleged that Radian's investment in C-BASS was impaired but failed to explain the reasons why that was so. *See Radian*, 612 F. Supp. 2d at 614 ("apart from the plaintiffs' bald assertions that the value of Radian's investment in C-BASS was impaired at an earlier date, and that a write-down should have been made no later than March 31, 2007, the CCAC fails to allege any such impairment with sufficient particularity."). By contrast, relying on Defendants' own admissions and the statements of confidential witnesses, the Amended Complaint alleges particularized facts showing that C-BASS had suffered $1.035 billion in losses in 1Q07 that were not appropriately recognized by MGIC.[8] Notably, the plaintiffs in *Radian* were given leave to file an amended complaint and their action is currently ongoing. *See, e.g.*, Corrected Consolidated Amended Class Action Complaint, filed on January 11, 2010, in *In re Radian Sec. Litig.*, No. 07-3375 (E.D. Pa.).

> E. <u>Defendants Hid the Fact That the Value of C-BASS's Portfolio Was Plummeting and the Fact That C-BASS Received $145 Million in Margin Calls in the First Eighteen Days of July 2007</u>

---

[8] For the same reasons two other decisions discussed by the MGIC Defendants, *In re Allied Capital Corp. Sec. Litig.*, No. 02-3812, 2003 WL 1964184 (S.D.N.Y. April 25, 2003) and *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, No. 08-8143, 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) are distinguishable. In *Allied*, plaintiff provided "no basis on which to infer that [the company's] valuation of its investments was in fact incorrect or inflated." *Allied*, 2003 WL 1964184, at *4. Similarly, in *Canadian Imperial*, the "Complaint [was] bereft of factual allegations from which a reader could infer Defendants intentionally or recklessly failed to take write-downs." *Canadian Imperial*, 2010 WL 961596, at *12. These decisions are inapt here because Plaintiff has pled with particularity the existence of large losses that were apparent to Defendants and should have been recognized.

Defendants hid the fact that C-BASS's portfolio was plummeting in value by, *inter alia*, failing to disclose those facts and by making rosy statements about C-BASS's profitability and liquidity that were inconsistent with the massive portfolio losses and severe liquidity deterioration that were actually occurring. (*See* Doc. No. 88 (Plaintiff's Reply to the C-BASS Defendants) at 10-11.)

On a related point, the MGIC Defendants argue that Williams told the market that C-BASS valued its portfolio using "cash flow models" rather than "in accordance with market prices." *See* MGIC Opp. at 25-26. But this argument is flatly contradicted by Defendants' own statements and, indeed, by the MGIC Defendants' opposition brief. As the MGIC Defendants admit, "C-BASS carried its mortgages and securities at 'fair value.'" *See* MGIC Opp. at 5. FAS 157 ¶5 states that "fair value" means "the price that would be received to sell an asset . . . in an orderly transaction between market participants at the measurement date." *See id.* at 4. Thus, fair value essentially means market pricing. *See id.* at 5 (quoting the statement in MGIC's SEC Form 10-K that "Changes in fair value between period ends (a 'mark-to-market') are reflected in C-BASS's statement of operations as unrealized gains or losses."). Moreover, C-BASS determined fair value "based on, among other things, valuations provided by financing counterparties." *See id.* at 5 (quoting MGIC's SEC Form 10-K).

By contrast, a cash flow model does not value securities based on an estimation of their market price. Rather, a cash flow model values a security based on the value of the expected cash that a security will generate over time. *See id.* at 25-26. The distinction between the two valuation methods is particularly significant when, as occurred during 2007, the market value of securities is declining rapidly such that the "fair value" method would result in valuations that are significantly lower than a cash flow model method.

## II. The Amended Complaint Pleads a Strong Inference of Scienter

### A. Culver

Throughout the relevant period, Culver knew the truth about C-BASS's collapsing business model or was reckless in not knowing.

A strong inference of fraud may arise where defendants "had access to information suggesting that their public statements were not accurate" or where defendants "failed to check information they had a duty to monitor." *See South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009). "A plaintiff may satisfy the heightened requirements for falsity and scienter and thus, raise a strong inference of fraud, by pointing to specific facts indicating that (1) the defendants' statements were false or misleading at the time they were made, and (2) the defendants either actually knew they were false or misleading, or 'egregiously refused to see the obvious, or to investigate the doubtful.'" *In re Shopko Sec. Litig.*, No. 01-1034, 2002 WL 32003318, at *6 (E.D. Wis. Nov. 5, 2002). Here, Culver admitted on April 11, 2007, that he was aware of the possibility that C-BASS was severely damaged by the subprime crisis, stating that he felt it appropriate for Williams to join MGIC's earnings conference call because "[w]e've had so many inquiries this quarter regarding C-BASS and the turmoil in the subprime markets." ¶170. Thus, Culver had reason to doubt Williams' representations at MGIC's 1Q07 earnings conference call that C-BASS only had to mark down its portfolio by 1.5 percent despite the fact that the general subprime market had decline by 30 percent and the fact that C-BASS had received $200 million in margin calls.

Furthermore, the $100 million emergency loan that MGIC and Radian extended to C-BASS on July 17, 2007 put Culver on notice of the rapid deterioration in C-BASS's liquidity and portfolio value. ¶102. Because he was CEO of MGIC, it can be inferred that Culver knew that

12

MGIC was going to extend $50 million in unsecured debt to C-BASS. *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (holding that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance'"). As a Radian officer revealed on July 25, 2007, the loans were made to "support" C-BASS's liquidity position. ¶102. In the midst of a subprime crisis, the fact that C-BASS, whose business was investing in subprime assets, needed $100 million in unsecured loans to support its liquidity position was a red flag that C-BASS was in critical condition and gave Culver reason to doubt Draghi's rosy prediction that C-BASS would earn a profit of $125 million to $175 million for 2007. In addition, the fact Culver knew about MGIC's loan shows that he knew that Draghi's statement that C-BASS had $150 million in cash resources was materially misleading in that it omitted reference to the contribution played by the $100 million loan and the fact that margin calls were quickly eroding C-BASS's liquidity.

Moreover, Culver had open access to C-BASS's financial information, which would have allowed him to investigate Williams' representations before they were made.[9] CW6 confirms that C-BASS made its financial information available to MGIC through quarterly and monthly earnings reports, executive management calls that occurred twice a month and presentations to C-BASS's Board, which Lauer attended. ¶¶136-37. Accordingly, Culver's failure to "investigate the doubtful" raises a strong inference of scienter. Indeed, given that Culver brought Williams and Draghi on MGIC's earnings calls and listened as they made detailed, positive, statements about C-BASS, "the possibility that [Culver] was ignorant is not necessarily exculpatory." *See Institutional Investors Group v. Avaya, Inc.,* 564 F.3d 242, 270 (3d Cir. 2009); *Tellabs II*, 513 F.3d at 704 ("When the facts known to a person place him on notice of a risk, he

---

[9] It can be inferred from the fact that Williams spoke at MGIC's earnings conference call that MGIC reviewed Williams' prepared statement before it was made at the 1Q07 earnings call.

cannot ignore the facts and plead ignorance of the risk.").

B.  Lauer

Like Culver, Lauer's position at MGIC supports an inference that he knew about MGIC's $50 million loan to C-BASS. *In re Sears*, 291 F. Supp. 2d at 727. Therefore, Lauer knew on July 19, 2007 that C-BASS's liquidity had severely deteriorated and that it had suffered huge portfolio losses such that Defendants' sunny statements to the contrary were false. Similarly, as a member of C-BASS's Board and a top official at MGIC, it can be inferred that Lauer was aware by April 11, 2007 that C-BASS had suffered serious portfolio losses that rendered Defendants' statements false. ¶25; *Selbst v. McDonald's Corp.,* Nos. 04-2422, 04-3635 and 04-3661, 2005 WL 2319936, at *20 (N.D. Ill. Sept. 21, 2005) (holding that "'high-level [] managers . . . may be presumed to have been aware of [] problems' at their company").

C.  MGIC

MGIC's scienter flows from the knowledge of its agents. *Tellabs II*, 513 F.3d at 708 (instructing that corporate liability is based on the state of mind of the individual corporate agent who made or issued the statement.) In this case, Williams, Draghi, Culver and Lauer made their statements with scienter for the reasons set forth in the Amended Complaint and in Plaintiff's papers. MGIC had scienter with regard to its press release statement that C-BASS maintains "substantial liquidity" because there is a strong inference that the statement would have to be approved by Culver or Lauer, who had scienter. *Id.* at 710.

III.  **Plaintiff Has Stated a Section 20(a) Claim**

The MGIC Defendants half-heartedly challenge Plaintiff's Section 20(a) "control person" claims against them on the ground that the Amended Complaint insufficiently alleges "control." *See* MGIC Opp. at 30. But the MGIC Defendants do not disturb Plaintiff's factual allegations.

The Seventh Circuit has held that Section 20(a) is "remedial" and "to be construed liberally," and "requiring only some indirect means of discipline or influence short of actual direction to hold a 'control person' liable." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992). "Moreover, control person determination is a factual question not ordinarily subject to resolution on a motion to dismiss." *In re Williams Sec. Litig.*, 339 F.Supp.2d 1206, 1237 (N.D. Okla. 2003). The Amended Complaint far exceeds these requirements by pointing to MGIC's 46 percent ownership of C-BASS (¶2), oversight of C-BASS (¶¶25, 136-37), and actual control over Williams and Draghi as demonstrated by their appearance at MGIC's earnings calls (¶24). Contrary to the MGIC Defendants' assertions, MGIC's 46 percent ownership of C-BASS was "substantial" and supports an inference of control. *See Sloane Overseas Fund, Ltd. v. Sapiens Intern. Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) (noting that a court may infer control from "substantial stock ownership"). The MGIC Defendants' own admission in their opposition brief that MGIC used the "equity method of accounting" described in APB 18 confirms this point because "[t]his method of accounting is based on the presumption that, absent facts to the contrary, a shareholder who owns 20 percent or more of an issuer's securities has the ability to control or exercise significant influence over the issuer." *See Kirsch Co. v. Bliss and Laughlin Ind., Inc.*, 495 F. Supp. 488, 495 (W.D. Mich. 1980) (citing to APB 18); *see also* MGIC Opp. at 6.

## IV. Conclusion

For the foregoing reasons, the Amended Complaint adequately pleads securities fraud violations against the MGIC Defendants. Accordingly, amendment would not be futile and the Court should grant Plaintiff's motion to file an amended pleading.

Dated: April 29, 2010

Respectfully submitted,

SCOTT+SCOTT LLP

/s/ Beth Kaswan
Beth Kaswan
Thomas Laughlin
500 Fifth Avenue, 40th Floor
New York, NY 10110
Tel: 212/223-6444
Fax: 212/223-6334
Email: bkaswan@scott-scott.com
tlaughlin@scott-scott.com

SCOTT+SCOTT LLP
Arthur L. Shingler III
600 B Street, Suite 1500
San Diego, CA 92101
Tel: 619/233-4565
Fax: 619/233-0508
Email: ashingler@scott-scott.com
 -and-
Geoffrey M. Johnson
12434 Cedar Road
Cleveland Heights, OH 44106
Tel: 216/229-6088
Fax: 216/229-6092
Email: gjohnson@scott-scott.com

PREVIANT, GOLDBERG, UELMEN,
GRATZ, MILLER & BRUEGGEMAN, S.C.
Jason R. Oldenburg
1555 North RiverCenter Drive, Suite 202
P.O. Box 12993
Milwaukee, WI 53212
Telephone: 414-271-4500 or 800-841-5232
Facsimile: 414-271-6308

*Attorneys for Plaintiff Fulton County Employees' Retirement System*