# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**FULTON COUNTY EMPLOYEES'
RETIREMENT SYSTEM, individually
and on behalf of all others similarly situated,**

        **Plaintiff,**

    **v.**                                **Case No. 08-C-0458**

**MGIC INVESTMENT CORPORATION, et al.,**

        **Defendants.**

---

## DECISION AND ORDER

In this consolidated class action, lead plaintiff Fulton County Employees' Retirement System alleges that defendants MGIC Investment Corporation ("MGIC"), Curt S. Culver, J. Michael Lauer, Bruce Williams and John Draghi committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.[1]  Plaintiff is an institutional investor that brings this action on behalf of itself and other investors who purchased MGIC common stock between February 6, 2007 and August 13, 2007.  On February 18, 2010, I granted defendants' motions to dismiss the consolidated class action complaint for failure to satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1) & (2).  In the order granting the motion to dismiss, however, I instructed plaintiff that if it believed that the complaint's defects could be cured, it could file a motion to amend the complaint.  Plaintiff has filed such a motion, which

---

[1]In the original consolidated class action complaint, plaintiff also named Larry Pierzchalski as a defendant.  However, plaintiff has dropped the claims involving Pierzchalski.

defendants oppose on the ground that the amendment would be futile because the amended complaint does not satisfy the PSLRA's pleading requirements. I thus consider whether the proposed amended complaint would survive a motion to dismiss based on the PSLRA.

## I. BACKGROUND

This case involves two different, but affiliated, companies – MGIC and Credit-Based Asset Servicing and Securitization ("C-BASS") – both of which suffered severe losses as a result of the subprime mortgage crisis. MGIC, through its principal subsidiary, is an insurer of residential home mortgages. MGIC also owned a 46% interest in C-BASS, a privately held joint venture of MGIC and another mortgage insurer, Radian Group Inc. ("Radian"). Like MGIC, Radian owned a 46% interest in C-BASS. C-BASS specialized in purchasing subprime single-family residential mortgages and packaging them into mortgage-backed securities. In 2006, C-BASS was responsible for 24% of MGIC's profits, and thus events relating to C-BASS had an impact MGIC's stock price.

In the original complaint, plaintiff alleged that, as the subprime crisis began to unfold, defendants made false and misleading statements and omissions designed to mask the true impact of the crisis on MGIC and C-BASS. I divided the statements and omissions into three categories – those relating to MGIC's underwriting practices, those relating to mortgages that MGIC insured during 2005 and 2006, and those concerning C-BASS. In the amended complaint, plaintiff drops the claims based on MGIC's underwriting and its 2005-06 insurance and focuses exclusively on the statements and omissions concerning C-BASS.

2

As noted, C-BASS was in the subprime residential mortgage business. At the beginning of 2007, it had $8.8 billion in assets, $4.6 billion of which were subprime mortgages and $2.4 billion of which were "extremely low grade" mortgage-backed securities. (Am. Compl. ¶ 38.) C-BASS had financed the acquisition of these assets, and as of the beginning of 2007, it carried $6.14 billion in debt on its balance sheet. C-BASS's portfolio of subprime mortgages and mortgage-backed securities served as collateral for this debt. If in the lender's view the value of the collateral dropped, the lender had the right to make "margin calls" on C-BASS – i.e., demands that C-BASS post additional cash as collateral to make up for the decline in value of the collateral.

By the beginning of 2007, instability in the subprime industry had called the value of C-BASS's subprime assets into question. Plaintiff alleges that defendants knew during the first half of 2007 that the value of C-BASS's assets had declined significantly but decided to engage in a fraudulent scheme designed to mislead the market into thinking that C-BASS was faring better than it was. As part of this scheme, defendants refused to write down the value of C-BASS's assets during the first half of 2007. This caused C-BASS and MGIC to overstate their earnings for the first and second quarters of 2007. A second component of this scheme was to hide from investors the fact that lenders had been making large margin calls on C-BASS, thereby putting C-BASS's liquidity in jeopardy. Under plaintiff's theory, defendants also misled the market when they represented on July 19, 2007, that C-BASS expected to earn between $125 million and $175 million in 2007.

According to plaintiff, both the MGIC and C-BASS defendants were highly motivated to engage in this fraudulent scheme about C-BASS because of its importance to a proposed merger between MGIC and Radian. This merger was announced on February

6, 2007, and was expected to close in the fourth quarter of 2007. To prepare for the merger, both MGIC and Radian planned to sell large shares of their interests in C-BASS to private investors. The reason for this was that if the post-merger entity continued to own almost all of C-BASS, the combined entity would have been required to carry C-BASS's assets and liabilities on its balance sheet, which would have threatened the combined entity's credit rating. Plaintiff's theory is that defendants intended to mislead the market about C-BASS's condition long enough to secure a buyer for C-BASS and ensure that the merger between MGIC and Radian would be completed.

At the end of July and the beginning of August 2007, C-BASS collapsed. As described in more detail below, C-BASS's lenders made hundreds of millions of dollars in margin calls, which C-BASS was unable to pay. This eventually led MGIC to decide that its entire investment in C-BASS (about $516 million) had been materially impaired. Ultimately, because of the problems that developed at C-BASS, MGIC and Radian abandoned their merger plans. All of this is alleged to have impacted MGIC's stock price.

## II. DISCUSSION

As it did in the original complaint, plaintiff in its proposed amended complaint alleges two theories of liability: (1) securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5 against MGIC and the individual defendants, and (2) control person liability under Section 20(a) of the Securities Exchange Act against the individual defendants. Both the MGIC defendants (MGIC, Culver and Lauer) and the C-BASS defendants (Williams and Draghi) argue that granting leave to amend would be futile

because the proposed amended complaint does not satisfy the heightened pleading requirements of the PSLRA.

**A.      Pleading Standards for Section 10(b) Claims**

Section 10(b) of the Securities Exchange Act forbids the use or employment of any deceptive device in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b). Rule 10b-5 forbids the making of any "untrue statement of a material fact" or the omission of any material fact needed to make the statements not misleading. 17 C.F.R. § 240.10b-5. To satisfactorily plead a violation of Section 10(b) and Rule 10b-5, a plaintiff must allege facts indicating that (1) defendants made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which plaintiff justifiably relied and (6) the false statement or omission proximately caused the plaintiff's damages. Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 595 (7th Cir. 2006) (Makor I), vacated and remanded on other grounds, 551 U.S. 308 (2007).

To plead a false statement of material fact, a plaintiff must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." Id. (citing 15 U.S.C. § 78u-4(b)(1)). The facts alleged must be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." Id. (internal quotation marks omitted).

A statement is material if it is likely that a reasonable purchaser or seller of a security (1) would consider it important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered

by the statement. Id. at 596. However, mere puffery is not actionable under Rule 10b-5. "If the statement amounts to vague aspiration or unspecific puffery, it is not material." Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir. 1997).

Scienter involves a "mental state embracing an intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). Misstatements or omissions made recklessly are also made with scienter. To plead scienter, a complaint must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In determining whether plaintiff's allegations are adequate to give rise to a strong inference of scienter, I accept the allegations as true and consider the complaint in its entirety as well as other sources that I would ordinarily review, such as documents attached to the complaint or those subject to judicial notice. Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). I then ask whether the allegations taken collectively establish a "strong inference of scienter." Id. at 323. In doing so, I weigh plausible nonculpable inferences against inferences favoring plaintiffs' claim. Id. at 323-24. The inference favoring plaintiff's claim "need not be irrefutable, . . . of the 'smoking-gun' genre, or even the most plausible of competing inferences." Id. at 324. Rather, plaintiff's complaint survives if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." Id.

**B.    Plaintiff's Allegations**

The alleged false and misleading statements and omissions can be grouped into two categories: (1) statements concerning the value of C-BASS's portfolio of subprime

mortgages and mortgage-backed securities; and (2) statements and omissions concerning C-BASS's liquidity. Plaintiff alleges that defendants made these statements and omissions on two occasions – at MGIC's first-quarter earnings conference call, which occurred on April 11, 2007, and at MGIC's second-quarter earnings conference call, which occurred on July 19, 2007.

During the April conference call regarding MGIC's first-quarter 2007 results, MGIC noted that one of the major reasons for its disappointing results was the performance of C-BASS. In light of this fact, MGIC asked Bruce Williams (the CEO of C-BASS) to join the call. Williams began by stating that the first quarter had been a negative one for subprime participants. He listed a number of "liquidity issues" that all subprime participants had experienced, including "increased margin calls from all lenders." (Chester Decl. [Docket #62] Ex. 12 at 4.) Although Williams then pointed to some positive results for C-BASS in the quarter and attributed these positives to "the strength of [the C-BASS] franchise," he admitted that C-BASS had not been "immune" to the events occurring in the subprime market and indicated that the market changes had negatively impacted C-BASS's first-quarter results and its forecast for the remainder of the year. (Id.) Williams stated that C-BASS was reporting a loss of $15 million for the quarter and contrasted the loss to the $60 million in profits that it had expected. Williams reported that this loss was due mostly to write-offs taken by C-BASS that amounted to $100 million. (Id. at 4-5.) Williams also stated that C-BASS had paid $200 million in margin calls during the quarter and that it ended the quarter with $200 million in cash resources. He added that C-BASS expected to return to profitability in the second quarter and that he expected its earnings for the year to be $150 million to $200 million.

Because the situation at C-BASS continued to be of interest to investors, MGIC asked Williams to participate in MGIC's second-quarter conference call, which was held on July 19, 2007. Williams reported that subprime participants continued to face liquidity issues and increased margin calls from lenders, as they did in the first quarter. Williams indicated that C-BASS continued to update its "credit and prepayment models" to ensure that it was "comfortable with the valuation of [its] portfolio." (Chester Decl. [Docket #62] Ex. 14 at 4.) He stated that the book value of C-BASS's assets approximated market value, "assuming orderly transactions that are not distressed sales or liquidations." (Id.) He stated that C-BASS estimated the value of its assets by using "a three way comparison of observed market prices, financing marks from our lenders and our internal calculations during our ongoing securities review." (Id.)

After Williams spoke, John Draghi, C-BASS's Chief Operating Officer, stated that C-BASS was reporting a pretax profit of approximately $50 million for the second quarter and that it expected pretax earnings for the year to be between $125 million and $175 million. Draghi then stated that as of "today" – July 19, 2007 – C-BASS had $150 million in cash resources remaining. He added that C-BASS planned to "remain conservative with [its] cash through the rest of the year, adjusting as needed to reflect market dynamics." (Chester Decl. [Docket #62] Ex. 14 at 4.) Draghi did not mention the amount of margin calls that C-BASS paid in the second quarter, but from C-BASS's later filings it appears that it paid $90 million. Between July 1 and July 18, 2007, however, C-BASS received and paid $145 million in margin calls. No one on the second-quarter conference call mentioned this fact. Moreover, no one mentioned that, two days before the call, MGIC and Radian had set up a $100 million line of credit for C-BASS.

In the days following the conference call, C-BASS was flooded with additional margin calls. Between July 19, 2007 and July 26, 2007, C-BASS paid $140 million in margin calls. Between July 26, 2007 and August 1, 2007 – that is, in less than one week – C-BASS received an additional $330 million in margin calls. On July 26, 2007, MGIC determined that in light of these margin calls, MGIC was required under applicable accounting standards to recognize that nearly its entire investment in C-BASS (approximately $516 million) was impaired. On July 30th and 31st, respectively, MGIC and C-BASS issued press releases announcing the unprecedented margin calls. On August 1, 2007, MGIC filed a Form 8-K with the Securities and Exchange Commission reporting that its investment in C-BASS was materially impaired. Ultimately, C-BASS wrote down the value of its assets by $1.75 billion.

### 1. Statements Concerning the Value of C-BASS's Assets

Plaintiff contends that defendants knew during the first half of 2007 that the value of C-BASS's assets had declined significantly and that they knowingly failed to write down the value of these assets in accordance with applicable principles of financial accounting. The failure to take these write downs, alleges plaintiff, caused C-BASS to knowingly overstate its actual quarterly earnings and expected earnings for the year. Plaintiff also alleges that MGIC knew that the value of C-BASS's assets had declined significantly, such that MGIC should have recognized that its investment in C-BASS had been impaired by the end of the first quarter of 2007, rather than on August 1, 2007, when MGIC actually reported an impairment.

I start by examining whether the complaint adequately alleges that C-BASS made false statements about the value of its portfolio, which consisted of, among other things, unsecuritized subprime mortgage loans and mortgage-backed securities. (Am. Compl. ¶ 90.) To adequately plead that the relevant statements were false, plaintiff must plead facts giving rise to a "reasonable belief" that they were false. Makor I, 437 F.3d at 595. As applied to the statements about the value of C-BASS's assets, this means pleading facts showing that the assets were not valued properly for financial accounting purposes. However, as the Supreme Court has recognized: "Financial accounting is not a science. It addresses many questions as to which the answers are uncertain and is a process [that] involves continuous judgments and estimates." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 100 (1995) (quoting R. Kay & D. Searfoss, Handbook of Accounting and Auditing, ch. 5, pp. 7-8 (2d ed. 1989)). Thus, financial accounting principles often do not "ensure identical accounting treatment of identical transactions." Thor Power Tool Co. v. Comm'r, 439 U.S. 522, 544 (1979). Rather, these principles "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." Id. Accordingly, it is important to recognize that there was no single value that could have been applied to C-BASS's portfolio and deemed the "true value" of the portfolio during the first half of 2007. Instead, there was a range of reasonable valuations, and statements that reported the value of the portfolio could have been false only if the reported value was not within the range. To adequately plead that C-BASS made false statements about the value of its portfolio, then, plaintiff must plead facts giving rise to a reasonable belief that the reported valuations were outside the range. This, in turn, requires plaintiff to (1) identify the

accounting principles that govern the valuation of C-BASS's assets and (2) plead facts giving rise to a reasonable belief that C-BASS did not properly apply such principles.

Regarding the first of these requirements, plaintiff pleads that C-BASS represented that its assets were reported at fair value, and that therefore C-BASS was required to follow the generally accepted accounting principles ("GAAP") concerning fair value. (Am. Compl. ¶ 172(a).) Fair value is an extremely technical accounting concept. See Accounting for Certain Investments in Debt and Equity Securities, Statement of Fin. Accounting Standards No. 115 ( Fin. Accounting Standards Bd. 1993); Fair Value Measurements, Statement of Fin. Accounting Standards No. 157, ¶¶ 22-31 (Fin. Accounting Standards Bd. 2006).[2] Although a comprehensive discussion of the concept of fair value is beyond the scope of this opinion, the basic idea is that, to value an asset, one must determine "the price that would be received to sell an asset . . . in an orderly transaction between market participants at the measurement date." FAS 157, ¶ 5. For certain assets – such as those traded on a regular basis in an active market – identifying this price may be easy, in that one can simply use the market price as of the measurement date. For other assets, however, identifying fair value is extremely difficult, in that it involves the consideration of various valuation techniques and a hierarchy of "inputs." See FAS 157 ¶¶ 18-31. During the first half of 2007, subprime assets such as those in C-BASS's portfolio almost certainly fell on the extremely difficult end of the spectrum, due to

_____

[2]Statements of financial accounting standards are promulgated by the Financial Accounting Standards Board ("FASB") and are considered part of GAAP. See United States v. Arthur Young & Co., 465 U.S. 805, 811 n.7 (1984). I will cite them as "FAS __." As of the date of this opinion, these standards were easily retrievable online through use of a search engine.

the limited number of observable transactions involving such assets.  See Christian Laux Christian Leuz, Did Fair-Value Accounting Contribute to the Financial Crisis?, 24 Journal of Economic Perspectives 93, 100 (2010) (explaining that during 2007 "[t]here was vast uncertainty over how [mortgage-backed] securities should be valued"); Stephen G. Ryan, Accounting in and for the Subprime Crisis, 83 The Accounting Review 1605, 1623-28 (2008) (describing "significant practical difficulties" associated with valuing subprime assets during subprime crisis); Tim Krumwiede et al., Mortgage-Backed Securities & Fair-Value Accounting, The CPA Journal, May 2008, at 30, 30 (stating that proper implementation of GAAP fair-value principles requires exercise of professional judgment, and that such judgment "is being put to the test in the measurement of fair value for mortgage-backed securities").

Because determining the fair value of the kinds of assets in C-BASS's portfolio involves technical concepts, the complaint must contain enough background about these concepts to enable the reader to conclude that the facts pleaded constitute evidence that the defendants misapplied them.  That is, it is not enough for a complaint to list facts about the value of an asset and then simply assert that the listed facts suggest that the asset was not reported at fair value.  Instead, the complaint must explain why the listed facts raise red flags about the defendants' compliance with GAAP.  This means showing that, assuming the pleaded facts are true, it is reasonably likely that the values that the defendants reported are outside the range of reasonable values under GAAP.  Plaintiff must take the

pleaded facts, run them through the fair-value machinery, and show that one could not reasonably come up with the values that the defendants reported.[3]

According to plaintiff, three facts raise red flags about the defendants' valuation techniques. The first is the performance of the ABX index – an index that tracked a basket of twenty subprime mortgage-backed securities – which declined significantly over the first half of 2007. The second is the fact that C-BASS received hundreds of millions of dollars in margin calls during the first half of 2007. The third is a group of statements that plaintiff collected from various confidential witnesses, all of whom were employed by C-BASS during the relevant time. These statements vary, but their general theme is that things were not particularly good at C-BASS during the first half of 2007 as compared to earlier periods.

Having identified the relevant facts, I now ask whether they point to an accounting violation. Plaintiff says that they do because C-BASS employed a three-pronged valuation technique in which it considered (1) observed market prices, (2) valuations provided by C-BASS's lenders, and (3) C-BASS's own internal calculations. (See Chester Decl. [Docket #62] Ex. 14 at 4.) Plaintiff argues that the ABX index shows that observed market prices were dropping, that the margin calls suggested that valuations provided by C-BASS's lenders were dropping, and that the confidential witnesses indicate that C-BASS's own

---

[3]A plaintiff might consider including a statement from an expert witness in the complaint. The witness could opine that, in light of the pleaded facts, it is highly unlikely that the defendants would have arrived at the reported values had they been properly applying fair-value principles. The court would have to accept such an allegation as true, unless the complaint pleads facts undermining the opinion. This is not to say that expert allegations are required at the pleading stage, but the reality may be that unless such allegations are included in the complaint the court will have no way to determine whether the pleaded facts give rise to a reasonable belief that the defendants violated GAAP.

internal calculations were negative.  I assume for the moment that all of this is true.  The problem is that none of it tells me anything about whether the values that C-BASS reported were justifiable.  Recall that during the first half of 2007 C-BASS wrote down the value of its assets by $100 million.  Thus, the relevant question is not whether C-BASS's assets declined in value, but by how much.  That three inputs into C-BASS's fair-value determination pointed downward does not tell me anything about the magnitude of the write-offs C-BASS should have taken.  To get a sense of the magnitude, plaintiff would have to show that it was highly unlikely that C-BASS could apply fair-value principles in good faith and come up with only $100 million in write-offs in the face of, for example, a 35% decline in the ABX index or $200 million in margin calls.

Plaintiff does make some effort to show that the ABX index and margin calls translated into bigger losses than C-BASS took, but these efforts do not create a reasonable belief that defendants made false statements.  Regarding the ABX index, plaintiff alleges that it was a "benchmark" indicating the overall performance of the market for subprime assets.  (Am. Compl. ¶ 183(b).)  Plaintiff then points to statements made by Confidential Witness #6 ("CW6") indicating that, in 2006, she ran "stress scenarios" which showed that if "the market" dropped by 35%, C-BASS would take a "nasty hit to the balance sheet."  (Am. Compl. ¶ 143.)  But what does CW6 mean by a "nasty hit"?  Her characterization of the hit does not enable me to determine whether it was bigger than the $100 million in write-offs that C-BASS took.

Regarding the margin calls, plaintiff performs some calculations designed to show that the amount of margin calls indicates that C-BASS's assets had declined in value by more than C-BASS reported.  (See, e.g., Pl.'s Reply to Williams & Draghi [Docket #88] at

5.)  This calculation is extremely convoluted and relies on a number of assumptions not supported by allegations in the amended complaint.  The key defect in this calculation, however, is that it assumes that there is a one-to-one correspondence between margin calls and the fair value of an asset – i.e., that the fair value of an asset must decline by $1 for every $1 in margin calls relating to that asset.  However, plaintiff has not shown that GAAP requires entities to recognize such a one-to-one correspondence.  To be sure, plaintiff cites statements in MGIC's SEC filings stating that C-BASS valued its assets "based on, among other things, valuations provided by financing counterparties."  See MGIC Form 10-K at 80 (2006).  Plaintiff then implies that this statement establishes that GAAP required C-BASS to write down the value of its assets by $1 for every $1 in margin calls, since margin calls are essentially valuations provided by financing counterparties. But plaintiff ignores the "among other things" part of the statement, which indicates that C-BASS considered other inputs and did not place dispositive weight on the valuations by financing counterparties.

Plaintiff also points to allegations involving Confidential Witness #9 ("CW9").  The amended complaint alleges that CW9 worked at C-BASS during the relevant time and "used models to value C-BASS's [mortgage-backed securities] and assess the risk presented by these [securities]."  (Am. Compl. ¶ 152.)  The complaint alleges that CW9's model valuations showed that "things were not good" and that the value of C-BASS's portfolio was "on the decline" from the third quarter of 2006 through the second quarter of 2007.  (Am. Comp. ¶ 156.)  The complaint then includes the following cryptic allegation: "CW9 further observed that C-BASS was 'valuing the portfolio higher than it was,' and compared the drop in the ABX index in 2007 to what C-BASS was claiming about the value

of its assets during the same period to support his statement." (Am. Compl. ¶ 158.) Plaintiff argues that this statement supports the notion that C-BASS was improperly reporting the value of its assets during the first half of 2007. But the complaint does not indicate that CW9 has any financial accounting expertise or that he is familiar with GAAP and the manner in which the value of subprime assets must be determined for financial reporting purposes. Further, the reference to the ABX index indicates that CW9's opinion about the value of C-BASS's assets was not based on his own model valuations but on his observation that the ABX index had declined over the relevant period. And, as noted above, the complaint does not allege facts explaining the accounting significance of the decline in the ABX index. Thus, the allegations concerning CW9 do little more than show that, in CW9's opinion, C-BASS's assets were overvalued. The complaint fails to include allegations showing that CW9 had competently formed this opinion, or that his understanding of "value" was in any way similar to the accounting concept of fair value.[4]

Accordingly, the amended complaint does not allege facts giving rise to a reasonable belief that defendants made false statements about the value of C-BASS's assets. Because plaintiff's claim that defendants made false statements about C-BASS's expected and actual profits and its claim that MGIC failed to timely recognize that its

---

[4]I add that CW9's statements about what his models showed are too general to be of any use in determining whether the actual reported value of C-BASS's assets was false. He states simply that "things were not good," and that the value of C-BASS's portfolio was "on the decline" during the first half of 2007. (Am. Compl. ¶ 156.) These statements do not suggest that C-BASS's write-offs were too small, since C-BASS's reported write-offs and first-quarter loss were consistent with things not being good and its portfolio declining in value. To show that C-BASS's write-offs were too small, CW9 would have to say something along the lines of "my models showed that C-BASS's assets were worth $10 million on a date when C-BASS reported that those assets were worth $100 million."

investment in C-BASS was impaired depend on the premise that the defendants overvalued C-BASS's assets, it follows that these claims also fail.

### 2. Statements and Omissions Relating to C-BASS's Liquidity

Plaintiff's remaining allegations involve statements that defendants made during MGIC's second-quarter 2007 earnings conference call, held on July 19, 2007. At the start of the call, Williams provided an overview of problems in the subprime market, stating that "[l]iquidity remains a primary issue for subprime market participants as illustrated by [among other things] . . . increased margin calls from all lenders." (Chester Decl. [Docket #62] at 3-4.) Williams then discussed the valuation of C-BASS's assets and in the course of this discussion explained that some of its assets were performing better than the industry average and that rating agencies had not downgraded any of its bonds. Draghi then spoke about C-BASS's second-quarter earnings. He stated that C-BASS was reporting a pretax profit of $50 million for the quarter. He also indicated that, although the market was tight, C-BASS was able to sell a number of its bonds and whole loans at prices that were "within our spread expectations." (Id. at 4.) Draghi then stated that "[w]e have today on the order of $150 million in cash resources." (Id.) He indicated that C-BASS would remain conservative with its cash through the rest of the year, adjusting as needed to reflect market dynamics. He closed by stating that C-BASS expected pretax earnings for the full year to be between $125 million and $175 million, adding: "This assumes, one, our credit portfolio continues to perform within our current expectations. Two, our whole loan purchase volume remains at levels [sic] and three, spreads do not widen significantly from here." (Id.)

Plaintiff argues that the above statements were misleading because no one on the call disclosed two facts: (1) C-BASS received $145 million in margin calls during the first eighteen days of July, and (2) two days before the call, MGIC and Radian each established a $50 million line of credit for C-BASS. Plaintiff contends that by stating that C-BASS had $150 million in cash resources without also mentioning these two facts, defendants gave investors a false sense of security about C-BASS's liquidity position.

In my prior opinion, I determined that the defendants did not paint a misleading picture of C-BASS's liquidity position merely by reporting the amount of cash C-BASS had available without also disclosing the amount of margin calls C-BASS received during the first half of July. (Dec. & Order at 31-32.) I did not consider the allegations relating to the lines of credit in my previous analysis, but these allegations do not change the result.[5] The essential problem with plaintiff's argument is that Draghi's statement about the amount of cash available was simply a true statement of historical fact that did not lead reasonable investors toward any conclusion about whether the amount of cash would be sufficient to cover future margin calls. In other words, it was not – and could not have been reasonably construed as – a positive assessment of C-BASS's liquidity position. Had Draghi followed up his report on the amount of cash available by stating something along the lines of "and we think this should be sufficient to cover any margin calls received during the rest of the

---

[5]Plaintiff deems the omission of the lines of credit misleading because it led investors to infer from defendants' statement that C-BASS had $150 million in cash that C-BASS had paid only $50 million in margin calls since the end of the first quarter, when C-BASS stated that it had $200 million in cash remaining. But investors could have made this inference only if they were under the impression that C-BASS never acquired cash in the course of its business. The amended complaint contains no allegations indicating that investors reasonably thought that this was the case.

year," then Draghi may have incurred a duty to disclose facts contradicting his assessment. But since Draghi did not offer a positive assessment of C-BASS's liquidity, Draghi did not have to immediately disclose the recent margin calls and lines of credit.  To state the point differently, plaintiff's argument assumes that defendants incurred a duty to provide investors with enough information to come up with their own assessment of C-BASS's liquidity position merely by mentioning the amount of cash available.  But the securities laws do not hold that once a company mentions a fact, the company is required to provide the context necessary to determine whether that fact is good or bad.  See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) ("a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact"); cf. Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 514-15 (7th Cir. 1989) (stating that securities laws do not require firms to reveal all data, assumptions and methodologies behind their projections, so that participants in the market can "assess them fully and react appropriately").

Plaintiff counters with the argument that, by making any statements suggesting that C-BASS had a future (such as that it expected $125 million to $175 million in profits for the year), defendants were implicitly saying that C-BASS was not about to experience the crushing wave of margin calls that came in between the date of the call and July 30, 2007, when MGIC recognized that its investment in C-BASS was impaired.  According to plaintiff's argument, defendants were required to disclose facts contradicting their implicit statement that C-BASS was not on the brink of collapse – namely, the receipt of $145 million in margin calls during the prior eighteen days.  A key premise in this argument, however, is that the $145 million in margin calls put C-BASS on the brink of collapse.  But

this premise is false, since C-BASS was able to pay the margin calls with $150 million in cash to spare. Of course, C-BASS's remaining cash proved inadequate to cover the $470 million in margin calls that it received over the next two weeks, but the amended complaint does not plead facts suggesting that defendants knew that these additional margin calls were on the way. The complaint does not, for example, plead that defendants had discussions with C-BASS's lenders prior to the conference call that should have caused them to conclude that the end was near. To be sure, the complaint pleads that defendants knew that the value of its portfolio was declining and that the decline could lead to further margin calls, but the critical question is whether C-BASS knew that its portfolio would decline in value so severely that it would cause lenders to make the overwhelming margin calls that came in during the two weeks after the conference call. The complaint does not in concrete terms provide any indication of the magnitude of the declines and corresponding margin calls that defendants should have expected, and thus it does not adequately plead that defendants knew that C-BASS was on the brink of collapse or recklessly disregarded the risk that it was. Accordingly, the amended complaint does not adequately plead that defendants knowingly or recklessly made false statements about C-BASS's liquidity.

## III. CONCLUSION

For the reasons stated, I conclude that the proposed amended complaint would not survive a motion to dismiss under the PSLRA, and that therefore granting plaintiff leave to amend would be futile. Accordingly, **IT IS ORDERED** that plaintiff's motion to file an amended complaint (Docket # 75) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for leave to file additional authority (Docket #78)  is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to correct the proposed amended complaint (Docket #80) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendants' motions to file sur-reply briefs (Docket ##92 & 96) are **GRANTED**.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter final judgment.

Dated at Milwaukee, Wisconsin, this 8th day of December, 2010.

/s_____
LYNN ADELMAN
District Judge