# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

FULTON COUNTY EMPLOYEES'
RETIREMENT SYSTEM, individually
and on behalf of all others similarly situated,
        Plaintiff,
   v.                                             Case No. 08-C-0458

MGIC INVESTMENT CORPORATION, et al.,
        Defendants.

## DECISION AND ORDER

In this securities-fraud action, plaintiff Fulton County Employees' Retirement System ("Fulton"), alleges that defendants Bruce Williams and John Draghi made fraudulent statements during a quarterly earnings conference call for MGIC Investment Corporation ("MGIC") on July 19, 2007. The statements pertained to C-BASS, a firm that was in the business of buying subprime mortgage loans, packaging them, and selling securities in the packages. Williams was the chief executive of C-BASS, and Draghi was its chief operating officer. Williams and Draghi were present and allowed to make statements during MGIC's earnings call because, at the time of the call, MGIC had a substantial investment in C-BASS. Fulton sues Williams and Draghi personally, but it also contends that MGIC and its chief executive, Curt Culver, are liable for Williams's and Draghi's allegedly fraudulent statements.

On February 18, 2010, I dismissed Fulton's original complaint after determining that it did not satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). ECF No. 74. On December 8, 2010, I denied Fulton's motion for leave to file an amended complaint and directed the clerk of court to enter final

judgment. ECF No. 104. On April 12, 2012, the Seventh Circuit affirmed these rulings. Fulton County Employees Retirement Sys, v. MGCI Inv. Corp., 675 F.3d 1047 (7th Cir. 2012). However, while Fulton's appeal was pending, Fulton obtained transcripts of testimony that Williams, Draghi, and Culver gave to the U.S. Securities and Exchange Commission ("SEC") during the SEC's investigation of the circumstances surrounding C-BASS's collapse. Fulton believes that with this testimony in hand it can draft a complaint that meets the PSLRA's pleading requirements. It has thus filed a motion for relief from final judgment pursuant to Federal Rule of Civil Procedure 60(b)(2), which I address below.

Rule 60(b)(2) provides that a court may "relieve a party . . . from a final judgment, order, or proceeding" on the basis of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." To prevail on a motion under Rule 60(b)(2), the movant must show the following:

1) the evidence was in existence at the time of trial or pertains to facts in existence at the time of trial;

2) it was discovered following trial;

3) due diligence on the part of the movant to discover the new evidence is shown or may be inferred;

4) the evidence is admissible;

5) it is credible;

6) the new evidence is material;

7) it is not merely cumulative or impeaching; and, finally,

8) the new evidence is likely to change the outcome.

2

United States v. McGaughey, 977 F.2d 1067, 1075 (7th Cir. 1992). As explained below, Fulton's new evidence is not likely to change the outcome of this case, and so I will not discuss the other seven parts of this test.

Fulton argues that the SEC transcripts allow it to satisfy the PSLRA's pleading requirements with respect to two statements: a statement by Williams about the valuation of C-BASS's assets, and a statement by Draghi about C-BASS's expected earnings for the year. The statement by Williams occurred while he was speaking about C-BASS's financial results for the second quarter of 2007. It reads:

> We continued to update our credit and prepayment models to ensure that we are comfortable with the valuation of our portfolio. . . . Our bond valuation method has not changed. Our book value approximates market value, assuming orderly transactions that are not distressed sales or liquidations. We verify this by a three way comparison of observed market prices, financing marks from our lenders and our internal calculations during our ongoing securities review. We evaluate all significant differences between book value and market value among these three valuation methods and take appropriate action as warranted.

Chester Decl. Ex. 15 at p. 4, ECF No. 62-11. Fulton contends that several excerpts from the SEC transcripts indicate that this statement was false.

First, Fulton contends that Draghi testified that C-BASS "never used" financing marks from its lenders when valuing its portfolio, and that therefore Williams's statement that C-BASS "verified" its valuation using such marks was false. However, Draghi's testimony was consistent with Williams's statement. Draghi did not testify that C-BASS never used financing marks from its lenders when valuing its portfolio. Rather, he testified that C-BASS never in its history simply adopted a lender's valuation of C-BASS's assets as the correct valuation. According to Draghi, C-BASS relied primarily on its own models and "used third party marks to try to determine . . . what was going on in the marketplace."

3

Draghi Tr. at 169, ECF No. 130-4. Draghi went on to explain that C-BASS's practice was to go though its assets one-by-one and examine any large discrepancies between a lender's valuation and C-BASS's own valuation. When a lender's valuation differed significantly from C-BASS's, C-BASS would ask the lender to justify its valuation. C-BASS would then review the lender's justification and make any appropriate changes. Id. Thus, the process that Draghi described in his testimony matched what Williams described during the earnings call: C-BASS used its own models to value its assets, and then checked that valuation against, among other things, lender valuations. If C-BASS found any "significant differences" between its valuation and a lender's valuation, C-BASS would "evaluate" the difference and take "appropriate action as warranted."

Second, Fulton notes that Draghi's testimony indicates that, as of July 19, 2007, the difference between the book value of C-BASS's assets and the value that C-BASS's lenders had placed on those assets was $250 million. The relevant testimony is the following:

> Q    Do you know what the variance between book value and lender value was as of July 19th?
> A    No.
> Q    Based on some documents we have seen, it appears it was approximately $250 million. Does that sound accurate?
> A    It sounds on the order of magnitude. . . .

Draghi Tr. at 192–93. However, even if this was the difference between book value and lender value as of July 19, it does not make anything Williams said false or misleading. Williams did not say that the book value of C-BASS's assets matched lender value. He said that C-BASS's book value approximated "market value, assuming orderly transactions that are not distressed sales or liquidations." Although Williams also said that C-BASS

4

"verified" that its book value approximated market value by comparing its book value to lender values (among other things), he did not say anything that could be reasonably construed to mean that C-BASS and its lenders agreed on the value of C-BASS's assets. Instead, he made clear that C-BASS evaluated all significant differences between book value and lender value and took appropriate action as warranted. Perhaps a difference of $250 million between book value and lender value on July 19 would have been a significant difference that would have required evaluation and appropriate action during the third quarter of 2007, but no principle of law required Williams to inform investors of that difference on July 19. Companies are allowed to take time to investigate matters before disclosing them to investors, and the securities laws do not require continuous disclosure. See Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 760–61 (7th Cir. 2007); Gallagher v. Abbott Labs., 269 F.3d 806, 808–10 (7th Cir. 2001). In making statements about the valuation of C-BASS's assets as of the end of the second quarter, Williams did not incur a duty to provide a running narrative of all the events relevant to valuation that had occurred since the start of the third quarter.[1] Accordingly, Fulton's newly discovered evidence does not create a reasonable belief that Williams's statement was false or misleading.

Draghi made his statement right after Williams made his. The part that Fulton contends was fraudulent is this:

---

[1] Fulton also contends that Draghi's testimony indicates that C-BASS had performed "stress scenarios" showing that the events that had occurred prior to July 19, 2007 could translate into between $200 million and $300 million in portfolio losses. See Br. at 15, ECF No. 130. Again, however, Williams had no duty to provide a running narrative of the events relevant to valuation that had occurred since the start of the third quarter, and so the failure to mention these scenarios was not fraudulent.

5

> For the full year, we expect pretax earnings to be between $125 and $175 million . . . . This assumes one, our credit portfolio continues to perform within our current expectations. Two, our whole loan purchase volume remains at levels and three, spreads do not widen significantly from here.

Chester Decl. Ex. 15 at p. 4, ECF No. 62-11. Throughout this case, Fulton has maintained that, as of July 19, 2007, the defendants knew that C-BASS was about to be inundated with margin calls that it could not pay, and that therefore this earnings projection was baseless. In previous orders, I found that Fulton had not pleaded facts giving rise to a reasonable belief that, as of July 19, 2007, the defendants foresaw that the $470 million in margin calls that C-BASS received between July 19 and August 2 were coming. The Seventh Circuit concurred. Fulton County, 675 F.3d at 1052. Fulton now argues that the SEC transcripts show that the defendants knew for certain that C-BASS was on the brink of collapse as of July 19, 2007. But they do not. The transcripts reveal that July was an extremely volatile time for C-BASS and that C-BASS was bracing for the possibility of further margin calls by lenders. However, nothing in the transcripts suggests that on July 19 the defendants knew for certain that the margin calls were coming or that C-BASS would be required to cease operations.

In any event, Draghi qualified his earnings projection by disclosing that the projection assumed that "spreads" would not "widen significantly." According to Fulton's proposed amended complaint, "when industry spreads widen . . . enormous margin calls will necessarily follow." Prop. Am. Compl. ¶ 98, ECF No. 130-2. Thus, Draghi informed investors that his earnings projection was based on the assumption that the market would not worsen and that C-BASS's lenders would not make significant additional margin calls. Armed with this accurate information, investors could decide for themselves how much

6

reliance to place on Draghi's projection. Investors who thought that the market would continue its downward trend and that spreads would continue to widen likely disregarded the projection entirely. Thus, there is simply no way in which Draghi's earnings projection could have misled investors.

Finally, Fulton argues that the SEC transcripts show that MGIC and Culver are liable for Williams's and Draghi's fraudulent statements. However, since I have determined that Williams and Draghi did not make any fraudulent statements in the first place, I have no need to consider whether MGIC and Culver are liable in connection with those statements.

Accordingly, **IT IS ORDERED** that plaintiff's motion for relief from judgment is **DENIED**.

Dated at Milwaukee, Wisconsin, this 3rd day of October, 2012.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge